**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 60**

**[EPA–HQ–OAR–2025–0124; FRL–12674.1–01–OAR]**

**RIN 2060–AX00**

# Rescission of the Greenhouse Gas Findings for Fossil Fuel-Fired Power Plants and Repeal of Regulations for Power Plant Greenhouse Gas Emissions Under Clean Air Act Section 111

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Supplemental notice of proposed rulemaking.

**SUMMARY:** In this action, the U.S. Environmental Protection Agency (EPA) is supplementing its proposal to repeal all greenhouse gas (GHG) emission standards for fossil fuel-fired electric generating units (EGUs) to effectuate the best reading of Clean Air Act (CAA) section 111. We propose that CAA section 111 does not authorize the EPA to regulate emissions from power plants in response to global climate change concerns. For the multiple and independent reasons described herein, this additional rationale would also require rescinding the Administrator's contrary findings and determinations in 2015 and repealing all associated 2015 and 2024 GHG standards for the fossil fuel-fired EGU source category. In a separate action published concurrently with this supplemental notice, the EPA is finalizing the repeal of certain 2024 GHG standards for the fossil fuel-fired EGU source category on distinct legal and technical grounds. We are not reopening that final rule. Nor are we soliciting further comment on those issues through this supplemental notice, except to the extent that commenters believe the final rule bears on the distinct questions of statutory authority addressed herein.

**DATES:** Comments must be received on or before November 2, 2026. Comments on the information collection provisions submitted to the Office of Management and Budget (OMB) under the Paperwork Reduction Act (PRA) are best assured of consideration by OMB if OMB receives a copy of your comments on or before October 19, 2026. Please refer to the PRA section under "Statutory and E.O. Reviews" in this preamble for specific instructions.

*Public Hearing.* The EPA will hold a virtual public hearing on October 1, 2026. Please refer to the **SUPPLEMENTARY INFORMATION** section for information on registering for the public hearing.

**ADDRESSES:** You may send comments, identified by Docket ID No. EPA–HQ–OAR–2025–0124, by any of the following methods:

- *Federal eRulemaking Portal: https://www.regulations.gov* (our preferred method) website. Follow the online instructions for submitting comments.
- *Email: a-and-r-docket@epa.gov.* Include Docket ID No. EPA–HQ–OAR–2025–0124 in the subject line of the message.
- *Mail:* U.S. Environmental Protection Agency, EPA Docket Center, Docket ID No. EPA–HQ–OAR–2025–0124, Mail Code 28221T, 1200 Pennsylvania Avenue NW, Washington, DC 20460.
- *Hand/Courier Delivery:* EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operation are 8:30 a.m. to 4:30 p.m. Eastern Time (ET), Monday through Friday (except Federal holidays).

*Instructions:* All submissions received must include the Docket ID No. for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov,* including any personal information provided. For detailed instructions on sending comments and additional information on the rulemaking process, see the **SUPPLEMENTARY INFORMATION** section of this document.

**FOR FURTHER INFORMATION CONTACT:** For information about this proposed rule, contact Ms. Lisa Thompson, Industrial Processing and Power Division (D243–02), Office of Clean Air Programs, U.S. Environmental Protection Agency, Research Triangle Park, North Carolina 27711; telephone number: (919) 541–5158 and email address: *thompson.lisa@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

*Participation in virtual public hearing.* The hearing will be held via virtual platform on October 1, 2026. The EPA will announce further details at *https://www.epa.gov/stationary-sources-air-pollution/greenhouse-gas-standards-and-guidelines-fossil-fuel-fired-power.*

The EPA will begin pre-registering speakers for the hearing no later than 1 business day after a request has been received. To register to speak at the virtual hearing, please use the online registration form available at *https://www.epa.gov/stationary-sources-air-pollution/greenhouse-gas-standards-and-guidelines-fossil-fuel-fired-power* or contact the public hearing team at (888) 372–8699 or by email at *IPPDpublichearing@epa.gov.* The last day to pre-register to speak at the hearing will be September 29, 2026. Prior to the hearing, the EPA will post a general agenda that will list pre-registered speakers at: *https://www.epa.gov/stationary-sources-air-pollution/greenhouse-gas-standards-and-guidelines-fossil-fuel-fired-power.*

The EPA will make every effort to follow the schedule as closely as possible on the day of the hearing; however, please plan for the hearings to run either ahead of schedule or behind schedule. The EPA may close a session 15 minutes after the last pre-registered speaker has testified if there are no additional speakers.

Each commenter will have 4 minutes to provide oral testimony. The EPA encourages commenters to submit a copy of their oral testimony as written comments electronically to the rulemaking docket.

The EPA may ask clarifying questions during the oral presentations but will not respond to the presentations at that time. Written statements and supporting information submitted during the comment period will be considered with the same weight as oral testimony and supporting information presented at the public hearing.

Please note that any updates made to any aspect of the hearing will be posted online at *https://www.epa.gov/stationary-sources-air-pollution/greenhouse-gas-standards-and-guidelines-fossil-fuel-fired-power.* While the EPA expects the hearing to go forward as set forth above, please monitor our website or contact the public hearing team at (888) 372–8699 or by email at *IPPDpublichearing@epa.gov* to determine if there are any updates. The EPA does not intend to publish a document in the **Federal Register** announcing updates.

If you require special accommodations such as audio description, please pre-register for the hearing with the public hearing team and describe your needs by September 24, 2026. The EPA may not be able to arrange accommodations without advanced notice.

*Docket.* The EPA established a docket for this action under Docket ID No. EPA–HQ–OAR–2025–0124. The docket lists all documents at *https://www.regulations.gov.* Although listed, some information is not publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. The EPA does not place certain other material, such as copyrighted material, on the internet; this material is publicly available only as portable document format (PDF) versions accessible only on

EPA computers in the docket office reading room. The public cannot download certain databases and physical items from the docket but may request these items by contacting the docket office at (202) 566–1744. The docket office has 10 business days to respond to such requests. With the exception of such material, publicly available docket materials are available electronically at *https://www.regulations.gov* or on EPA computers in the docket office reading room at the EPA Docket Center, WJC West Building, Room Number 3334, 1301 Constitution Ave. NW, Washington, DC. The Public Reading Room hours of operation are 8:30 a.m. to 4:30 p.m. ET, Monday through Friday (except for Federal holidays). The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the EPA Docket Center is (202) 566–1742.

*Written Comments.* Direct your comments to Docket ID No. EPA–HQ–OAR–2025–0124. Under the EPA's policy, the Agency includes all comments in the public docket without change and makes them available online at *https://www.regulations.gov,* including any personal information provided, unless a submission contains information claimed as CBI or other information for which a statute restricts disclosure. Do not submit electronically to *https://www.regulations.gov* any information that you consider to be CBI or other information for which a statute restricts disclosure. Submit such information as described in the Submitting CBI section of this preamble.

The EPA may publish any comment it receives to the public docket. A written comment must accompany any multimedia submission (*e.g.,* audio or video). The EPA considers the written comment the official comment and expects it to address all points the commenter wishes to make. The EPA will generally not consider comments or supporting materials that appear outside the primary submission (*i.e.,* on websites, cloud storage, or other file-sharing systems). For additional submission methods, the EPA's full public comment policy, information about CBI or multimedia submissions, and guidance on making effective comments, visit *https://www.epa.gov/dockets/commenting-epa-dockets.*

The *https://www.regulations.gov* website allows commenters to submit comments anonymously, which means the EPA will not know the commenter's identity or contact information unless the commenter provides it in the body of the comment. If a commenter emails a comment directly to the EPA rather than using *https://www.regulations.gov,* the EPA's system automatically captures the sender's email address, and the Agency includes that address in the public docket and makes it available online. If a commenter submits an electronic comment, the EPA recommends including the commenter's name and other contact information in the body of the comment and with any digital storage media submitted. If the EPA cannot read a comment due to technical difficulties and cannot contact the commenter for clarification, the Agency may be unable to consider the comment. Submit electronic files without special characters, encryption, defects, or viruses. For additional information about the EPA's public docket, visit the EPA Docket Center homepage at *https://www.epa.gov/dockets.*

The EPA solicits comment on numerous aspects of this proposed rule. The EPA indexes each comment solicitation with an identifier (*e.g.,* ''C–1, C–2, . . .'') to provide a consistent framework for effective, efficient commenting. Accordingly, the EPA asks commenters to include the corresponding identifier when submitting comments relevant to that solicitation. Include the identifier in a heading or within the text of each comment (*e.g.,* ''In response to C–1, . . .'') to make clear which solicitation the commenter is addressing. The EPA emphasizes that the Agency is not limiting comment to these identified areas and encourages commenters to provide any other comments relevant to this supplemental proposal.

*Submitting CBI.* Do not submit information containing CBI to the EPA through *https://www.regulations.gov.* Clearly mark the part or all the information that you claim to be CBI. For CBI information on any digital storage media that you mail to the EPA, note the docket ID, mark the outside of the digital storage media as CBI, and identify electronically within the digital storage media the specific information that is claimed as CBI. In addition to one complete version of the comments that includes information claimed as CBI, you must submit a copy of the comments that does not contain the information claimed as CBI directly to the public docket through the procedures outlined in the *Written Comments* section of this preamble. If you submit any digital storage media that does not contain CBI, mark the outside of the digital storage media clearly that it does not contain CBI and note the docket ID. Information not marked as CBI will be included in the public docket and the EPA's electronic public docket without prior notice. Information marked as CBI will not be disclosed except in accordance with procedures set forth in 40 Code of Federal Regulations (CFR) part 2.

Our preferred method to receive CBI is for it to be transmitted electronically using email attachments, File Transfer Protocol (FTP), or other online file sharing services (*e.g.,* Dropbox, OneDrive, Google Drive). Electronic submissions must be transmitted directly to the Office of Clean Air Programs (OCAP) at the email address: *ocapcbi@epa.gov* and, as described earlier in this preamble, should include clear CBI markings and note the docket ID. If assistance is needed with submitting large electronic files that exceed the file size limit for email attachments, and if you do not have your own file sharing service, please contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section of this preamble to receive instructions.

*Preamble acronyms and abbreviations.* Throughout this document the use of ''we,'' ''us,'' or ''our'' is intended to refer to the EPA. We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, the EPA defines the following terms and acronyms here:

ACE Affordable Clean Energy [rule]
BSER best system of emission reduction
CAA Clean Air Act
CCS carbon capture and sequestration/storage
$CO_2$ carbon dioxide
CPP Clean Power Plan
CPS Carbon Pollution Standards rule
EGU electric generating unit
EIA economic impact analysis
E.O. Executive Order
EPA Environmental Protection Agency
FR Federal Register
GHG greenhouse gas
GMST global mean surface temperature
GSLR global sea level rise
HAP hazardous air pollutant
HFC hydrofluorocarbons
IGCC integrated gasification combined cycle
IRA Inflation Reduction Act
NAAQS National Ambient Air Quality Standards
NPRM Notice of Proposed Rulemaking
NSPS new source performance standards
OMB Office of Management and Budget

## Table of Contents

I. General Information
A. Does this action apply to me?
B. Where can I get a copy of this document and other related information?
II. Executive Summary
A. Introduction
B. Need for Regulatory Action
III. Background

A. Statutory Authority Under CAA Section 111
B. Legislative and Regulatory History of CAA Section 111
C. Regulation of Greenhouse Gases Under CAA Section 111
D. Legislation Concerning CAA Section 111
IV. Legal Framework for Action
V. Rescission of the 2015 Findings
A. Best Reading of CAA Section 111(b)(1)(A)
B. Lack of Clear Congressional Authorization
C. Eliminating GHG Emissions From Fossil Fuel-Fired Power Plants Would Be Futile
VI. Repeal of GHG Standards of Performance for Fossil Fuel-Fired EGUs Under CAA Section 111
A. Scope of Repeal of GHG Standards of Performance
B. Impacts of Repeal of GHG Standards of Performance
VII. Requests for Comment
VIII. Statutory and E.O. Reviews
A. E.O. 12866: Regulatory Planning and Review
B. E.O. 14192: Unleashing Prosperity Through Deregulation
C. Paperwork Reduction Act (PRA)
D. Regulatory Flexibility Act (RFA)
E. Unfunded Mandates Reform Act (UMRA)
F. E.O. 13132: Federalism
G. E.O. 13175: Consultation and Coordination With Indian Tribal Governments
H. E.O. 13045: Protection of Children From Environmental Health Risks and Safety Risks
I. E.O. 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
J. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51

## I. General Information

### *A. Does this action apply to me?*

Fossil fuel-fired electric utility steam generating units and stationary combustion turbine EGUs that provide electricity to the electric grid (a utility power distribution system) comprise the source category that is subject to this action. The 2022 North American Industry Classification System (NAICS) code for the source category is 221112. The EPA does not intend this identification to be exhaustive but rather to provide a guide for readers regarding the entities that this proposed action is likely to affect.

The proposed repeal of 40 CFR part 60, subpart TTTT, once promulgated, would be applicable to stationary combustion turbines that commenced construction or modification after January 8, 2014, or reconstruction after June 18, 2014, and on or before May 23, 2023, and any steam generating unit or integrated gasification combined cycle (IGCC) facility that commenced construction after January 8, 2014, or commenced modification or reconstruction after June 18, 2014. The proposed repeal of 40 CFR part 60, subpart TTTTa, once promulgated, would be applicable to stationary combustion turbines that began construction or reconstruction after May 23, 2023, and any steam generating unit that commenced modification after May 23, 2023.

### *B. Where can I get a copy of this document and other related information?*

In addition to the docket, an electronic copy of this proposed action will be on the internet. Following signature by the Administrator, the EPA will post a copy of this proposed action at *https://www.epa.gov/stationary-sources-air-pollution/greenhouse-gas-standards-and-guidelines-fossil-fuel-fired-power.* Following publication in the **Federal Register** (FR), the EPA will post the FR version at this same website.

## II. Executive Summary

### *A. Introduction*

On June 17, 2025, the EPA published a Notice of Proposed Rulemaking (NPRM) in the **Federal Register** entitled ''Repeal of Greenhouse Gas Emissions Standards for Fossil Fuel-Fired Electric Generating Units.'' 90 FR 25752 (''June 2025 NPRM''). In that action, we proposed two independent pathways for revisiting the GHG standards of performance for the fossil fuel-fired EGU source category established in the 2015 New Source Performance Standards, 80 FR 64510 (Oct. 23, 2015) (''2015 NSPS''), and 2024 Carbon Pollution Standards, 89 FR 39798 (May 9, 2024) (''2024 CPS''). The primary pathway proposed to repeal all GHG standards of performance for fossil fuel-fired EGUs for lack of authority based on the conclusion that such power plants do not ''contribute significantly'' to air pollution that endangers public health or welfare. The alternative pathway proposed to repeal many requirements in the 2024 CPS based on a reconsideration of the best system of emission reduction (BSER) determinations supporting the requirements.

In a final rule issued concurrently with this supplemental notice, the EPA is finalizing the repeal of the majority of the 2024 CPS requirements based on a reassessment of the BSER for the relevant subcategories.[1] The EPA notes in that final rule that it is seeking additional public comment in a separate action (*i.e.,* in this supplemental notice) on the underlying question raised in the primary basis of the June 2025 NPRM: Whether the EPA lacks statutory authority to regulate GHG emissions from power plants under CAA section 111.[2]

This supplemental notice proposes additional approaches to that question in light of the Agency's intervening final action entitled ''Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act,'' 91 FR 7686 (Feb. 18, 2026) (''Endangerment Finding Rescission''). In that final rule, the EPA rescinded the Administrator's 2009 findings of endangerment and contribution, and repealed all GHG emission standards, for new motor vehicles and engines based on the conclusion that the Agency lacks statutory authority under CAA section 202(a)(1) to regulate in response to global climate change concerns. In this supplemental notice, we propose that the EPA lacks authority under CAA section 111 to regulate power plants in response to global climate change concerns for multiple, independent reasons. The approach and rationales proposed in this supplemental notice would require the same regulatory actions contemplated in the primary proposal in the June 2025 NPRM—the repeal of all fossil fuel-fired EGU GHG standards for lack of authority—but for different reasons. Whereas the primary proposal in the June 2025 NPRM sought public comment on, among other things, whether fossil fuel-fired EGUs ''contribute significantly'' to air pollution, this supplemental notice seeks public comment on the distinct question whether global climate change concerns satisfy the threshold requirement in CAA section 111(b)(1)(A) that the source category emissions contribute significantly to ''air pollution which may reasonably be anticipated to endanger public health or welfare.'' We will evaluate both proposed approaches and rationales in taking final action, as both issues—

[1] See *Partial Repeal of the Carbon Pollution Standards for Fossil Fuel-Fired Electric Generating Units,* available in Docket ID EPA–HQ–OAR–2025–0124.

[2] The EPA is not reopening or soliciting further comment on the distinct issues addressed in the contemporaneous final rule. Commenters are welcome to articulate whether and why they believe the actions and rationales adopted in the final rule are relevant to the distinct question addressed in this supplemental proposal, but the EPA generally will not respond to comments that are limited to the issues resolved in the final rule. Interested parties were invited to comment on those issues in connection with the alternative basis presented in the June 2025 NPRM and may review the EPA's summary of comments and responses thereto in the final rule preamble and associated response to comments (RTC).

contribution and endangerment—were the subject of significant interpretive and policy changes in the 2009 Endangerment Finding and the 2015 NSPS and 2024 CPS that extended the Agency's novel approach to power plant stationary sources.[3]

In 2009, the EPA took the unprecedented step of asserting authority to regulate GHG emissions in a standalone action that launched the Agency into a course of regulation that fundamentally reshaped many aspects of the Nation's economic and social life. 74 FR 66496 (Dec. 15, 2009) (''2009 Endangerment Finding'').[4] In the 2009 Endangerment Finding, we interpreted CAA section 202(a)(1) for the first time to authorize regulation of domestic emissions from new motor vehicles and engines based on global climate change concerns rather than air pollution that endangers public health or welfare through local or regional exposure. 74 FR 66526–27. We relied on that interpretation to define both the relevant ''air pollution'' and the relevant ''air pollutant'' as the combination of six ''well-mixed GHGs''—carbon dioxide ($CO_2$), methane, nitrous oxide ($N_2O$), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), and sulfur hexafluoride ($SF_6$)—while reserving the right to include additional ''climate forcers'' in these definitions in the future. 74 FR 66516–17, 66536–37.

The EPA subsequently relied on the 2009 Endangerment Finding as the foundation for a new regulatory construct that subjected an increasing number of sectors to controls in the name of addressing global climate change concerns. In 2015, we extended the GHG initiative to power plant stationary sources regulated under CAA section 111 by promulgating GHG emissions standards for new, modified, and reconstructed fossil fuel-fired EGUs in the 2015 NSPS, 80 FR 64510, and GHG emission guidelines for existing fossil fuel-fired EGUs, 80 FR 64662 (''Clean Power Plan'' or ''2015 CPP'').[5] In these related actions, we applied the expansive reading of CAA section 202(a)(1) adopted in the 2009 Endangerment Finding to conclude for the first time that a source category could be subject to additional regulatory controls under CAA section 111 based on global climate change concerns. We also made a finding in the alternative, again relying on the 2009 Endangerment Finding, that global GHG concentrations in the atmosphere constitute air pollution that endangers public health and welfare and that GHG emissions from power plants cause or contribute significantly to that air pollution. After the Supreme Court largely vacated these regulatory efforts in *West Virginia* v. *EPA,* 597 U.S. 697 (2022), we responded by promulgating more stringent GHG standards for new sources and reissuing emission guidelines for existing sources in the 2024 CPS. Meanwhile, global GHG concentrations in the upper atmosphere have continued to rise, driven primarily by increased emissions from foreign sources,[6] all without producing the degree of adverse impacts to public health and welfare in the U.S. anticipated in the 2009 Endangerment Finding and 2015 NSPS and 2015 CPP.

Upon further review, and in light of subsequent developments since 2009 and 2015, the EPA is seeking further public comment on its statutory authority to regulate GHG emissions from fossil fuel-fired EGUs in response to global climate change concerns. The Supreme Court has significantly clarified the limits on the EPA's authority in recent years, including in *West Virginia, Utility Air Regulatory Group* v. *EPA,* 573 U.S. 302 (2014) (''*UARG*''), and *Michigan* v. *EPA,* 576 U.S. 743 (2015), and made clear in *Loper Bright Enterprises* v. *Raimondo,* 603 U.S. 369 (2024), that Federal agencies can no longer rely on statutory silence or ambiguity to expand regulatory power. The EPA recently considered these issues in the Endangerment Finding Rescission, in which we concluded that CAA section 202(a)(1) is best read as authorizing regulation of air pollution that threatens health and welfare through local and regional exposure and does not authorize regulation in the name of global climate change concerns. We further concluded that Congress had not provided the requisite clear authorization for our GHG emissions program under CAA section 202(a)(1), which had resulted in an unprecedented expansion of regulatory power with adverse effects on the economy and American households. And we concluded that attempting to address global climate change through regulation under CAA section 202(a)(1) was futile based on modeling showing that new motor vehicle and engine GHG emission standards would have no more than a *de minimis* impact on key indicators of the health and welfare concerns animating regulation. We thus rescinded the 2009 Endangerment Finding and repealed all associated GHG emission standards to ensure that the EPA exercised ''only those powers given to [it] by Congress''[7] and to follow ''the best reading of the statute,'' which is fixed at the time of enactment.[8]

Informed by these conclusions, the EPA in this supplemental proposal seeks additional public comment on the Agency's statutory authority to regulate GHG emissions from power plants. We propose that the text, structure, and history of CAA section 111, the applicability and implications of the major questions doctrine, and the futility of power plant GHG standards in relation to the unique and global scale of the underlying problem similarly support the conclusion that the EPA lacks authority to impose additional controls on power plants in response to global climate change concerns under the statutory standard for regulation.

The remainder of this section describes the need for regulatory action and the scope of this proposed action. These interests emphasize the need for urgent action to avoid further expenditures in reliance on a potentially unlawful regulatory framework that may not further public health or welfare in any material respect relevant to the global climate change concerns identified and relied upon by the EPA since 2015.

Section III of this preamble sets out relevant background, including the EPA's statutory authority under CAA section 111, our historical approach to regulating emissions from new and existing stationary sources, our changes in position with respect to regulating in response to global climate change

[3] The EPA is not soliciting further comment on the primary proposal in the June 2025 NPRM. Commenters are welcome to articulate whether and why they believe the distinct rationales presented in this supplemental proposal are or are not preferable to the rationale presented in the June 2025 NPRM, but the EPA generally will not respond to comments that are limited to the primary proposal in the June 2025 NPRM. Interested parties were invited to comment on those issues in connection with the primary proposal in the June 2025 NPRM, and the Agency will address such comments as appropriate in a forthcoming final rule addressing the rationales presented in both the primary proposal in the June 2025 NPRM and this supplemental proposal.

[4] *See also* ''Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act: EPA's Response to Public Comments'' (''EF RTC''), available in a Memorandum to Docket entitled ''EPA's Response to Public Comments on the 2009 Endangerment and Cause or Contribute Findings for Greenhouse Gases: Volumes 1–11,'' Document ID EPA–HQ–OAR–2025–0194–31053.

[5] References to ''GHG standards'' here and elsewhere include new source performance standards (NSPS) promulgated under CAA section 111(b) and emission guidelines for existing sources promulgated under CAA section 111(d). *See* 42 U.S.C. 7411(b), (d).

[6] Crippa, M. et al. (2023). GHG emissions of all world countries. *Publications Office of the European Union: https://doi.org/10.2760/953322.*

[7] 91 FR 7686, 7688 (Feb. 18, 2026) (quoting *West Virginia,* 597 U.S. at 723).

[8] *Id.* (quoting *Loper Bright,* 603 U.S. at 400–01).

concerns in 2009 and 2015, as well as relevant litigation, and our recent reconsideration and rescission of the 2009 Endangerment Finding.

Section IV of this preamble describes our legal authority for the proposed rescissions and repeals of the 2015 NSPS, 2024 CPS, and any underlying listings, findings, and determinations with respect to GHG emissions from fossil fuel fired-EGUs under CAA section 111. We propose that CAA section 111 authorizes these proposed actions, together with agencies' authority to revise or rescind prior actions by acknowledging the change, providing a reasonable explanation, and considering legitimate reliance interests. In the June 2025 NPRM, we acknowledged that our prior decisions to regulate GHG emissions from fossil fuel-fired EGUs have caused significant expenditure of resources by Federal, State, local, and private-sector entities and solicited comment on any legitimate reliance interests relevant to the proposed rescissions and repeals. In this supplemental proposal, we solicit comment on whether the additional bases set out in this supplemental proposal implicate distinct reliance interests and how the EPA should consider such interests consistent with applicable legal principles and limits on our statutory authority.

Section V.A of this preamble discusses the EPA's additional statutory interpretation rationale for the proposed rescissions and repeals. First, we propose that EPA lacks authority to retain these standards under CAA section 111(b)(1)(A), which subjects a source category's emissions to regulation when the Administrator determines that the source category causes or contributes significantly to ''air pollution which may reasonably be anticipated to endanger public health or welfare.'' Specifically, we propose that ''air pollution'' is best read as that which itself threatens health or welfare through local or regional exposure, consistent with the ordinary meaning of the term at the time of enactment, the surrounding language of the provision, the statute's structure and amendment history, and the EPA's longstanding practice prior to 2015. For these reasons, we propose that the 2015 NSPS and 2024 CPS erred in listing and regulating fossil fuel-fired EGUs based on global climate change concerns that fall outside the scope of ''air pollution'' within the meaning of the CAA section 111. Second, we propose that additional flaws in the Agency's findings and determinations in the 2015 NSPS, as endorsed by the 2024 CPS, render them independently unlawful and reinforce the proposed conclusions previously discussed. These flaws include the effective listing of a new source category without undertaking a new listing under CAA section 111(b)(1)(A) and reliance on the flawed 2009 Endangerment Finding.

Section V.B discusses the EPA's major questions doctrine rationale for the proposed rescissions and repeals. We propose that, consistent with the Supreme Court's decision in *West Virginia,* the major questions doctrine applies to the Agency's economically and politically significant assertion of authority to regulate power plant emissions based on global climate change concerns. We further propose that Congress did not clearly authorize the EPA to regulate power plants in response to global climate change concerns when it enacted the standard for regulation in CAA section 111(b)(1)(A) and authorized the Administrator to determine whether emissions satisfy that standard. That is, Congress did not clearly provide that global climate change concerns may trigger regulation under CAA section 111(b)(1)(A) and therefore did not clearly authorize the Administrator to invoke that standard to subject power plant emissions to additional regulatory controls commensurate with the unique and global nature of the problem. Rather, we propose that the appropriate policy response to global climate change concerns is a decision vested in Congress, and that Congress did not decide that the Nation's policy response to these concerns would include regulating power plants when it enacted CAA section 111.

Section V.C discusses the EPA's proposed futility rationale for the proposed rescissions and repeals. In developing this supplemental proposal, the Agency used generally accepted models to estimate the impacts on global mean surface temperature (GMST) and global sea level rise (GSLR) of eliminating all GHG emissions from the U.S. power sector as an overly conservative proxy for the potential impacts of GHG emission restrictions under CAA section 111. The EPA proposes that the results of this modeling demonstrate that even the complete elimination of GHG emissions from the U.S. power sector, and at minimum, any plausible reduction in GHG emissions from the U.S. power sector that could result from application of CAA section 111, would have no more than *de minimis* impacts on the key indicators of adverse impacts attributed to global climate change. On this basis, the EPA proposes that the futility of regulation supports the conclusion that global climate change concerns cannot satisfy the prerequisite for imposing regulatory controls under CAA section 111. The EPA further propose that the inability of GHG standards to address global climate change supports the conclusion that GHG emissions from fossil fuel-fired EGUs do not ''contribute significantly'' to air pollution. Finally, the EPA proposes that retaining futile GHG standards for fossil fuel-fired EGUs under CAA section 111 would be unreasonable given the significant costs they impose on regulated parties, consumers, and the economy.

Section VI of this preamble discusses the proposed repeals of all GHG regulations for fossil fuel-fired EGUs under CAA section 111, including the relationship of these repeals to distinct regulatory programs and Federal preemption. We propose that absent emissions satisfying the statutory prerequisite for regulation under CAA section 111(b)(1)(A), the EPA must fully repeal the 2015 NSPS and 2024 CPS, which listed (and retained) a combined source category of fossil fuel-fired EGUs for the purpose of regulating GHG emissions. We explain that these repeals would not disturb criteria-pollutant standards or other requirements applicable to power plants currently listed in the fossil fuel-fired EGU source category. Nor would returning to the pre-2015 status quo alter the CAA's displacement of Federal common law or the CAA's preemptive force with respect to State law.

Section VII of this preamble specifically requests comment on key aspects of this supplemental notice and indexes comment solicitation to promote public participation and facilitate our review of public comments. The EPA is not limiting public participation to the issues raised in this section and will respond to all significant comments within the scope of this supplemental proposal. Rather, we are highlighting aspects of this supplemental proposal for which public input would be particularly helpful in determining whether to finalize the additional rationales proposed in this supplemental notice.

### *B. Need for Regulatory Action*

Immediately upon taking office in 2025, President Trump established as the policy of the United States new Executive Branch priorities for energy, transportation, and consumer choice and committed agencies to ensuring regulations remain within constitutional and statutory bounds.

On January 20, 2025, President Trump issued Executive Order (E.O.) 14154,

"Unleashing American Energy." [9] In that E.O., the President established that it is "the policy of the United States to ensure that all regulatory requirements related to energy are grounded in clearly applicable law," [10] and directed Federal agencies, including the EPA, to review existing regulations "to identify those agency actions that impose an undue burden on the identification, development, or use of domestic energy resources—with particular attention to oil, natural gas, coal, hydropower, biofuels, critical mineral, and nuclear energy resources." [11] The President also directed the Administrator to submit recommendations to the Director of the Office of Management and Budget (OMB) on the legality and continuing applicability of the 2009 Endangerment Finding.[12]

On February 19, 2025, President Trump issued E.O. 14219, "Ensuring Lawful Governance and Implementing the President's 'Department of Government Efficiency' Deregulatory Initiative." [13] This E.O. established a national policy requiring agencies, including the EPA, to "focus the executive branch's limited enforcement resources on regulations squarely authorized by constitutional Federal statutes" and to "initiate a process to review all regulations subject to their sole or joint jurisdiction for consistency with law and Administration policy." [14] Among other things, the E.O. instructed agencies to identify regulations that are based on anything other than the best reading of the underlying statutory authority or prohibition and regulations that implicate matters of social, political, or economic significance that are not authorized by clear statutory authority. In the course of this review, the EPA identified GHG standards for power plants as regulations that may be based on interpretations that are inconsistent with the best reading of CAA section 111 and address a significant issue without clear statutory authorization.

On April 8, 2025, President Trump issued E.O. 14261, "Reinvigorating America's Beautiful Clean Coal Industry and Amending Executive Order 14241." [15] This E.O. states that "coal is essential to our national and economic security" and establishes "a national priority to support the domestic coal industry by removing Federal regulatory barriers that undermine coal production." [16] The E.O. finds that "coal resources will be critical to meeting the rise in electricity demand due to the resurgence of domestic manufacturing and the construction of artificial intelligence data processing centers" and to increasing "energy supply," lowering "electricity costs," stabilizing the power grid, creating "high paying jobs," supporting "burgeoning industries," and assisting allies abroad.[17] Accordingly, the E.O. directs the EPA, among other Federal agencies, to identify regulatory actions that seek to transition the Nation away from coal production and electricity generation and consider revising or rescinding such actions consistent with applicable law.[18]

Upon confirmation by the Senate, Administrator Lee Zeldin committed the EPA to prioritizing its core statutory missions and ensuring that all regulatory actions are clearly grounded in statutory authority and the best reading of the law. As part of these efforts, and consistent with E.O. 14154, E.O. 14219, and E.O. 14261, the Administrator initiated a review of the 2009 Endangerment Finding and related regulations bearing on the energy sector, including power plant GHG emission standards. On February 19, 2025, the Administrator submitted a memorandum to the OMB Director recommending that the EPA reconsider the 2009 Endangerment Finding to address legal and scientific developments that appeared to undermine the bases for that action and subsequent regulations. The Administrator noted that recent Supreme Court decisions, including *Loper Bright, West Virginia, UARG,* and *Michigan,* provided further instruction as to how we should interpret and apply the statutes Congress entrusted us to administer. The Administrator further noted that the 2009 Endangerment Finding recognized significant uncertainties in its conclusions and assumptions that should be evaluated in light of more recent empirical data and scientific evidence. Accordingly, the Administrator announced on March 12, 2025, that the EPA would reconsider the 2009 Endangerment Finding and subsequent regulations under CAA section 202(a)(1) to determine whether our GHG regulations have an adequate statutory basis and to seek public input on developments since 2009.[19] That same day, the Administrator announced that the EPA would initiate a rulemaking to reconsider our GHG emission standards for power plants under CAA section 111.[20]

In June 2025, the EPA completed its initial review of GHG emission standards for power plants under CAA section 111. Based on a reassessment of the legal and technical conclusions in the 2015 NSPS and 2024 CPS, we sought public comment in the June 2025 NPRM on a primary proposal and an alternative proposal.[21] The primary proposal involved repealing all GHG emissions standards for new and existing sources in the fossil fuel-fired EGU source category. Specifically, we proposed to determine that CAA section 111 requires the Agency to make a finding that GHG emissions from fossil fuel-fired power plants "cause[ ], or contribute significantly" to "air pollution which may reasonably be anticipated to endanger public health or welfare" (which we shorthanded as "dangerous air pollution") as a predicate to regulating GHG emissions from those power plants. We further proposed to find that GHG emissions from fossil fuel-fired power plants do not contribute significantly to dangerous air pollution. The alternative proposal was based on the EPA's reexamination of the BSER determinations and associated requirements for fossil fuel-fired power plants in the 2024 CPS. Specifically, we proposed to repeal requirements in the 2024 CPS predicated on the Agency's prior determinations that 90 percent carbon capture and storage (CCS) and/or 40 percent natural gas co-firing were BSER for the relevant subcategories.

In August 2025, the EPA completed its initial review of GHG emission standards for new motor vehicles and engines under CAA section 202(a)(1). Based on substantial concerns with the legal and scientific underpinnings of these regulations and the associated findings, we proposed to rescind the 2009 Endangerment Finding and repeal associated GHG emission standards on several alternative legal, policy, and scientific bases.

In February 2026, the EPA took final action to rescind the 2009

[9] 90 FR 8353 (Jan. 29, 2025).

[10] *Id.* section 2.

[11] *Id.* section 3(a).

[12] *Id.* section 6(f).

[13] 90 FR 10583 (Feb. 25, 2025).

[14] *Id.* sections 1, 2.

[15] 90 FR 15517 (Apr. 14, 2025).

[16] *Id.* section 2.

[17] *Id.* section 1.

[18] *Id.* section 6(a)–(b).

[19] Memorandum from Lee Zeldin, Administrator, U.S. Environmental Protection Agency, to Russell Vought, Director, Office of Management and Budget (Feb. 19, 2025) (Feb. 19, 2025 Memo), Docket ID No, EPA–HQ–OAR–2025–0194–0059.

[20] Trump EPA Announces Reconsideration of Biden-Harris Rule, "Clean Power Plan 2.0," That Prioritized Shutting Down Power Plants While Raising Costs on American Families (Mar. 12, 2025), *available at https://www.epa.gov/newsreleases/trump-epa-announces-reconsideration-biden-harris-rule-clean-power-plan-20-prioritized.*

[21] 90 FR 25752 (June 17, 2025).

Endangerment Finding and repeal associated GHG emission standards for new motor vehicles and engines under CAA section 202(a)(1). We concluded in the Endangerment Finding Rescission that the EPA lacks statutory authority under CAA section 202(a)(1) to regulate in response to global climate change concerns for the legal reasons discussed at proposal. Specifically, we concluded that global climate change concerns associated with GHG emissions are not "air pollution which may reasonably be anticipated to endanger public health or welfare" within the meaning of CAA section 202(a)(1), that Congress had not clearly authorized such an economically and politically significant assertion of authority, and that the futility of emission standards further supported the rescission and repeals in multiple respects.

In today's actions, the EPA is returning to the issues raised in the June 2025 NPRM regarding our statutory authority to regulate GHG emissions from power plants under CAA section 111. Concurrently with this supplemental notice, the EPA is taking final action to repeal most of the provisions of the 2024 CPS based on a record-focused reevaluation of the BSER determinations for the relevant subcategories. That concurrent final rule repeals the associated aspects of the 2024 CPS, consistent with the alternative proposal in the June 2025 NPRM, while taking no action on the primary proposal in the June 2025 NPRM. The EPA responded to comments received on the alternative proposal in the RTC for the final rule. The EPA is not reopening the record for the final rule in this supplemental notice and is not seeking further public comment on the record-based considerations addressed in the final rule.

This supplemental proposal seeks public comment on the question whether the EPA lacks authority under CAA section 111 to regulate GHG emissions from power plants in response to global climate change concerns given CAA section 111(b)(1)(A)'s predicate requirement that their emissions contribute significantly to "air pollution which may reasonably be anticipated to endanger public health or welfare." The rationale proposed in this supplemental notice is distinct from the rationale presented in the primary proposal of the June 2025 NPRM, which sought public comment on whether the EPA has authority to regulate GHG emissions from power plants based on the significance of the fossil fuel-fired EGU source category's contribution. The EPA is not seeking additional comment on the primary proposal in the June 2025 NPRM in this supplemental notice. Rather, we are rather soliciting public comment on distinct statutory authority rationales in light of the Endangerment Finding Rescission: the best reading of CAA section 111 with respect to fossil fuel-fired EGUs; the applicability and implications of the major questions doctrine; the futility of GHG emission standards for power plants in addressing global climate change concerns; and several additional issues, including the ongoing validity of the Agency's endangerment and significant contribution findings in the alternative in the 2015 NSPS, as reaffirmed in the 2024 CPS. In contrast to the record-based issues related to BSER determinations addressed in the concurrent final rule, this supplemental proposal analyzes the text and structure of the CAA to ascertain its best reading, bolstered by statutory and legislative history and the body of regulatory history relevant to the scope of the Agency's legal authority, including all aspects of the 2015 NSPS, the vacated 2015 CPP, and the 2024 CPS, as well as regulatory actions that predated the Agency's 2015 changes in position. This information is relevant to how the statute has been applied and, for major questions doctrine purposes, to the permissibility of the scope of the authority we first asserted in 2015.

Should the EPA finalize its proposed conclusion that the Agency lacks statutory authority to regulate GHG emissions from power plants based on global climate change concerns under the statutory standard for regulation in CAA section 111(b)(1)(A), that final action would remove the legal basis for all prior actions taken under CAA section 111 to regulate GHG emissions from these sources in response to global climate change. This conclusion would require the EPA to rescind its findings and determinations in the 2015 NSPS and repeal all GHG regulations and requirements for power plants under CAA section 111, including those in the 2015 NSPS and those in the 2024 CPS that are not being repealed on other grounds in the concurrent final rule. With respect to the aspects of the 2024 CPS being repealed on other grounds in the concurrent final rule, this conclusion would independently reinforce the basis for repeal based on a lack of statutory authority.[22]

## III. Background

This section discusses the EPA's statutory authority under CAA section 111, relevant statutory, legislative, and regulatory history, and the Agency's prior changes in position with respect to the regulation of GHGs under CAA section 111.

### *A. Statutory Authority Under CAA Section 111*

CAA section 111 authorizes the EPA to list and regulate a category of stationary sources if the Administrator, "in his judgment," finds that it "causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare."[23] The listing of a source category triggers the Agency's authority to promulgate "standards of performance" for new sources and, under limited circumstances, to prescribe regulations under which States submit plans that establish standards of performance for existing sources.[24]

#### 1. Regulation of Emissions From New Sources

CAA section 111(b)(1)(A) authorizes the Administrator to publish, and from time-to-time revise, a list of categories of stationary sources that the Administrator, "in his judgment," finds "causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." Once the EPA lists a source category under CAA section 111(b)(1)(A), the EPA must, under CAA section 111(b)(1)(B), establish "standards of performance" for "new sources" in the source category. These standards are referred to as new source performance standards, or NSPS. The NSPS are national requirements that apply directly to new sources within the relevant source category.

As discussed later in this section, Congress enacted the NSPS regulatory scheme to work together with the geography-based national ambient air quality standards (NAAQS) program in CAA sections 107–110. Similar to national emission standards for hazardous air pollutants (NESHAPs) that limit emissions of hazardous air pollutants (HAPs) listed and regulated

[22] Because the Supreme Court invalidated the 2015 CPP in *West Virginia* by reversing the D.C. Circuit's vacatur of the EPA's subsequent repeal of the 2015 CPP, any similar findings or determinations in the 2015 CPP are no longer in effect. 597 U.S. 697; *see Am. Lung Ass'n* v. *EPA*, No. 19–1140, Order (D.C. Cir. Oct. 27, 2022). Nevertheless, as with the concurrently repealed aspects of the 2024 CPS, finalizing that the EPA lacks statutory authority to regulate GHG emissions from power plants in response to global climate change would necessarily contradict and invalidate any such findings or determinations in the 2015 CPP.

[23] 42 U.S.C. 7411(b)(1)(A).

[24] 42 U.S.C. 7411(b), (d).

under CAA section 112, NSPS under CAA section 111 apply to a new source regardless whether the area in which the new source is located is attaining the NAAQS (and therefore subject to limited NAAQS-related restrictions) or not attaining the NAAQS (and therefore subject to additional NAAQS-related restrictions). Accordingly, CAA section 111(a)(2) defines a ''new source'' as ''any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section, which will be applicable to such source.''

CAA section 111(a)(1) defines ''standard of performance'' as ''a standard for emissions of air pollutants'' that must be promulgated or revised in a specified manner. When the EPA establishes or revises a standard of performance, CAA section 111(a)(1) provides that such standard must ''reflect[ ] the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.'' Thus, the term ''standard of performance'' as used in CAA section 111 makes clear that the foundation for the regulatory requirements for the source category is the EPA's determination of the ''best system of emission reduction'' (BSER) that is ''adequately demonstrated'' for emissions of the relevant air pollutants.[25] The EPA has discretion in determining the BSER, and has historically followed a ''technology-based approach'' that focuses on ''measures that improve the pollution performance of individual sources,'' such as ''add-on controls.''[26]

After determining the BSER, the EPA derives the ''degree of emission limitation achievable'' through application of the BSER. A standard of performance is ''achievable'' if a technology can reasonably be projected to be available to an individual source at the time it is constructed so as to allow it to meet the standard.[27] The EPA must then, under CAA section 111(b)(1)(B), promulgate ''standard[s] for emissions''—the NSPS—that reflect that level of stringency. The EPA may determine that different sets of sources have different characteristics relevant for determining the BSER for emissions of the relevant air pollutants and may subcategorize sources accordingly.[28]

2. Regulation of Emissions From Existing Sources

The EPA has generally used CAA section 111 to establish NSPS for emissions of specified air pollutants from new sources within a category. In the rare instances in which the new stationary source standards concern air pollutant emissions that are not regulated under the NAAQS program pursuant to CAA sections 108–110, or the NESHAP program pursuant to CAA section 112, the statute provides a separate authority for addressing such emissions from existing sources in the source category.[29]

In contrast to the national regime for new sources under CAA section 111(b), CAA section 111(d) establishes a framework of ''cooperative federalism for the regulation of existing sources.''[30] CAA section 111(d)(1) provides that when air pollutants covered by an NSPS for a source category are not already encompassed within the NAAQS program or NESHAP program, the EPA ''shall prescribe regulations which shall establish a procedure similar to that provided by'' CAA section 110 ''under which each State shall submit to the Administrator'' a plan for addressing emissions of such air pollutants by existing sources within such source category.[31] Reference to CAA section 110 incorporates the statute's provision for State submission and EPA review of state implementation plans (SIPs) that provide for the implementation, maintenance, and enforcement of the NAAQS for the areas within such State.[32] In a comparable manner, State plans required by the regulations authorized in CAA section 111(d) must ''establis[h] standards of performance for any existing source'' for the air pollutant emissions at issue and ''provid[e] for the implementation and enforcement of such standards of performance.''

In the relatively few instances in which the EPA applies this provision, the Agency generally promulgates regulations, termed ''emission guidelines,'' that identify the BSER and the degree of emission limitation achievable through the application of the BSER. These regulations then require States to establish standards of performance for emissions of the air pollutant at issue by covered sources that reflect that level of stringency. Once the EPA approves a State's plan, its provisions become federally enforceable in the same manner as the provisions of an approved SIP under the CAA.[33] If a State does not submit a plan or the EPA does not find a State's submission ''satisfactory,'' the Agency is authorized to issue a Federal plan imposing standards of performance for the State's existing sources.[34]

*B. Statutory and Regulatory History of CAA Section 111*

Congress enacted CAA section 111 in the 1970 CAA Amendments as part of title I of Act, which ''establishes three main regulatory programs to control air pollution from stationary sources such as power plants.''[35] In enacting CAA section 111 in 1970 and revising key language in the 1977 CAA Amendments and 1990 CAA Amendments, Congress addressed its requirements as part of a comprehensive scheme including the NAAQS program under CAA sections 107–110 and the NESHAP program under CAA section 112. This subsection discusses the statutory history of CAA section 111, the relation of CAA section 111 to the other provisions of title I, and regulatory history that reflects the EPA's contemporary understanding of the statute as informed by Congress's amendments to key statutory language.

1. 1970 CAA Amendments and Subsequent Regulations

Congress enacted CAA section 111 in 1970 as one of three related provisions directing the EPA to regulate emissions from stationary sources. The first—CAA sections 107 through 110—addressed what are commonly referred to as criteria pollutants, which are pollutants, ''the presence of which in the ambient air results from numerous or diverse mobile or stationary sources'' and are determined to have ''an adverse effect on public health or welfare.''[36] Under

[25] *West Virginia,* 597 U.S. at 709.

[26] *See id.* at 727 (quoting the 2015 CPP).

[27] *Portland Cement Ass'n* v. *Ruckelshaus*, 486 F.2d 375, 391 (D.C. Cir. 1973).

[28] 42 U.S.C. 7411(b)(2).

[29] 42 U.S.C. 7411(d)(1)(A)(i)–(ii); *see West Virginia,* 597 U.S. at 710 (''Section 111(d) thus 'operates as a gap-filler,' empowering EPA to regulate harmful emissions not already controlled under the Agency's other authorities . . . . Reflecting the ancillary nature of Section 111(d), EPA has used it only a handful of times since the enactment of the statute in 1970.'').

[30] *Am. Lung Ass'n* v. *EPA*, 985 F.3d 914, 931 (D.C. Cir. 2021), *rev'd in part sub nom. West Virginia,* 597 U.S. 697.

[31] 42 U.S.C. 7411(d)(1). CAA section 111(a)(6) defines an ''existing source'' as ''any stationary source other than a new source.'' 42 U.S.C. 7411(a)(6).

[32] 42 U.S.C. 7410.

[33] 42 U.S.C. 7411(d)(2)(B).

[34] 42 U.S.C. 7411(d)(2)(A).

[35] *West Virginia,* 597 U.S. at 707.

[36] CAA Amendments of 1970, Public Law 91–604, 84 Stat. 1676, 1678. Congress subsequently

Continued

these provisions, the Federal government would develop air quality criteria on the health and welfare impacts of criteria pollutants and promulgate numeric standards—the NAAQS—representing the ambient concentrations of such pollutants in the air of a particular area that are adequately protective. States would have primary responsibility for assuring air quality within their geographic area by developing and submitting SIPs for ''implementation, maintenance, and enforcement'' of the NAAQS to the Federal government for review and approval. These plans would include ''emission limitations, schedules, and timetables for compliance . . . and such other measures as may be necessary to insure attainment and maintenance'' of the NAAQS.[37]

The second prong was CAA section 112, which addressed particularly dangerous pollutants—HAPs—through the establishment of NESHAPs at a level that ''provides an ample margin of safety to protect the public health.'' [38] All new or modified sources of any HAP would be required to meet these emission standards unless, for example, an existing source obtained a waiver or presidential exemption.

The third prong was CAA section 111, which addressed air pollutant emissions on a source category basis. Under CAA section 111(b), as enacted in 1970, the EPA would list source categories which ''contribute significantly to air pollution which causes or contributes to the endangerment of public health or welfare'' and then establish ''standards of performance'' for new sources in the listed category.[39] The relevant Committee Report explained that the provision would apply to ''[m]ajor new facilities such as electric generating plants, kraft pulp mills, petroleum refineries, steel mills, primary smelting plants, and various other commercial and industrial operations'' along with ''any other categories of major stationary sources from which emissions would cause or contribute to endangerment of public health and welfare.'' [40] The legislation's Senate sponsor, Senator Edmund Muskie, explained that CAA section 111 was designed to apply across the country to level the playing field among States, thereby avoiding '''shopping around' for open sites'' in areas that were subject to fewer local restrictions under the NAAQS program.[41] In this way, the national standards for new sources would reduce an incentive to shift operations from nonattainment areas required to improve air quality to attainment areas that already had acceptable air quality that should be maintained. For existing sources in a listed source category, CAA section 111(d) set out procedures for the establishment of federally enforceable ''emission standards'' of any pollutant not otherwise controlled under the CAA's NAAQS provisions or CAA section 112.

These provisions grew out of different bills adopted by the House and Senate and reconciled by a conference committee to create what became CAA sections 107–112. The relevant committees and bill sponsors drafted these provisions to address contemporary air pollution problems causing or threatening harm through exposure at the local and regional level.[42] These included the criteria pollutants addressed by what became CAA sections 107–110; [43] various ''hazardous,'' [44] ''extremely hazardous'' [45] or ''extra-hazardous'' [46] air pollutants, which were subject to what became CAA section 112; and ''selected air pollution agents,'' which could also be criteria pollutants and were subject to what became CAA section 111.[47] The Senate Report described the air pollutants subject to the language later adopted at conference as CAA section 111 as ''agents which are not emitted in such quantities or are not of such a character as to be widely present or readily detectable on a continuous basis with available technology in the ambient air'' and specified that ''[t]he presence of these agents is generally confined, at least for detection purposes, to the area of the emission source.'' [48] The Senate Report further specified that ''[t]he information available at this time indicates that the following list of substances are most likely to be considered as the agents to be covered under this section: Arsenic, chlorine gas, hydrogen chloride, copper, manganese, nickel, vanadium, zinc, barium, boron, chromium, selenium, pesticides, [and] radioactive substances.'' [49]

In response to the 1970 CAA Amendments, the EPA began listing source categories under CAA section 111(b)(1)(A) and promulgating standards of performance under CAA section 111(b)(1)(B). Between 1970 and 1977, the EPA listed at least 31 source categories in brief notices that did not solicit public comment.[50] In 1975, EPA published regulations that established the process for promulgating standards of performance for new sources and emission guidelines for existing sources [51] and established requirements for modified and reconstructed sources.[52] By 1977, the EPA generally proposed standards of performance for a source category at the same time as the listing and discussed the basis for the listing in the preamble to the proposed standards, including the amount of emissions of relevant air pollutants from the source category.[53]

### 2. 1977 CAA Amendments and Subsequent Regulations

Congress revisited the CAA in 1977 to address growing concerns related to the energy and environmental impacts of the 1973 oil embargo and resolve issues associated with implementing the statutory programs enacted in 1970.[54] The EPA advised relevant committees at

amended the ''adverse effect'' criterion in CAA section 108(a)(1)(A) to refer to pollutants ''which may reasonably be anticipated to endanger public health or welfare,'' 42 U.S.C. 7408(a)(1)(A), and deliberately added identical phrasing to statutory provisions granting the EPA authority to regulate particular sources under certain conditions, *see, e.g.,* 42 U.S.C. 7411(b)(1)(A) (stationary sources), 7521(a)(1) (new motor vehicles and new motor vehicle engines).

[37] CAA Amendments of 1970, 84 Stat. at 1680.

[38] *Id.* at 1685.

[39] *Id.* at 1684.

[40] S. Rep. No. 91–1196, at 16 (1970). The Committee Report added ''New stationary sources which the administration has advised the committee to expect would be subject to the provisions of this section include'' 19 industries, ranging from ''[c]ement manufacturing'' and ''[c]oal cleaning operations'' to ''[m]unicipal incinerators'' and ''[s]team electric powerplants.'' *Id.*

[41] 91 Cong. Rec. 32902 (Sept. 21, 1970) (statement of Sen. Muskie, during the Senate debate on S. 4358).

[42] *See* S. Rep. No. 91–1196, at 18 (1970) (describing the various sets of air pollutants subject to the stationary source provisions of the Senate bill).

[43] Prior to 1970, the Secretary of Health, Education, and Welfare issued air quality criteria under an earlier version of the CAA for $SO_2$, PM, CO, ozone (photochemical oxidants), and hydrocarbons. *See, e.g.,* 36 FR 1502 (Jan. 30, 1971) (citing 35 FR 4768 and 34 FR 1988). Congress anticipated that these pollutants, along with certain precursors, would be the foundation of the NAAQS program for criteria pollutants under CAA sections 107–110. *See, e.g.,* 91 Cong. Rec. 32902 (Sept. 21, 1970) (Exhibit II to statement of Sen. Boggs during the Senate debate on S. 4358).

[44] S. 4358, 91st Cong. section 6 (1970).

[45] H.R. 17255, 91st Cong. section 5 (1970).

[46] H.R. Rep. No. 1146, at 3 (1970).

[47] S. Rep. No. 91–1196, at 93–94 (1970).

[48] S. Rep. No. 91–1196, at 18 (1970).

[49] *Id.*

[50] *See, e.g.,* 36 FR 5931 (Mar. 31, 1971) (first five source categories, including steam-fired EGUs); 42 FR 22510 (May 3, 1977) (listing lime manufacturing).

[51] 40 FR 53340 (Nov. 17, 1975).

[52] 40 FR 58416 (Dec. 16, 1975).

[53] *See, e.g.,* 42 FR 22510 (May 3, 1977) (listing lime manufacturing); 42 FR 22506 (May 3, 1977) (proposing standards for lime manufacturing and explaining that ''[l]ime manufacturing plants have been shown to be a significant source of particulate matter emissions'').

[54] CAA Amendments of 1977, Public Law 95–95, 91 Stat. 685.

the time that increased coal combustion to generate power in response to the oil crisis meant that ''vigorous and effective control'' of air emissions was ''even more urgent.'' [55] Congress responded by adding new statutory provisions setting out the prevention of significant deterioration (PSD) program, visibility protections known as the regional haze program, and additional requirements for nonattainment areas under the NAAQS program. As with the 1970 CAA Amendments, the provisions added in the 1977 CAA Amendments required further steps to combat air pollution by reducing emissions of criteria pollutants and other air pollutants that cause or threaten adverse impacts from local or regional exposure.[56]

Congress further amended the endangerment and contribution language in CAA section 111, CAA section 202(a)(1), and additional regulatory provisions to provide a comparable standard for invoking each regulatory authority. As amended in 1977, CAA section 111(b)(1)(A) read as it currently does: the Administrator ''shall include a category of sources in such list if in his judgment it causes, or contributes significantly, to air pollution which may reasonably be anticipated to endanger public health or welfare.'' [57] The House Report for the relevant bill language explained that these related amendments were designed to provide ''the same standard of proof for regulation of any air pollutant, whether that pollutant comes from stationary or mobile sources, or both'' that allowed for precautionary regulation, consistent with the D.C. Circuit's en banc decision in *Ethyl Corp.* v. *EPA,* 541 F.2d 1 (D.C. Cir. 1976).[58]

Congress also enacted further amendments specific to CAA section 111. First, it amended the definition of ''standard of performance'' in CAA section 111 to require ''all new sources to meet emission standards based on the reductions achievable through the use of the 'best technological system of continuous emission reduction.' '' [59] Second, for fossil fuel-fired stationary sources, Congress required a percentage reduction in emissions from the use of fuels.[60] Together, this was designed to ''force new sources to burn high-sulfur fuel thus freeing low-sulfur fuel for use in existing sources where it is harder to control emissions and where low-sulfur fuel is needed for compliance.'' [61] This change responded to the oil shortage, the resulting energy legislation that restricted power plant use of oil or gas to generate electricity, and the consequent increase in coal combustion by power plants. This increase in coal combustion gave rise to the need to limit low-sulfur coal to existing power plants.[62] [63] Third, Congress added CAA section 111(f), which required the EPA to list categories of major stationary sources not already listed and imposed a schedule for establishing standards of performance for those source categories. Finally, Congress added CAA section 111(f)(4), which specifically allowed States to petition the Administrator for new or revised (and more stringent) standards.[64]

The EPA responded to the 1977 CAA Amendments by increasing the pace of stationary source regulation. Consistent with CAA section 111(f), the Agency promulgated a list of 59 source categories in 1979 with each assigned a priority for action.[65] The EPA based the list on the source categories' emissions of nine air pollutants: volatile organic compounds (VOC), nitrogen oxides ($NO_X$), particulate matter (PM), sulfur dioxide ($SO_2$), carbon monoxide (CO), lead, fluorides, acid mist, and hydrogen sulfide.[66] The EPA proceeded to promulgate standards of performance for these air pollutants applicable to new sources in the listed categories.[67]

3. 1990 CAA Amendments and Subsequent Regulations

In the 1990 CAA Amendments, Congress overhauled the CAA by strengthening the NAAQS program, thoroughly revising CAA section 112, and adding several new titles to the Act to address emerging problems not adequately encompassed within the design of title I for regulating stationary sources.[68] The newly enacted title IV addressed acid rain, which forms when $SO_2$ and $NO_X$ emissions transform in the atmosphere and return to the earth as precipitation, by requiring the EPA to impose strict limits on $SO_2$ emissions from existing power plants and other sources. The newly enacted title V established a consolidated permitting program for certain stationary sources intended to improve efficiency, compliance, and enforceability of existing permitting and emission requirements. And the newly enacted title VI provided the EPA with new regulatory authorities and obligations to phase out certain ozone depleting substances in response to rising concerns that anthropogenic emissions were contributing to a global weakening of the stratospheric ozone layer's capacity to deflect radiation from the sun associated with skin cancer and

[55] *See* Senate Hearings on S. 272, S. 273, S. 977, and S. 1469 (1977), *reprinted in* Library of Congress, 5 *A Legislative History of the Clean Air Amendments of 1977* (''1977 CAA Legis. Hist.'') at 3532 (statement of Administrator Costle).

[56] For example, Congress recognized that many air pollutants had not been regulated despite ''mounting evidence'' that these pollutants ''are associated with serious health hazards.'' H.R. Rep. No. 94–1175, at 22 (1976). Because the EPA ''failed to promulgate regulations to institute adequate control measures,'' Congress directed the EPA to regulate four specific pollutants that had ''been found to be cancer-causing or cancer-promoting.'' *Id.* at 23. This directive, reflected in CAA section 122, specifically added radioactive pollutants, cadmium, arsenic, and polycyclic organic matter ''under the various provisions of the Clean Air Act and allows their regulation as criteria pollutants under ambient air quality standards, as hazardous air pollutants, or under new source performance standards, as appropriate.'' H.R. Rep. No. 95–564, at 142 (1977); 42 U.S.C. 7422(a).

[57] CAA Amendments of 1977, section 109(a), 91 Stat. at 791; *compare* 42 U.S.C. 7411(b)(1)(A), *with* 42 U.S.C. 7521(a)(1) (the Administrator ''shall by regulation prescribe . . . standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines . . . which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare'').

[58] H.R. Rep. No. 95–294 at 43 (1977). The House Report further explained that the language eventually enacted set out ''a standardized basis for future rulemakings'' and the ''same basic formula'' in CAA sections 108 (defining criteria for NAAQS), 111 (NSPS), 112 (HAP, ''although the nature of risk must be more serious''), 202 (new motor vehicle emission standards), 211 (regulation of fuels and fuel additives), and 231 (aircraft emission standards). *Id.* at 50.

[59] *Id.* at 192. Congress separately defined ''technological system of continuous emission reduction'' as ''(A) a technological process for production or operation by any source which is inherently low-polluting or nonpolluting, or (B) technological system for continuous reduction of the pollution generated by a source before such pollution is emitted into the ambient air, including precombustion cleaning or treatment of fuels.'' CAA Amendments of 1977, 91 Stat. at 700; *see* 42 U.S.C. 7411(a)(7).

[60] CAA Amendments of 1977, 91 Stat. at 700.

[61] 44 FR 33580, 33581–82 (June 11, 1979) (promulgating NSPS for electric utility steam generating units).

[62] H.R. Rep. No. 95–294, at 185–86, 188–89, 190–93.

[63] Congress also amended CAA section 111(b)(1)(B) to require the Administrator to periodically review and, if appropriate, revise new source standards of performance; further amended the definition of a standard of performance in section 111(a)(1) to require the consideration of ''nonair quality health and environmental impact and energy requirements,'' along with cost; amended CAA section 111(d) to require States to promulgate ''standards of performance,'' as defined under 111(a)(1), in lieu of ''emission standards'' and to clarify that States could consider ''the remaining useful life'' of a source when applying a standard of performance to a particular existing source; and added CAA section 111(h), which authorized alternative standards in limited circumstances. CAA Amendments of 1977, 91 Stat. at 699–700.

[64] *Id.* at 697.

[65] 44 FR 49225–26 (Aug. 21, 1979).

[66] 44 FR 49222 (Aug. 21, 1979).

[67] *See, e.g.,* 50 FR 26122 (June 24, 1985) (promulgating NSPS for $SO_2$ emissions from natural gas processing plants).

[68] CAA Amendments of 1990, Public Law 101–549, 104 Stat. 2399.

other adverse health and environmental impacts worldwide.

Congress also made several further changes to CAA section 111. For the CAA section 111(a)(1) definition of ''standard of performance,'' Congress repealed the percentage reduction requirement added in the 1977 CAA Amendments, which had come to be understood as unduly restrictive, and returned the definition to how it read after the 1970 CAA Amendments while retaining the 1977 language providing that the EPA must consider nonair quality environmental impacts and energy requirements.[69] In connection with the newly enacted title IV, Congress directed the EPA to revise its NSPS for $SO_2$ emissions from fossil fuel-fired power plants and required the revised standards to be at least as stringent as earlier regulations.[70] And Congress revised CAA section 111(f) to update the schedule for regulating listed source categories according to a prioritization scheme that reinforced the provision's design: establishing national minimum standards for emitting sources that may shift over time from one area of the country to another.[71]

In response to the 1990 CAA Amendments, the EPA began implementing the new programs in title IV, title V, and title VI, continued to promulgate standards of performance for new sources in listed source categories under CAA section 111(b), and, in limited instances, promulgated regulations addressing existing-source emissions under CAA section 111(d).

### *C. Regulation of Greenhouse Gases Under CAA Section 111*

#### 1. The EPA's Historical Approach to CAA Section 111

During the first four decades of regulatory activity under CAA section 111 and related provisions, the EPA listed and regulated source categories to address air pollution with adverse impacts from local and regional exposure and never attempted to list or regulate in response to global climate change concerns. In the limited instances in which the Agency addressed emissions of what have since been labeled GHGs, the justifications for and requirements of the regulatory action were based on such local and regional impacts. For example, in 1996, we listed the municipal solid waste (MSW) landfills source category primarily to regulate nonmethane organic compound (NMOC) emissions but also included limited requirements for methane emissions.[72] In the 1991 proposal, we explained that there is a ''well-documented danger of fires and explosions, both on- and off-site'' from methane emitted from MSW landfills.[73] After surveying multiple additional bases for regulating methane and other emissions form that source category, we also noted that ''[a]n ancillary benefit from regulating air emissions from MSW landfills is a reduction in the contribution of MSW landfill emissions to global emissions of methane,'' [74] and that methane was ''under discussion by the Intergovernmental Negotiating Committee for a Framework Convention on Climate Change, convened by the United Nations.'' [75] The 1996 final rule further discussed these issues,[76] again making it clear that our justification for listing the MSW landfill source category and regulating landfill gases was not contingent on global climate change concerns.[77]

In 2003, the EPA expressly took the position that CAA section 202(a)(1) did not authorize the Agency to regulate GHG emissions in response to global climate change concerns in denying 1999 petitions for rulemaking on mobile-source emissions of $CO_2$, methane, $N_2O$, and HFCs. 68 FR 52922 (Sept. 8, 2003) (''2003 Denial''). In the 2003 Denial, the EPA asserted three primary reasons for denying the petitions. First, after ''examin[ing] the fundamental issue of whether the CAA authorizes the imposition of control requirements'' to ''reduce the risk of global climate change,'' we concluded that ''$CO_2$ and other GHGs cannot be considered 'air pollutants' subject to the CAA's regulatory provisions for any contribution they may make to global climate change.'' 68 FR 52925. Citing the Supreme Court's decision in *FDA* v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000), we noted that the CAA does not address GHGs as a regulatory matter, including in then-recent amendments, and that the ''EPA has used these provisions to address air pollution problems that occur primarily at ground level or near the surface of the earth.'' 68 FR 52926. On this basis, we concluded that GHGs ''are not air pollutants under the CAA's regulatory provisions, including sections 108, 109, 111, 112, and 202'' because they categorically are not ''air pollutant[s]'' under the Act-wide definition in CAA section 302(g). 68 FR 52928.

Second, we raised several policy reasons for declining to regulate GHG emissions, including that regulating GHG emissions from motor vehicles and engines under the CAA would interfere with the National Highway Traffic Safety Administration's authority to implement fuel economy standards. 68 FR 52929. We also asserted that regulating GHG emissions from motor vehicles and engines under the CAA would undermine then-President Bush's policy approach of addressing global climate change concerns multilaterally. 68 FR 52930–31. That is, we reasoned that establishing GHG emission standards through unilateral action would ''result in an inefficient, piecemeal approach to addressing the climate change issue'' because ''all significant sources and sinks of GHG emissions'' should be considered in deciding the best way to achieve emission reductions. 68 FR 52931.

In *Massachusetts* v. *EPA,* 549 U.S. 497 (2007), the Supreme Court narrowly reversed the D.C. Circuit's decision upholding the EPA's denial of the 1999 petitions for rulemaking.[78] The Court took particular issue with the EPA's reading of the Act-wide definition in CAA section 302(g), ruling that ''[t]he Clean Air Act's sweeping definition of 'air pollutant' . . . embraces all airborne compounds of whatever stripe'' and provided no textual basis for excluding $CO_2$ or the three other GHGs raised in the petitions for rulemaking. 549 U.S. at 528–29. The Court also addressed the EPA's reliance on *Brown & Williamson,* which the majority construed as having found no congressional intent to ban the

[69] Congress designed this repeal to apply only so long as the $SO_2$ cap in the newly established acid rain program of title IV remained in effect. CAA Amendments of 1990, 104 Stat. at 2631.

[70] *Id.*

[71] *See id.* at 2467. Specifically, Congress instructed the EPA to prioritize regulation based the quantity of a source category's emissions, the extent to which each emitted pollutant may endanger public health or welfare, and ''the mobility and competitive nature of each such category of sources and the consequent need for nationally applicable new source standards of performance.'' 42 U.S.C. 7411(f)(2).

[72] 61 FR 9905 (Mar. 12, 1996).

[73] 56 FR 24468, 24474 (May 30, 1991).

[74] *Id.*

[75] *Id.* at 24473.

[76] *See, e.g.,* 61 FR at 9906 (Mar. 12, 1996).

[77] *See id.* (analyzing the health and welfare impacts of local and regional exposure to landfill gas emissions that constitute the basis for listing and regulating the source category, as well as discussing methane's role as a GHG); *see also id.* at 9914, 9916, 9917 (explaining that the methane-related requirements function in part to response to the EPA's obligations under President Clinton's 1993 ''Climate Change Action Plan'' and repeating that global climate change benefits are ''[a]n ancillary benefit'' of the regulation).

[78] The D.C. Circuit majority had upheld the denial on the merits because ''the EPA Administrator properly exercised his discretion under section 202(a)(1) in denying the petition for rulemaking.'' *Massachusetts* v. *EPA,* 415 F.3d 50, 58 (D.C. Cir. 2005). The dissent argued that CAA section 202(a)'s breadth provided the EPA sufficient authority to regulate GHGs, that more specific authorization was not required, and that the Agency's policy justifications were inadequate reasons to deny the petitions. *Id.* at 67–82 (Tatel, J., dissenting).

sale of tobacco products outright because such an application of the relevant statute would have been highly unlikely given the Food and Drug Administration (FDA)'s refusal to assert such authority in the past. *Id.* at 530–31. In contrast, in *Massachusetts,* the Court found that the CAA did not reflect a congressional intent to categorically exclude GHGs from the ''sweeping definition of 'air pollutant''' and, citing several EPA memoranda, that we had not similarly foresworn all authority to regulate GHGs as a categorical matter. *Id.* at 528, 530–31. Notably, the Court expressly declined to decide whether the EPA was required to issue an endangerment finding as to GHG emissions under the standard set out in CAA section 202(a)(1). *Id.* at 534 (''We need not and do not reach the question whether on remand EPA must make an endangerment finding.''). Nor did the Court address ''whether policy concerns can inform EPA's actions in the event that it makes such a finding.'' *Id.* at 534–35. Rather, the Court emphasized that the scope of its review of the denial of a rulemaking petition was ''extremely limited,'' *id.* at 527–28 (citation omitted), and held that we must respond to the petitions by deciding whether GHG emissions from new motor vehicles and engines meet the standard for regulation in CAA section 202(a)(1) or whether the science was too uncertain to make any determination, and that, in doing so, we must ''ground [our] reasons for action or inaction in the statute,'' *id.* at 535.[79]

The EPA responded in 2008 by issuing an advanced notice of proposed rulemaking titled ''Regulating Greenhouse Gas Emissions Under the Clean Air Act,'' 73 FR 44354 (July 30, 2008) (''2008 ANPRM''), which analyzed the extent to which various CAA provisions could address GHGs. The Agency noted that the CAA was not specifically designed to address GHGs, 73 FR 44397, and that the Agency had traditionally used its air pollution authorities to address local and regional problems, 73 FR 44408. The EPA further noted that CAA section 111 provided significant discretion over which stationary sources should be regulated and in determining the appropriate technologies and costs. 73 FR 44486–93.

The EPA subsequently retained this position in implementing CAA section 111. In June 2008, the EPA promulgated revised standards of performance for petroleum refineries, including $NO_X$ standards for certain types of facilities.[80] In response to comments asserting that the EPA was required to promulgate standards for $CO_2$ and methane emissions because they contribute significantly to dangerous air pollution, we stated that ''it is reasonable for EPA not to promulgate performance standards for GHG emissions as part of this 8-year review cycle'' because ''we believe that the nature of GHG emissions renders them readily distinguishable from other air pollutants for which we have previously promulgated new performance standards concurrent with an 8-year review of the existing standards.''[81] We further stated that ''[i]ndeed, GHG emissions present issues that we have never had to address in the context of even an initial NSPS rulemaking for a source category,'' and that ''[t]hese differences warrant proceeding initially through a more deliberate process, *i.e.,* the announced [2008 ANPRM], than in this source category-specific rulemaking.''[82]

2. Developments Between 2009 and 2015

In 2009, following a change in administration, the EPA adopted a new position on its authority to regulate in response to global climate change concerns under CAA section 202(a)(1). President Obama and the Administrator at the time initially urged Congress to amend the Act to provide additional statutory authority. As discussed later in this section, Congress considered legislation that would have added a new title to the Act specific to GHGs and global climate change, similar to the approach taken in the 1990 CAA Amendments with respect to title IV's acid rain program and title VI's provisions for phasing out ozone-depleting substances. When this legislation stalled, however, the EPA finalized a new interpretation of its existing authority under CAA section 202(a)(1) in the 2009 Endangerment Finding.

In the 2009 Endangerment Finding, the Administrator found that ''the science [was] sufficiently certain'' to compel a determination and interpreted *Massachusetts* as ''allow[ing] for the consideration only of science.'' 74 FR 66501. The Administrator interpreted *Massachusetts* as holding not only that ''GHGs fall within the definition of 'air pollutant' under the CAA,'' but also as standing for the proposition ''that EPA may regulate GHGs if required findings were made.'' EF RTC 11:5. The EPA based the endangerment determination on the Intergovernmental Panel on Climate Change's (IPCC) Assessment Report 4 projections concerning global mean surface temperature and linked that warming to indirect health risks driven by, among other things, more frequent heat waves, air quality effects and extreme weather events, 74 FR 66525, as well as welfare effects related to global sea level rise, and other downstream impacts, including, among other things, food production and agriculture and water resources, 74 FR 66531–35.[83] Importantly, the Administrator acknowledged that the understanding of public health and welfare in the Endangerment Finding was atypical, particularly with respect to considering indirect effects and because ''[n]one of th[e] human health effects are associated with direct exposure to [GHGs],'' but asserted the approach was necessary given the ''unique'' challenge presented by global climate change. 74 FR 66527. The EPA subsequently issued GHG standards for multiple new motor vehicle and engine categories under CAA section 202(a)(1) and attempted to expand its regulatory program to stationary sources by establishing GHG emission thresholds for stationary source permitting under the PSD program and title V.[84]

The EPA did not immediately apply the new legal interpretation developed in the 2009 Endangerment Finding with respect to CAA section 202(a)(1) to CAA section 111. In October 2009, for example, we promulgated NSPS for $SO_2$, $NO_X$, and CO from the coal preparation and processing plants source category for the first time.[85] Commenters again argued that we were required to, or at least should, regulate GHG emissions—$CO_2$, $N_2O$, and black carbon—from the

[79] Writing for four members of the Court, Chief Justice Roberts would have dismissed the petitions for review for lack of Article III standing. 549 U.S. at 535 (Roberts, C.J., joined by Scalia, Thomas, and Alito, J.J., dissenting). Writing for the same four members of the Court, Justice Scalia would have denied the petitions on the grounds that the Administrator reasonably exercised judgment in declining to regulate and that CAA section 302(g)'s definition of ''air pollutant'' does not clearly encompass $CO_2$ and other GHGs that naturally occur in the ambient air. *Id.* at 549 (Scalia, J., joined by Roberts, C.J., and Thomas and Alito, J.J., dissenting).

[80] 73 FR 35838, 35846 (June 24, 2008).

[81] *Id.* at 35859.

[82] *Id.*

[83] The EPA acknowledged that the identified welfare impact pathways involved multiple causal steps, unlike more typical situations analyzed in the past. 74 FR 66531.

[84] Reconsideration of Interpretation of Regulations That Determine Pollutants Covered by Clean Air Act Permitting Programs, 75 FR 17004 (Apr. 2, 2010) (''Triggering Rule''); Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule, 75 FR 31514 (June 3, 2010) (''Tailoring Rule'').

[85] 74 FR 51950 (Oct. 8, 2009). The EPA had listed the source category in 1974, 39 FR 37807 (Oct. 24, 1974), and regulated PM emissions from the source category in 1976, 39 FR 2232 (Jan. 15, 1976).

source category to address global climate change concerns. We declined to regulate such emissions, stating: ''At this time EPA is not aware of any emissions or mitigation data for the pollutants noted by the commenter for this source category. Hence, we lack sufficient information on which to base an NSPS for emissions of $CO_2$, $N_2O$, and black carbon from the source category at this time.'' [86]

Litigation by proponents of regulations seeking other avenues for controlling GHG emissions from power plants continued during this period. In *Connecticut* v. *American Electric Power Co.,* 582 F.3d 309 (2d Cir. 2009), the Second Circuit held (among other things) that litigants could seek pollution controls under the Federal common law because the EPA had not yet taken regulatory action with respect to GHG emissions from stationary sources.[87] The Supreme Court unanimously reversed this holding in *American Electric Power Co.* v. *Connecticut,* 564 U.S. 410 (2011) (''*AEP*'').[88] In *AEP,* the Court found that CAA section 111, together with the Act's avenues for enforcement, rulemaking petitions, and judicial review, ''provides a means to seek limits on emissions of carbon dioxide from domestic powerplants—the same relief the plaintiffs seek by invoking federal common law.'' *Id.* at 425. The Court held that the Act's preclusive effect does not turn on whether the EPA actually exercises its regulatory authority: ''The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from powerplants; the delegation is what displaces federal common law.'' *Id.* at 426. Further, ''were EPA to decline to regulate carbon-dioxide emissions altogether,'' the courts ''would have no warrant to employ the federal common law of nuisance to upset the Agency's expert determination.'' *Id.*

Separate litigation addressed aspects of the EPA's GHG regulatory initiative without definitively resolving important questions regarding the scope of the Agency's statutory authority. In *Coalition for Responsible Regulation* v. *EPA,* 684 F.3d 102 (D.C. Cir. 2012), the D.C. Circuit rejected certain challenges to the 2009 Endangerment Finding and the suite of rules promulgated under CAA section 202(a)(1) and the Act's stationary source permitting provisions. Among other things, the court read *Massachusetts* as precluding us from declining to regulate for policy reasons that ''were not part of the calculus'' and, citing generally to the entirety of the opinion, as holding that the ''EPA indeed wields the authority to regulate greenhouse gases under the CAA.'' 684 F.3d at 118. Applying this reading, the court rejected petitioners' arguments that we should have considered the '' 'absurd' '' results for stationary source permitting when issuing the 2009 Endangerment Finding. *Id.* The court understood the interpretation of the statutory definition of ''air pollutant'' in *Massachusetts* to apply anywhere that term is used in the substantive provisions of the CAA. *Id.* at 134–44. The court acknowledged that ''nothing in the CAA requires regulation of a substance simply because it qualifies as an 'air pollutant' under this broad definition.'' *Id.* at 135. Applying its broad understanding of *Massachusetts,* however, the court held that reading ''air pollutant'' as ''any regulated air pollutant'' was ''compelled by the statute'' and rejected petitioners' arguments that the PSD provisions should be read in context as focusing on localized ''air pollution'' problems. *Id.* at 134, 138.[89]

In *UARG,* the Supreme Court granted review of the D.C. Circuit's decision in *Coalition* and revisited issues related to those it had addressed seven years earlier in *Massachusetts* and three years earlier in *AEP.* The Court disagreed with the D.C. Circuit's reasoning and held that the EPA's approach to extending PSD permitting to GHG emissions exceeded the Agency's statutory authority. 573 U.S. at 316. The Court rejected the D.C. Circuit's application of *Massachusetts* in this context as a ''flawed syllogism,'' *id.* at 319 (citation omitted), holding that ''while *Massachusetts* rejected EPA's categorical contention that greenhouse gases *could not* be 'air pollutants' for any purposes of the Act, it did not embrace EPA's current, equally categorical position that greenhouse gases *must* be air pollutants for all purposes regardless of the statutory context,'' *id.* Rather, ''*Massachusetts* does not foreclose the Agency's use of statutory context to infer that certain of the Act's provisions use 'air pollutant' to denote not every conceivable airborne substance, but only those that may sensibly be encompassed within the particular regulatory program.'' *Id.* The Court rejected the EPA's attempt to require a permit based on GHG emissions as '' 'incompatible' with 'the substance of Congress' regulatory scheme' '' and contrary to the principle that ''Congress . . . speak[s] clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.' '' *Id.* at 322–24 (quoting *Brown & Williamson,* 529 U.S. at 159).

3. The EPA's Regulation of GHGs Under CAA Section 111 Since 2015

In August 2015, the EPA announced ''a historic and important first step in reducing carbon pollution from power plants.'' [90] This ''first step'' consisted of two related final rules that, for the first time since 1970, regulated stationary source emissions in response to global climate change concerns. This watershed moment fundamentally changed what and how the EPA regulates under CAA section 111.

a. Regulation of $CO_2$ Emissions From Fossil Fuel-Fired Power Plants

i. 2015 NSPS for $CO_2$ Emissions From New Power Plants

In the 2015 NSPS, the EPA laid out a novel legal basis for regulating GHG emissions under CAA section 111 based on global climate change concerns. The EPA explained that CAA section 111(b)(1)(A) requires the Administrator to list any source category that ''causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.'' The EPA posited that, unlike other CAA provisions, CAA section 111(b)(1)(A) does not require the EPA to make endangerment and significant contribution findings for individual pollutants. Rather, the EPA asserted that once such findings are made for *any* pollutant emitted by a source category, the Agency has discretion to regulate *all* pollutants emitted by the source

[86] 74 FR 51957–58.

[87] *See* 582 F.3d at 379–80 (''In sum, at least until EPA makes the requisite findings, for the purposes of our displacement analysis the CAA does not (1) regulate greenhouse gas emissions or (2) regulate such emissions from stationary sources. . . . We express no opinion at this time as to whether the actual regulation of greenhouse gas emissions under the CAA by EPA, if and when such regulation should come to pass, would displace Plaintiffs' cause of action under the federal common law.'').

[88] The Supreme Court affirmed by an equally divided court the Second Circuit's holding that plaintiffs had standing to maintain the lawsuit. *See AEP,* 564 U.S. at 420.

[89] The D.C. Circuit subsequently denied rehearing en banc. *See* Coal. for Responsible Regulation v. EPA, 2012 U.S. App. LEXIS 25997 (Dec. 20, 2012). Judge Brown dissented, arguing that the CAA was designed to address ''the harmful effects of poisoned air on human beings and their local environs,'' that such important policy decisions were for Congress to decide, and that the panel had overread ''dicta'' in *Massachusetts. Id.* at *29–62. Then-Judge Kavanaugh also dissented, arguing that the EPA exceeded its statutory authority in regulating GHG emissions under the PSD program by failing to read the term ''air pollutant'' in context and that the issue was ''plainly one of exceptional importance'' that Congress should decide. Id. at *62–93.

[90] *https://archive.epa.gov/epa/cleanpowerplan/fact-sheet-overview-clean-power-plan.html.*

category subject only to rational basis constraints. 80 FR 64529–30.

Using this framework, the EPA created a new source category consisting of the type of power plants previously listed in the 1970s under several source categories. The source category encompassed all fossil fuel-fired EGUs and focused on $CO_2$ emissions on the understanding that subject power plants did not emit substantial quantities of the additional GHGs encompassed within the 2009 Endangerment Finding.[91] The Agency maintained, however, that it was not listing a new source category and therefore was not required to make any endangerment or significant contribution finding for the fossil fuel-fired EGU source category to promulgate NSPS. The EPA determined that it had a rational basis for concluding that emissions of $CO_2$ from fossil fuel-fired power plants merit regulation under CAA section 111. In reaching that conclusion, the Agency stated that it had determined in the 2009 Endangerment Finding that GHG emissions may reasonably be anticipated to endanger public health or welfare and that more recent information confirmed this determination. The EPA explained that the approach it was taking to endangerment from GHG emissions from the fossil fuel-fired EGU source category was ''substantially similar to that reflected in the 2009 Endangerment Finding and the 2010 denial of petitions to reconsider.'' 80 FR 64531.[92] The EPA added that ''the high level of GHG emissions from fossil fuel-fired EGUs makes clear that it is rational for the EPA to regulate GHG emissions from this sector.'' 80 FR 64530.

Nevertheless, the EPA purported to make separate endangerment and significant contribution findings in the alternative pursuant to CAA section 111(b)(1)(A). While maintaining that no pollutant-specific contribution findings were required, the EPA asserted that the information and conclusions in the preamble to the 2015 NSPS would suffice for such findings. 80 FR 64530–31. That is, the EPA took the position in the 2015 NSPS that regardless whether the Agency needed only a rational basis to regulate $CO_2$ emissions from fossil fuel-fired EGUs or whether the Agency was instead required to make new endangerment and contribution findings, it had made the requisite determinations based on the 2009 Endangerment Finding and the additional information presented in the preamble to the 2015 NSPS.

The standards of performance in the 2015 NSPS limited $CO_2$ emissions based on several different BSER determinations. For new coal-fired steam boilers, the EPA based the standards on a BSER of 16 to 23 percent (depending on the type of coal combusted) carbon capture and storage (CCS). 80 FR 64548. For new natural gas-fired combustion turbines, the EPA based the standards on a BSER of efficiency measures. 80 FR 64515. The EPA subsequently denied multiple petitions for reconsideration,[93] and several States and industry groups filed petitions for review in the D.C. Circuit.[94]

ii. Emission Guidelines for $CO_2$ From Existing Power Plants

(A) 2015 Clean Power Plan

In the 2015 CPP, issued the same day as the 2015 NSPS, the EPA promulgated emissions guidelines under CAA section 111(d) establishing presumptive standards of performance for existing fossil fuel-fired EGUs and requiring States to submit plans for implementation and enforcement. 80 FR 64661. The Agency asserted that its authority under CAA section 111(d) derived from the 2015 NSPS under CAA section 111(b) and noted that GHGs, and $CO_2$ in particular, are not separately regulated through the NAAQS program under CAA sections 107–110 or the NESHAP program under CAA section 112.

The Agency based the emission guidelines for existing coal-fired steam plants on a BSER that consisted of a set of measures, including heat-rate improvements (*i.e.,* the amount of fuel that must be burned to generate a unit of electricity) and substituting fossil fuel-based power generation with lower-emitting power generation, such as renewable sources. 80 FR 64667. The latter type of measure is known as ''generation shifting.'' 80 FR 64728–29. The emission guidelines authorized the States to include trading or averaging programs in their State plans. 80 FR 64840. In February 2016, the Supreme Court stayed the 2015 CPP after the D.C. Circuit denied preliminary relief.[95]

(B) 2019 ACE Rule and Clean Power Plan Repeal

In 2019, following a change in administration, the EPA repealed and replaced the 2015 CPP in the Affordable Clean Energy (ACE) Rule, 84 FR 32529 (July 8, 2019). In the 2019 ACE Rule, the Agency determined that the statutory ''text and reasonable inferences from it'' indicate that the best ''system'' of emission reduction as defined in CAA section 111(a)(1) ''is limited to measures that can be applied to and at the level of the individual source,'' meaning the BSER must be control measures for reducing emissions at individual sources. 84 FR 32523–24. The Agency concluded that generation shifting is not such a control measure. 84 FR 32546. In addition, the EPA concluded that the 2015 CPP was a ''major rule'' subject to the major questions doctrine and therefore must be supported by ''a clear statement from Congress.'' Because the statutory phrase ''best system of emission reduction'' does not clearly speak to generation shifting, the Agency reasoned that CAA section 111 should not be read to encompass generation-shifting measures. 84 FR 32529. To replace the 2015 CPP, the EPA promulgated as part of the 2019 ACE Rule a new set of emission guidelines for existing coal-fired steam-generating EGUs. 84 FR 32532.

In *American Lung Association,* a divided panel of the D.C. Circuit vacated the 2019 ACE Rule, including the CPP Repeal. First, the panel majority held that CAA section 111(d) does not limit the EPA, in determining the BSER, to measures applied at and to an individual source. 985 F.3d at 944. Second, the panel majority rejected in the strongest terms the argument that generation-shifting implicated ''the so-called 'major questions' doctrine'' based on its interpretation of the Supreme Court's decisions in *Massachusetts* and *AEP. Id.* at 959. The panel majority reasoned that the EPA had ''complied'' with *Massachusetts* by issuing the 2009 Endangerment Finding and that in *AEP,* ''the Court [ ] told the EPA directly that it is the Agency's job to regulate power plants' emissions of greenhouse gases under Section [111].'' *Id.* at 959–60. Therefore, the panel majority concluded, all questions as to ''what,''

[91] Specifically, referencing the determination in the 2009 Endangerment Finding that GHGs constitute both the relevant ''air pollutant'' and ''air pollution'' for purposes of regulating in response to global climate change, the EPA stated in the 2015 NSPS that ''[t]he air pollutant regulated in this final action is greenhouse gases. However, the standards in this rule are expressed in the form of limits on only emissions of $CO_2$, and not the other constituent gases of the air pollutant GHGs.'' 80 FR 64537.

[92] *See* 75 FR 49556 (Aug. 13, 2010) (denying petitions for reconsideration of the 2009 Endangerment Finding).

[93] 81 FR 27442 (May 6, 2016). The EPA deferred action on one petition with respect to the treatment of biomass. *Id.* at 27443.

[94] *North Dakota* v. *EPA*, No. 15–1381 (D.C. Cir.). These petitions have been held in abeyance since 2016 given intervening developments.

[95] *West Virginia* v. *EPA*, 577 U.S. 1126 (2016). The D.C. Circuit held the litigation in abeyance and later dismissed in light of subsequent developments. *See Am. Lung Ass'n,* 985 F.3d at 937.

''whom,'' and ''how'' the Agency may regulate ''have all been resolved and so do not trigger the major questions doctrine.'' *Id.* at 962.[96] Finally, the panel majority rejected certain additional challenges to the findings (or lack thereof) supporting the 2015 NSPS and therefore the 2015 CPP as well as arguments that coal power plants could not be regulated under CAA section 111(d) given the EPA's regulation of mercury emissions from coal plants under CAA section 112. *Id.* at 971–88. Ultimately the panel majority vacated the 2019 ACE Rule, including the CPP Repeal, thereby placing the 2015 CPP back into effect.[97]

In *West Virginia,* the Supreme Court reversed the D.C. Circuit's treatment of the major questions doctrine and held that the 2015 CPP exceeded the EPA's authority under CAA section 111(d). First, the Court surveyed its precedents to confirm that an agency must have more than ''a colorable textual basis'' to assert '' 'unheralded' regulatory power over 'a significant portion of the American economy.' '' 597 U.S. at 721–23 (quoting *UARG,* 573 U.S. at 324). In such cases, ''both separation of power principles and a practical understanding of legislative intent'' require the agency to ''point to 'clear congressional authorization' for the power it claims.'' *Id.* at 723 (quoting *UARG,* 573 U.S. at 324). The Court explained that its decision in *UARG* ''addressed another question regarding EPA's authority—namely, whether EPA could construe the term 'air pollutant,' in a specific provision of the Clean Air Act, to cover greenhouse gases,'' and held that despite the ''textual plausibility'' of the interpretation supporting the Agency's assertion of authority, the significant consequences involved required more than a ''plausib[le]'' statutory basis. *Id.* at 722. Next, the Court held that our reliance on CAA section 111(d) to regulate GHG emissions was ''a major questions case'' because we had asserted the power ''to substantially restructure the American energy market.'' *Id.* at 724. That provision ''had rarely been used in the preceding decades,'' and we had used it in an ''unprecedented'' manner ''to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself.'' *Id.* at 724–28. The Court specifically rejected the argument that *AEP* precluded application of the major questions doctrine, stating that the case involved the question ''whether Congress wanted district court judges to decide, under unwritten federal nuisance law, 'whether and how to regulate carbondioxide emissions from powerplants' '' and ''said nothing about the ways in which Congress intended EPA to exercise its power under that provision.'' *Id.* at 730 (quoting *AEP,* 564 U.S. at 426). Finally, the Court concluded that we lacked statutory authority for the 2015 CPP based on a lack of statutory authorization to require generation shifting. *Id.* at 732–35.[98]

In October 2022, the D.C. Circuit recalled its mandate for the vacatur of the 2019 ACE Rule, revised its judgment to place the CPP Repeal back into effect, and stayed further proceedings. *Am. Lung Ass'n* v. *EPA,* No. 19–1140, Order (Oct. 27, 2022).

(C) 2024 Carbon Pollution Standards Rule

In May 2024, the EPA responded to the Supreme Court's decision in *West Virginia* by promulgating more stringent requirements for fossil fuel-fired EGUs than those contained in the 2015 NSPS or vacated 2015 CPP. 89 FR 39798. The 2024 CPS included several related components. First, the EPA repealed the 2019 ACE Rule (aside from its repeal of the 2015 CPP) after determining that the BSER for existing coal-fired power plants was not the suite of heat-rate improvements identified in the 2019 ACE Rule. Second, the EPA promulgated new emission guidelines for GHG emissions from existing fossil fuel-fired power plants subcategorized into coal-fired units, oil-fired units, and gas-fired units. For existing coal-fired units, the EPA based the requirements on a new BSER of either 90 percent CCS or 40 percent gas cofiring. For existing natural gas- and oil-fired steam generating units, the EPA based the requirements on BSERs of either routine methods of operation and maintenance or uniform fuels. Finally, the Agency promulgated NSPS for new and reconstructed combustion turbines, based on efficiency measures, 90 percent CCS, or use of lower-emitting fuels. In addition, the EPA revised the standards of performance for coal-fired steam generating units that undertake a large modification to be based on the BSER of 90 percent CCS.[99]

Following promulgation of the 2024 CPS, States and industry groups filed petitions for review in the D.C. Circuit, and many subsequently filed motions to stay the rule. The D.C. Circuit denied the stay motions on July 19, 2024,[100] and the Supreme Court denied them on October 16, 2024.[101] These challenges have been held in abeyance since the change in administration.

*D. Recent Developments*

1. Rescission of the 2009 Endangerment Finding

In February 2025, the Administrator initiated reconsideration of the 2009 findings of endangerment and contribution under CAA section 202(a)(1) that launched the EPA's GHG regulatory initiative across multiple statutory programs. The Administrator explained that the Agency would address legal and scientific developments that presented reason to question the ongoing validity and reliability of the conclusions in the 2009 Endangerment Finding and to seek public comment on these important issues for the first time since 2009.[102] These efforts culminated in a proposed rule issued on July 29, 2025,[103] followed by a public comment period in which we received hundreds of thousands of comments from a variety of perspectives.

On February 12, 2026, the Administrator signed a final rule rescinding the 2009 Endangerment Finding and repealing all associated GHG emission standards for new motor vehicles and engines under CAA section 202(a)(1).[104] The EPA concluded in the Endangerment Finding Rescission that we lack statutory authority to regulate GHG emissions from new motor

[96] The panel majority further held that the major questions doctrine ''does not apply'' to the interpretation of ''best system of emission reduction'' because, among other reasons, ''the regulatory authority and its reach have been affirmed and enforced by the Supreme Court'' and generation shifting was an ''already-in-use'' system. 985 F.3d at 963–68.

[97] In a partial dissent, Judge Walker argued that the 2015 CPP (and aspects retained in the 2019 ACE Rule) violated the major questions doctrine because CAA section 111 does not include a clear statement of authority to regulate GHG emissions from power plants. *Id.* at 995–1003 (pointing to failed legislation in 2009 that would have provided the requisite authority to regulate GHG emissions from power plants).

[98] In dissent, Justice Kagan argued that the Court had obstructed the EPA's efforts to regulate GHG emissions: ''Today, the Court strips the [EPA] of the power Congress gave it to respond to 'the most pressing environmental challenge of our time.''' *West Virginia,* 597 U.S. at 753 (Kagan, J., joined by Breyer and Sotomayor, J.J., dissenting) (quoting *Massachusetts,* 549 U.S. at 505); *see also id.* at 755 (''This Court has obstructed EPA's effort from the beginning.'').

[99] In the 2024 CPS, the EPA also withdrew the separate proposed revisions to the New Source Review (NSR) regulations that were included the ACE Rule proposal (*see* 83 FR 44746, 44773–83 (Aug. 31, 2018)).

[100] *West Virginia* v. *EPA*, No. 2420, Order, 2024 U.S. App. LEXIS 17856 (July 19, 2024).

[101] *West Virginia* v. *EPA*, 145 S. Ct. 2 (2024). Justice Thomas would have granted a stay, and Justice Kavanaugh, joined by Justice Gorsuch, wrote separately that ''the applicants have shown a strong likelihood of success on the merits as to at least some of their challenges to the [EPA's] rule.'' *Id.*

[102] *See* Feb. 19, 2025 Memo at 1.

[103] *See* 90 FR 36288 (Aug. 1, 2025).

[104] *See* 91 FR 7586 (Feb. 18, 2026).

vehicles and motor vehicle engines based on global climate change concerns. We further concluded that the appropriate policy response to global climate change concerns is a decision vested in Congress, and that Congress did not give the EPA the authority to decide the Nation's policy response to these concerns when it enacted CAA section 202(a)(1) to address domestic air pollution problems. And we concluded, based on an analysis of commonly accepted climate impact modeling, including models and arguments received from multiple perspectives during the public comment period, that the inability of GHG emission standards for new motor vehicles and engines to have more than a de minimis impact on phenomena attributed to global climate changes rendered the standards futile.[105]

2. Proposed Repeal of GHG Standards for Fossil Fuel-Fired EGUs

On June 17, 2025, the EPA issued a proposed rule to repeal GHG standards for fossil fuel-fired EGUs. The June 2025 NPRM included a primary proposal, which would repeal all such GHG standards, and an alternative proposal, which would repeal most of the GHG standards promulgated in the 2024 CPS. This subsection summarizes the June 2025 NPRM for informational purposes only; as noted above, the EPA is not soliciting additional comment on issues addressed in the concurrently issued final rule based on the alternative proposal in the June 2025 NPRM and will address comments received on the primary proposal in the June 2025 NPRM in a final action addressing that proposal and this supplemental proposal.

The primary proposal in the June 2025 NPRM proposed to conclude that CAA section 111 is best read to require, or at least authorize the EPA to require, an Administrator's determination that an air pollutant emitted by a source category causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare as a predicate to establishing emission standards for that pollutant. As such, we proposed to conclude that the Administrator must make a significant contribution finding before issuing GHG emission standards for a new source category even if covered sources had previously been listed under a distinct category. We further proposed to determine, in a change from the 2015 NSPS and 2024 CPS, that GHG emissions from fossil fuel-fired EGUs do not contribute significantly to air pollution as required for the promulgation of new and existing source standards. We proposed that a determination of significant contribution must consider whether such determination would have an influence or effect on the targeted air pollution and the public health or welfare impacts attributed to such air pollution, and that this inquiry entails considering the policies that would inform the resulting regulation. Based on this understanding, we proposed to find that regulation of GHG emissions from fossil fuel-fired EGUs under CAA section 111 would not have a significant effect on GHG air pollution and the public health or welfare impacts attributed to such air pollution, and that the contribution of this source category is therefore not significant for a host of reasons. The EPA thus proposed to repeal all GHG emissions standards for the power sector under CAA section 111, including the 2015 NSPS, codified in 40 CFR part 60, subpart TTTT, and the 2024 CPS, codified in 40 CFR part 60, subparts TTTTa and UUUUb.

The alternative proposal in the June 2025 NPRM proposed to reconsider the BSER determinations in the 2024 CPS through a record-based evaluation and in light of applicable requirements for determining an appropriate BSER. The EPA proposed to rescind the requirements for existing coal-fired units on grounds that 90 percent CCS and 40 percent natural gas co-firing do not qualify as the BSER for existing coal-fired units. The EPA is finalizing that proposal concurrently with this supplemental proposal. The EPA is not taking further action at this time on the primary proposal in the June 2025 NPRM and will consider and respond to comments on that proposal together with comments submitted on this supplemental notice in a forthcoming final action.

3. Relevant Legislative Action

Both before and since the 2009 Endangerment Finding, "'Congress considered and rejected' multiple times" legislation that would have authorized or required the EPA to regulate GHG emissions from stationary sources that were subject to CAA section 111 for their non-GHG emissions, as well as mobile sources. *West Virginia,* 597 U.S. at 731 (quoting *Brown & Williamson,* 529 U.S. at 144). This history is particularly relevant because of the established pattern in the 1970, 1977, and 1990 CAA Amendments of Congress adding requirements for regulatory action to CAA section 111. From 2007 to 2009, Congress considered legislation that would have authorized or required the EPA to prescribe emissions regulations for GHGs. For example, the Safe Climate Act of 2007 would have adopted findings and policies with respect to limiting global temperature increase, required participating in various forms of international cooperation, and added a new title VII to the CAA instructing the EPA to achieve phased GHG emission reduction targets and employ a cap-and-trade program to regulate GHG emissions from sources that EPA determines are appropriate to regulate, including sources that "have the largest emissions." [106] Similarly, the American Clean Energy and Security Act of 2009 would have required international cooperation and added new titles to the CAA requiring the EPA to, among other things, regulate through a cap-and-trade program GHG emissions from large stationary sources and regulate GHG emissions from other stationary sources under CAA section 111 on a specified schedule.[107] Neither bill was enacted, and Congress has since declined to adopt similar legislation.[108]

On several recent occasions, Congress has adopted legislation bearing on issues similar to those addressed here with respect to the EPA's authority under CAA section 111. This subsequent legislation either declined to adopt statutory language endorsing our authority to regulate GHG emissions from power plants or elected to use non-regulatory measures.

[105] This discussion summarizes the bases of the Endangerment Finding Rescission for informational purposes, only, and does not reopen that final rule or seek additional comment on issues addressed in that final rule. For more information, see the final rule preamble, accompanying RTC, and supporting documentation for the Endangerment Finding Rescission.

[106] H.R. 1590, 110th Cong. (2007) (proposed CAA section 703(b)(1)(A)).

[107] H.R. 2454, 111th Cong. (2009) (proposed CAA section 811). This bill, introduced on May 15, 2009—a month after the EPA proposed the 2009 Endangerment Finding—passed the House of Representatives by a 219–212 vote on June 26, 2009, but never received a vote in the Senate. *https://www.congress.gov/bill/111th-congress/house-bill/2454.* The President and Administrator at the time expressed a strong preference for legislation but also a willingness to resolve legislative inaction by administrative means, and the Agency ultimately finalized the Endangerment Finding on December 7, 2009. *See* President Barack Obama, 2013 State of the Union Address (Feb. 12, 2013) *https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/remarks-President-state-union-address* ("[I]f Congress won't act soon to protect future generations, I will.").

[108] Congress's pattern of declining to provide the EPA such authority extends long before 2009. *See Coal. For Responsible Regulation,* 2012 U.S. App. LEXIS 25997, at *36–37 (Brown, J., dissenting from denial of rh'g en banc) (noting Congress expressly rejected proposals offered during the drafting of the 1990 CAA Amendments that would have authorized the EPA to regulate GHGs).

In 2022, Congress adopted the Inflation Reduction Act (IRA),[109] which appropriated funds to the EPA for a low emissions electricity program (LEEP) that would, among other things, ''assess . . . the reductions in [GHG] emissions that result from changes in domestic electricity generation and use that are anticipated to occur'' and ensure that such reductions ''are achieved through use of the existing authorities of this chapter, incorporating the assessment'' noted above.[110] The version of the IRA adopted by the House of Representatives would have appropriated funds to EPA ''to remain available until September 30, 2031, to carry out, with respect to greenhouse gases, sections 111, 115, 165, 177, 202, 211, 213, 231, and 612 of the Clean Air Act,'' but this provision was eventually dropped and never enacted.[111]

In 2025, Congress passed and the President signed into law the One Big Beautiful Bill Act (OBBBA). This legislation rescinded the unobligated balance of funding for the LEEP program and the majority of other programs funded under the IRA, as well as repealing certain IRA provisions.[112] Also in 2025, Congress passed, and the President signed into law, three joint resolutions adopted under the Congressional Review Act disapproving three waivers EPA granted under CAA section 209 that allowed California and participating States to enforce GHG emission regulations for motor vehicles and engines, up to and including zero-emissions standards that mandated a shift to electric vehicles.[113]

## IV. Legal Framework for Action

In the 2015 NSPS and 2015 CPP, the EPA for the first time announced a legal basis for regulating GHG emissions from power plants under CAA section 111. The EPA asserted that section 111 authorizes the Agency to regulate GHG emissions from a listed source category so long as it has a rational basis for doing so and does not require endangerment or contribution findings specific to GHG emissions from power plants. The Agency went on to determine that we had a rational basis for concluding that emissions of $CO_2$ from fossil fuel-fired power plants merit regulation under CAA section 111, in light of the 2009 Endangerment Finding and subsequent information, as well as the amount of GHG emissions from the source category; and that even if we were required to make new endangerment and contribution findings, the same information would justify such findings.[114]

The EPA is now proposing to repeal the suite of determinations, findings, and actions finalized in the 2015 NSPS for purposes of regulating GHG emissions from fossil fuel-fired power plants on statutory authority grounds distinct from those presented in the primary proposal in the June 2025 NPRM. Regardless whether the EPA must or can make a GHG-specific significant contribution finding for fossil fuel-fired power plants, the Agency cannot invoke its CAA section 111 authority to regulate emissions from power plants unless GHG emissions from such sources and the associated global climate change concerns used to justify regulation satisfy the statutory prerequisite for regulation under CAA section 111(b)(1)(A) in the first instance. That is, GHG emissions from power plants must contribute significantly to ''air pollution that may reasonably be anticipated to endanger public health or welfare.'' The Agency is proposing in this supplemental notice that global climate change concerns cannot satisfy that standard. Thus, the EPA is proposing to rescind the set of determinations the Agency made in the 2015 NSPS and retained in the 2024 CPS with regard to GHG emissions from fossil fuel-fired power plants, including the determination that it had a rational basis for regulating GHG emissions from fossil fuel-fired power plants and the endangerment and significant contribution findings made in the alternative (collectively ''the 2015 Findings'').

The statutory authority for this supplemental proposal is the same as that relied upon to make the 2015 Findings in the first instance: CAA section 111(b)(1)(A). In addition, unless provided otherwise by statute, an agency may revise or rescind prior actions so long as it acknowledges the change in position, provides a reasonable explanation for the new position, and considers legitimate reliance interests in the prior position.[115]

The EPA proposes that nothing in the language of the relevant statutory provisions prohibits or conditions our general authority to rescind prior actions through rulemaking. CAA section 111(b)(1)(B) explicitly calls upon the Administrator to ''revise'' standards of performance if appropriate and does not require retaining the same level of stringency when revising or rescinding the existing standards at issue here. Moreover, the statute does not prohibit the Administrator from rescinding findings under CAA section 111(b)(1)(A). The EPA notes that, with regard to the similar statutory provision in CAA section 202(a)(1), it has consistently assumed that it has the statutory authority to rescind endangerment and contribution findings. This is evidenced by both the EPA's review of the merits of petitions for reconsideration of the Agency's authority to regulate GHG emissions under CAA section 202(a)(1) and the recent Endangerment Finding Rescission.[116]

The EPA acknowledges that rescinding the 2015 Findings and repealing associated standards would involve significant changes to the more recent legal interpretations that we have relied on to regulate GHG emissions from power plants under CAA section 111. For example, the interpretation of CAA section 111(b)(1)(A) the EPA is proposing would reverse the basis for the 2015 Findings by concluding that global climate change concerns cannot satisfy the statutory standard for regulation of emissions under CAA section 111(b)(1)(A). Going forward, the EPA would regulate emissions from power plants that fall within the meaning of ''air pollution which may reasonably be anticipated to endanger public health or welfare'' as interpreted in this supplemental proposal. However, the EPA believes that a reconsideration of these legal interpretations is necessary to hew to

[109] Public Law 117–169, *https://www.govtrack.us/congress/bills/117/hr5376.*

[110] CAA section 135(a)(5)–(6), 42 U.S.C. 7435(a)(5)–(6).

[111] The EPA issued a comment solicitation in November 2022 seeking input on how to use the funds to promote education, technical assistance, and partnerships but ultimately did not take further action. *https://www.regulations.gov/document/EPA-HQ-OAR-2022-0878-0002.*

[112] 139 Stat. 155 (''RESCISSION OF FUNDING FOR THE LOW EMISSIONS ELECTRICITY PROGRAM. The unobligated balances of amounts made available to carry out section 135 of the Clean Air Act (42 U.S.C. 7435) are rescinded.'') *https://www.congress.gov/bill/119th-congress/house-bill/1/text.*

[113] H.R.J. Res. 87; H.R.J. Res. 88; H.R.J. Res. 89; *see also Diamond Alt. Energy, LLC* v. *EPA,* 606 U.S.100, 107 n.1 (2025); Statement by the President (June 12, 2025), *https://www.whitehouse.gov/briefings-statements/2025/06/statement-by-the-president/.*

[114] 80 FR 64530–31 (Oct. 23, 2015).

[115] *See FDA* v. *Wages & White Lion Invs., LLC,* 145 S. Ct. 898 (2025) (applying change-in-position doctrine); *FCC* v. *Fox TV Stations, Inc.,* 556 U.S. 502 (2009); *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983); *see also Clean Air Council* v. *Pruitt,* 862 F.3d 1, 8 (D.C. Cir. 2017) (''Agencies obviously have broad discretion to reconsider a regulation at any time.'').

[116] *See, e.g.,* 87 FR 25412 (Apr. 29, 2022) (noticing 2022 reconsideration denial documents in which the EPA assumed it could rescind the findings); 75 FR 49556, 49560–63 (Aug. 13, 2010) (denying reconsideration without asserting that the EPA lacked statutory authority to rescind or revise the Endangerment Finding); *see generally* 91 FR 7686, 7702–10 (Feb. 18, 2026).

the best reading of the statute and in light of recent legal developments, such as the Supreme Court's landmark decisions in *West Virginia* and *Loper Bright.*

The EPA further acknowledges that the 2015 Findings, and in particular regulatory requirements under the 2015 NSPS and 2024 CPS, have imposed significant burdens on Federal, State, and private-sector entities, including costs already incurred to achieve and demonstrate compliance with requirements by compliance dates in the past. We also understand that certain States, municipalities, and third-party organizations may have relied on the 2015 Findings or associated regulations in developing additional regulatory or voluntary programs. The EPA solicited public comment on these and other reliance interests in connection with the primary proposal in the June 2025 NPRM, which similarly proposed to rescind and repeal these findings and regulations. We acknowledge that the additional rationales in this action could potentially implicate additional and different reliance interests. Although we do not believe that any such reliance interests could justify retaining the findings and regulations in the absence of statutory authorization, we solicit comment on whether the there are additional reliance interests implicated by the additional rationales put forward in this supplemental proposal and, if so, why they are legitimate and significant and how we should consider them when taking final action.

To a certain extent, the EPA's reexamination of its authority to regulate GHG emissions under CAA section 111 based on global climate change concerns is informed by our recent rescission of the 2009 Endangerment Finding under CAA section 202(a)(1). The statutory provisions governing the endangerment and contribution findings under CAA sections 111(b)(1)(A) and 202(a)(1) differ in ways, although both call upon the EPA to regulate when a collection of emitting sources contributes (or contributes significantly) to ''air pollution which may reasonably be anticipated to endanger public health or welfare.'' The 2015 Findings were based in significant part on the approach taken in the 2009 Endangerment Finding, and as such, many of the flaws identified in the 2009 Endangerment Finding similarly impact the legal and analytical approach we carried through to stationary sources in the 2015 NSPS and 2024 CPS.

Recent legal developments have also compelled the EPA to take a harder look at the 2015 Findings. In particular, the Supreme Court's decision in *West Virginia,* which explained and applied the major questions doctrine, has particular bearing on the question whether the EPA has authority to regulate GHG emissions from fossil fuel-fired power plants under CAA section 111. The EPA discusses application of the major questions doctrine to this question in section V of this preamble. And in June 2024, the Supreme Court announced its decision in *Loper Bright,* which overruled *Chevron* deference to agency statutory interpretation and clarified that statutes have a single, best meaning, which is fixed at the time of enactment.[117] As explained in section V of this preamble, the EPA's authority to regulate air pollutant emissions from a source category under CAA sections 111(b)(1)(B) and 111(a)(1) flows from the Administrator's listing of that category upon finding that it ''causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.'' Regardless whether CAA section 111(b)(1)(A) requires the EPA to have only a rational basis for regulating air pollutants from an already listed source category or whether the Agency must make a pollutant-specific significant contribution finding, as a threshold matter, the EPA must demonstrate that the source category emissions satisfy the statutory prerequisite for regulation—that is, they must relate to qualifying ''air pollution'' within the meaning of the statute. And because the EPA is proposing to find that we lack authority under CAA section 111 to regulate GHG emissions from fossil fuel-fired power plants based on global climate change concerns, we are also proposing to repeal all regulations relating to GHG emissions from fossil fuel-fired power plants that the Agency has promulgated pursuant to CAA sections 111(b)(1)(B) and 111(a)(1), which are currently codified in 40 CFR part 60, subparts TTTT and TTTTa.

The EPA emphasizes that the scope of this supplemental notice is limited to the treatment of GHG emissions from fossil fuel-fired power plants under CAA section 111.[118] While the proposed interpretation of CAA section 111(b)(1)(A) regarding authority to regulate GHG emissions could apply more broadly, other components of our analysis, including the applicability of the major questions doctrine and the evaluation of the impact of regulating GHG emissions from fossil fuel-fired power plants based on the identified harms associated with global climate change, are specific to the fossil fuel-fired power plant source category.

The EPA acknowledges that we are proposing action in the context of a subject matter that has generated scientific and technical literature, including findings and reports of the National Academy of Sciences (NAS). For example, on July 16, 2026, the NAS released a consensus study report discussing the attribution of extreme weather events to global climate change.[119] The report discusses scientific methodology and modeling associated with the attribution of extreme weather events such as heat waves, wildfires, or connective storms to GHG emissions produced from human activities. The report also discusses developments in weather event attribution and further steps for research and improving conclusions regarding event attribution. The issues raised in this supplemental proposal, however, are legal in nature and turn on statutory interpretation and the application of judicial precedent. We propose that this report, and prior information released by NAS, do not differ in any material respect from or conflict with the legal rationales set forth in this supplemental notice.

As discussed throughout this preamble, the EPA is proposing these changes to comply with limits on our statutory authority under the best reading of CAA section 111(b)(1)(A), to adhere to the legal limits on our power to set national policy within our constitutional system of democratic government, and to realign Agency resources to prioritize core statutory responsibilities to protect human health and the environment. Importantly, the Nation's policy response to global climate change concerns was a major issue in the 2024 presidential election, in which voters were presented with distinct legal and policy approaches and elected a candidate promising a change in policy. Under these circumstances, the election of a new Administration is an independent and sufficient basis for reassessing and revising legal interpretations to faithfully adhere to the best reading of the statute.[120]

[117] 603 U.S. at 412–13 (overruling *Chevron U.S.A., Inc.* v. *NRDC, Inc.,* 467 U.S. 837 (1984)).

[118] *See UARG,* 573 U.S. at 319–20.

[119] National Academies of Sciences, Engineering, and Medicine. 2026. Attribution of Extreme Weather and Climate Events and Their Impacts. Washington, DC: National Academies Press. *https://doi.org/10.17226/28590.*

[120] *See State Farm,* 463 U.S. at 59 (Rehnquist, J., concurring in part and dissenting in part); *PETA* v. *USDA,* 918 F.3d 151, 158 (D.C. Cir. 2019) (''new administrations are entitled to reevaluate and modify agency practices, even longstanding ones''); *Nat'l Ass'n of Home Builders* v. *EPA,* 682 F.3d

Continued

Democratic accountability is essential to the exercise of delegated authority by administrative agencies,[121] and retaining the 2015 Findings and associated GHG standards without clear statutory authority would frustrate, not promote, constitutional values and the rule of law. The EPA proposes to determine that it lacks authority to retain the 2015 Findings under the best reading of CAA section 111(b)(1)(A), and the statute controls regardless of policy preferences.[122]

### V. Rescission of the 2015 Findings

In this section, the EPA provides its bases for proposing to rescind the 2015 Findings that purported to provide the authority to regulate GHG emissions from fossil fuel-fired power plants under CAA section 111 based on global climate change concerns. We are proposing to determine that these Findings and regulations exceed the EPA's statutory authority for multiple, independent reasons.

Section V.A.1 proposes that the best reading of CAA section 111(b)(1)(A), as informed by *Loper Bright* and principles of statutory interpretation, precludes the EPA from regulating power plant emissions based on global climate change concerns because such concerns cannot satisfy the statutory prerequisite for applying the Agency's regulatory authority. Rather, the best reading of the requirement to list a source category ''if in [the Administrator's] judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare'' is that the ''air pollution'' to be addressed under CAA section 111 must adversely impact public health or welfare through local or regional exposure. This proposed interpretation is based on the language of the statute, canons of statutory interpretation, statutory context, amendment and legislative history, and relevant case law, among other considerations. Because GHG emissions may endanger public health and welfare only by virtue of elevated global concentrations of GHGs in the atmosphere and the impacts of second- and third-order phenomena attributed to global climate change, *i.e.,* not based on local or regional exposure to GHG emissions, the EPA is proposing to find that they cannot satisfy the standard in CAA section 111(b)(1)(A). The futility of regulating GHG emissions from fossil fuel-fired power plants under CAA section 111 in addressing the public health and welfare impacts attributed to global climate change further reinforces this proposed interpretation.

Section V.A.2 proposes two further bases for rescinding the 2015 Findings and associated regulations that stem from flaws in the 2015 Findings themselves. First, as an initial step, in 2015 the EPA combined two separate source categories to create the fossil fuel-fired EGU source category specifically for the purpose of regulating GHG emissions from these sources. In doing so, we failed to undertake a new listing under CAA section 111(b)(1)(A) and instead purported to subject these sources to additional regulatory controls without grappling fully with the predicate requirements for taking such an action. The EPA proposes that this omission renders the 2015 Findings and subsequent regulations unlawful. Second, the 2015 Findings relied on the same interpretive approach that underlays the 2009 Endangerment Finding under CAA section 202(a)(1), as well as on the existence of the endangerment and contribution findings in the 2009 Endangerment Finding. The rescission of the 2009 Endangerment Finding has abrogated the legal framework underlying the 2015 Findings, which the EPA proposes to find renders the 2015 Findings without legal basis. Relatedly, the flaws identified in the 2009 Endangerment Finding similarly render the 2015 Findings insupportable.

Section V.B proposes that the major questions doctrine applies to the EPA's assertion of authority under CAA section 111 and that the Agency lacks the clear congressional authorization required for the unheralded assertion of authority adopted in the 2015 Findings. We review the Supreme Court's precedents applying the major questions doctrine, including *UARG* and *West Virginia,* to propose that the Nation's policy response to global climate change concerns is a question of significant economic and political importance that Congress did not clearly empower the EPA to decide by authorizing the Administrator to list a category of sources for regulation ''if in [the Administrator's] judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.'' We further propose that a limiting construction of CAA section 111(b)(1)(A) is necessary to avoid serious constitutional concerns with the breadth of the provision required by the logic adopted in the 2015 Findings.

Section V.C of this preamble explains our proposed determination that the EPA lacks authority to regulate GHG emissions under CAA section 111(b)(1)(A) because such regulations have not and cannot diminish the public health and welfare impacts attributed to global climate change in any non-*de minimis* way. As presented below, the results of commonly accepted models indicate that even the elimination of all $CO_2$ emissions from fossil fuel-fired power plants in the United States (much more than the regulations we propose to repeal would do if fully implemented) would not yield impacts beyond a level that is well below the range of inherent variability in measurement for trends in GMST and GSLR. We propose that these findings further support the contemplated rescissions and repeals given the language of CAA section 111(b)(1)(A) and the background principles that Congress does not require futile efforts or include *de minimis* concerns in general statutory terms.

In proposing these rationales, the EPA is mindful that we issued the 2015 Findings during a transitional period regarding the standards for statutory interpretation and understandings of agency authority. The Supreme Court had, in *Massachusetts,* determined that GHGs fit within the CAA-wide definition of ''air pollutant.'' At the time we responded to this decision, both the breadth of agency discretion and the question whether Congress reserves major policy questions for itself were sharply disputed. Judicial decisions in the intervening years have significantly clarified the law. In *Loper Bright,* the Supreme Court overruled the *Chevron* doctrine of deference to agency statutory interpretation, ruling that statutes ''have a single, best meaning'' that is '' 'fixed at the time of enactment' '' and informed, but not dictated, by Executive Branch practice. 603 U.S. at 400–01 (quoting *Wis. Cent. Ltd.* v. *United States,* 585 U.S. 274, 284 (2018)). And in *West Virginia,* the Supreme Court built upon its decisions in *UARG* and *Brown & Williamson,* among others, by confirming that an agency must have more than ''a colorable textual basis'' to claim authority to decide major questions of policy that Congress generally reserves for itself. 597 U.S. at 723.

Each of the legal bases proposed in this action is independent from the others and would be sufficient to rescind the 2015 Findings and repeal the associated GHG standards. The EPA

1032, 1043 (D.C. Cir. 2012) (''the inauguration of a new President and the confirmation of a new EPA Administrator'' went ''a long way toward explaining why EPA'' changed policy).

[121] *See, e.g., U.S. Telecom Ass'n* v. *FCC,* 855 F.3d 381 (D.C. Cir. 2017) (Brown, J., dissenting from denial of rehearing en banc); Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2252–53, 2332–34 (2001).

[122] *Loper Bright,* 603 U.S. at 403; *West Virginia,* 597 U.S. at 735; *UARG,* 573 U.S. at 325.

is proposing that a lack of statutory authority for the 2015 Findings and related GHG regulations would require the rescissions and repeals even if the major questions doctrine did not apply. Similarly, we propose that the major questions doctrine would require finalizing this action even if the EPA had a plausible textual basis for asserting the authority to regulate GHG emissions in response to global climate change concerns. Each of these bases would require finalizing this action even if the futility of regulating GHG emissions from fossil fuel-fired power plants was not established in the record or was not an adequate basis for finalizing these actions. And that futility, in turn, provides another separate and independent basis for these proposed actions.

*A. Best Reading of CAA Section 111(b)(1)(A)*

The EPA is proposing that under the best reading of CAA section 111, fixed at the time of enactment and informed by ordinary principles of statutory interpretation and relevant history, the Agency's change in position in the 2015 NSPS (as retained in the 2024 CPS) exceeded the Agency's statutory authority for multiple reasons. First, we propose multiple reasons for concluding that CAA section 111(b)(1)(A) sets the outer bounds of the EPA's regulatory authority and is best read as authorizing the Agency to regulate emissions that contribute significantly to air pollution that itself endangers public health or welfare through local or regional exposure. Second, we propose that separate and apart from whether the EPA may regulate in response to global climate change concerns, several errors in the 2015 NSPS (retained in the 2024 CPS) would independently support rescinding these prior actions and associated emission standards for fossil fuel-fired power plants.

1. CAA Section 111(b)(1)(A) Does Not Subject Source Category Emissions to Regulation Based on Global Climate Change Concerns

The EPA is proposing to determine that CAA section 111(b)(1)(A) authorizes the Agency to regulate source category emissions that cause or contribute significantly to air pollution that may itself endanger health or welfare through local or regional exposure. This reading is consistent with the ordinary meaning of key terms and the statutory structure and history, our decades-long implementation of the statute prior to 2015, and background principles of statutory interpretation, including default rules for proximate cause. This reading is also consistent with the Supreme Court's decisions in *Massachusetts* and *AEP,* both of which addressed distinct issues and must be read in harmony with subsequent decisions bearing on the EPA's authority and statutory interpretation, including *UARG, West Virginia,* and *Loper Bright.*

As an initial matter, we propose that the EPA's authority to list source categories under CAA section 111(b)(1)(A) informs the overall regulatory scope of CAA section 111. That is, the Agency's authority to regulate particular emissions from a given source category is cabined by whether the associated air pollution is the type that Congress authorized the EPA to address. This inquiry is informed by the function CAA section 111(b)(1)(A) plays in the statute's regulatory scheme for stationary sources. After the Administrator lists a source category under CAA section 111(b)(1)(A), section 111(b)(1)(B) provides that the EPA "shall publish proposed regulations, establishing Federal standards of performance for new sources within such category." The definition of "standard of performance" in CAA section 111(a)(1) states that it is "a standard for *emissions of air pollutants* which reflects the degree of emission limitation achievable through the application of the best system of emission reduction . . ." (emphasis added). Thus, we propose that the basis for any regulation of stationary sources under CAA section 111 must be "air pollution which may reasonably be anticipated to endanger public health or welfare."

In the 2015 NSPS, the EPA effectively listed a new source category—fossil fuel-fired EGUs—when it combined the fossil fuel-fired steam generating EGU and fossil fuel-fired stationary combustion turbine source categories.[123] Consistent with discussion in the June 2025 NPRM, we propose that the Agency erred in failing to undertake a listing for this new source category. That listing action would have required analyzing whether the global climate change concerns associated with power plant GHG emissions qualified as air pollution within the meaning of CAA section 111 and evaluating whether GHG emissions from power plants contribute significantly to such air pollution. Instead, we asserted that the Agency need only have a "rational basis" for regulation of GHG emissions from "a source category that was previously listed and regulated for other pollutants."[124] Importantly, however, the rational basis we identified was the conclusion in the 2009 Endangerment Finding "that GHG air pollution may reasonably be anticipated to endanger public health or welfare."[125] We thus acknowledged in the 2015 NSPS that regulation is bounded by the statutory requirement that such regulation involve qualifying air pollution. We propose that even under the "rational basis" approach, it would be irrational to regulate emissions from a source category for purposes other than addressing "air pollution which may reasonably be anticipated to endanger public health or welfare."

a. Extending CAA Section 111(b)(1)(A) Regulation to Global Climate Change Concerns Is Inconsistent With the Statutory Text and Past Practice

CAA section 111(b)(1)(A) calls on the Administrator to list a category of stationary sources "if in his judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare."[126] The Act does not define the term "air pollution." The EPA proposes to interpret "air pollution" as that which itself endangers public health or welfare through local or regional exposure. This interpretation is supported by the ordinary meaning at the time of enactment of the key terms "air pollution," "pollutant," and "pollution," the statutory definitions of "air pollutant" and "welfare" in CAA section 302, the context in which these terms appear, and the Agency's consistent practice prior to 2015 and 2009.

As noted above, the scope of the EPA's authority to list source categories under CAA section 111(b)(1)(A) informs the overall regulatory scope of CAA section 111. That is, the Agency's authority to regulate a given air pollutant from a given source category under CAA section 111 is cabined by whether the associated air *pollution* is the type that Congress intended the EPA to address. At the time Congress added the terms "air pollutant" and "air pollution" to CAA section 111, "pollutant" was defined as "[a]nything that pollutes; especially, any gaseous, chemical, or organic waste that

[123] *See* 80 FR 64510, 64531 (Oct. 23, 2015).

[124] *Id.* at 64530.

[125] *See id.* at 64522–24, 64529–31. Specifically, the 2015 NSPS cited to the 2009 Endangerment Finding, subsequent 2010 reconsideration denials, and additional information that "len[t] further credence to the validity of the Endangerment Finding." *Id.* at 64530.

[126] 42 U.S.C. 7411(b)(1)(A).

contaminates air, soil, or water,'' [127] and ''pollution'' was defined as ''[t]he contamination of soil, water or the atmosphere by the discharge of noxious substances.'' [128] The definition of the root word ''pollute''—''[t]o dirty, contaminate''—confirms the relationship of these terms to concepts of contamination and toxicity.[129] The central concept is the addition of a contaminant, something that ''make[s] impure by contact or mixture.'' [130] CAA section 302(g) defines ''air pollutant'' as any ''air pollution agent or combination of such agents'' that ''is emitted into or otherwise enters the ambient air.'' [131] The underlying concept of dangerousness and contamination reinforces the conclusion that ''air pollution''—when read in the context of CAA section 111, as the Supreme Court held the EPA must in *UARG*—refers to that which itself endangers public health or welfare through local or regional exposure.

Contemporaneous usage of the term ''air pollution'' in the 1960s and 1970s supports this reading. Judicial decisions issued around that time used the term exclusively in reference to local and regional exposure.[132] News reports and legislative debates similarly addressed air pollution problems arising from local and regional exposure, including smog and health and welfare impacts related to inhalation and physical contact.[133]

Understandings of terms used in the CAA section 302(h) definition of ''welfare'' also support the understanding that CAA section 111(b)(1)(A) encompasses air pollution with adverse impacts from local or regional exposure. The statute provides that references to ''effects on welfare'' include ''effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate,'' damage to property, transportation hazards, and effects on economic values and personal comfort and well-being. The ordinary meaning of ''climate,'' an undefined term, was ''[t]he prevailing weather in a particular region'' or ''[a] region manifesting particular meteorological conditions.'' [134] Similarly, ''weather'' meant ''[t]he state of the atmosphere at a given time and place, described by temperature, moisture, wind velocity, and pressure.'' [135] Both terms must also be read together in context, including by reference to the other terms enumerated in the list.[136] Each of the other terms in the definition of ''welfare'' refers to things and mechanisms of action that occur in a particular place or under regionally bounded conditions.

The terms Congress used speak to air pollution with adverse impacts from local and regional exposure, not global climate change concerns that entail a very different and much longer causal chain. The definition is broad enough to encompass the various air pollutants and air pollution of concern, each of which interacts differently with the environment—*e.g.,* smog and PM. Congress understood that air pollution challenges varied from State to State and region to region, while, at the same time, recognizing that the most acute challenges—*e.g.,* smog in highly populated urban areas—had similarities that would benefit from national standards.[137] But none of the many terms listed in the definition of welfare would have been understood, absent modifying terms, to refer to global considerations. Nor has Congress added terms like ''global'' or ''change'' that would have expanded the scope of the effects on welfare encompassed within the definition.[138]

The interpretation of ''air pollution'' reflected in the 2015 Findings is different in kind from contemporaneous understandings of the term. That interpretation was, to a significant degree, rooted in the 2009 Endangerment Finding. *See* 80 FR 64531. The 2009 Endangerment Finding defined the relevant ''air pollutant'' as six ''well-mixed GHGs'' and the relevant ''air pollution'' as total global concentrations of ''the combined mix of'' these GHGs ''which together, constitute the root cause of human-induced climate change and the resulting impacts on public health and welfare.'' 74 FR 66516. The 2015 Findings likewise treated the six long-lived and directly emitted GHGs as the relevant air pollution, 80 FR 64531 n.110, and provided that such ''air pollution'' was reasonably anticipated to endanger public health or welfare through the mechanism of global climate change, 80 FR 64531. The 2015 Findings further stated that the regulated ''air pollutant'' was also GHGs, although the standards of performance for fossil fuel-fired power plants were expressed in the form of limits on $CO_2$, given that $CO_2$ comprised more than 99 percent of total estimated GHG emissions from the regulated sources. 80 FR 64537.

In contrast to the air pollution that the EPA has historically addressed under CAA section 111 and that is addressed

[127] *Pollutant,* Am. Heritage Dictionary 1015 (1970); *see also Pollutant,* 3 Webster's Third New Int'l Dictionary 1756 (1966) (''something that pollutes: a polluting substance, medium or agent'').

[128] *Pollution,* Am. Heritage Dictionary 1015 (1970); *see also Pollution,* 3 Webster's Third New Int'l Dictionary 1756 (1966) (''the action of polluting or the state of being polluted: defilement, desecration, impurity, uncleanness'').

[129] *Pollute,* Am. Heritage Dictionary 1015 (1970); *see also Pollute,* Black's Law Dictionary 1043 (5th ed. 1979) (''To corrupt or defile. The contamination of soil, air and water by noxious substances and noises.''); *Pollute,* 3 Webster's Third New Int'l Dictionary 1756 (1966) (''to make physically impure or unclean: befoul, dirty, taint'').

[130] *Contaminate,* Am. Heritage Dictionary 156 (1970); *see also Contaminate,* 1 Webster's Third New Int'l Dictionary 491 (1966) (''to soil, stain, corrupt, or infect by contact or association'').

[131] 42 U.S.C. 7602(g).

[132] *See, e.g., Washington* v. *GM Corp.*, 406 U.S. 109, 115–16 (1972) (declining to exercise original jurisdiction over complaint alleging conspiracy to restrain the development of air pollution control devices for motor vehicles because, although ''Congress has largely preempted the field with regard to 'emissions from new motor vehicles,' . . . geophysical characteristics which define local and regional airsheds are often significant considerations in determining the steps necessary to abate air pollution''); *Friends of Earth* v. *FCC*, 449 F.2d 1164, 1165–66 (D.C. Cir. 1971) (addressing challenge to the FCC's treatment of automobile advertisements that petitioners alleged took a position on motor vehicle air pollution worsening local conditions in New York City, including ''dangerous hydrocarbons in the air'').

[133] *See, e.g., Coal. for Responsible Regulation,* 2012 U.S. App. LEXIS 25997, at *32–37 (Brown, J., dissenting from denial of rh'g en banc) (summarizing relevant history).

[134] *Climate,* Am. Heritage Dictionary 136 (1970); *see, e.g.,* Alameda Cons. Ass'n v. California, 437 F.2d 1087, 1096 (9th Cir. 1971) (using ''climate'' to discuss local environmental conditions in San Francisco Bay); Levenson's Case, 194 NE2d 103, 105 (Mass. 1963) (using ''climate'' to address whether moving to another state with a different climate is a covered medical expense).

[135] *Weather,* Am. Heritage Dictionary 785 (1970).

[136] *See Fischer* v. *United States*, 603 U.S. 480, 487 (2024) (''[T]he canon of *noscitur a sociis* teaches that a word is 'given more precise content by the neighboring words with which it is associated.' That 'avoid[s] ascribing to one word a meaning so broad that it is inconsistent with' 'the company it keeps''' (citations omitted)); *Gustafson* v. *Alloyd Co.*, 513 U.S. 561, 575 (1995) (applying canon to interpret the broad term ''communication,'' as used in a statutory definition of ''prospectus,'' to mean only public-facing communications that offer securities).

[137] *See, e.g.,* S. Rep. No. 91–1196, at 1–8, 24 (1970) (discussing need for and intent of Senate bill that would eventually form much of the 1970 CAA by reference to urban pollution problems and areas in proximity to stationary and mobile sources and recognizing that ''protection of the public health and welfare requires definitive knowledge of the causal relationships between exposure to air pollution agents . . . under varying environmental conditions''); H.R. Rep. No. 91–1146, at 6 (1970) (similar for House bill that informed aspects of the 1970 CAA).

[138] Congress has used such language to specify the relevance of global climate change concerns in more recent amendments to different programs. CAA section 211(o)(2)(B)(ii), for example, provides that the EPA must consider the impact of the production and use of renewable fuels on ''climate *change*'' when setting renewable fuel volumes under the RFS program. 42 U.S.C. 7545(o)(2)(B)(ii) (emphasis added); *see id.* 7545(o)(1) (defining various renewable fuels in part by reference to GHG emissions).

under title I of the CAA generally, GHGs do not endanger public health or welfare through local or regional exposure. Rather, any adverse impacts stem from GHGs becoming well mixed in the upper atmosphere, resulting in elevated global GHG concentrations. It is then these elevated GHG concentrations that drive phenomena that, in turn, affect public health and welfare. To this end, the 2009 Endangerment Finding, on which the 2015 Findings are based, asserted that GHG ''air pollution'' would *lead to* increases in global temperature and change to ocean pH that, in turn, would *lead to* environmental phenomena, in combination with an open-ended universe of additional factors, which would potentially have adverse health and welfare impacts of varying severity in certain regions.

The Administrator admitted at the time that the circumstances were ''unique'' because ''[n]one of th[e] human health effects'' identified in the Endangerment Finding ''are associated with direct exposure to greenhouse gases.'' 74 FR 66527. With respect to welfare effects, the Administrator acknowledged that the primary effects of concern could be considered health *or* welfare impacts [139] and that certain welfare impacts were ''effects on people that do not rise to the level of health effects'' but utilize the same causal chain. 74 FR 66527; *see* 74 FR 66531.[140] In the same way that the EPA found in the Endangerment Finding Rescission that regulating GHG emissions based on global climate change concerns ''requires reading an additional instance of 'cause, or contribute' '' [141] into CAA section 202(a)(1), the EPA proposes that reading CAA section 111 to authorize the regulation of GHG emissions based on global climate change concerns would similarly require reading section 111(b)(1)(A) as encompassing the ''emission of air pollutants that cause, or contribute significantly to, air pollution that causes, or contributes to, endangerment of public health or welfare.''

The EPA is proposing that background principles of causation and proximate cause support our proposed interpretation of CAA section 111(b)(1)(A) as not extending to regulation of fossil fuel-fired power plants based on global climate change concerns. In particular, the EPA proposes that the terms ''cause,'' ''contribute,'' and ''reasonably be anticipated to endanger'' must be read consistent with these principles. In enacting and amending CAA section 111(b)(1)(A), Congress legislated on a foundation that included ''default rules,'' including the background principles of causation and proximate cause.[142] These rules are ''presumed to have [been] incorporated, absent an indication to the contrary in the statute itself.'' [143] Additionally, Congress endorsed the incorporation of proximate cause principles when it added the phrase ''may reasonably be anticipated'' to this section in the 1977 CAA Amendments. That phrase is another way of saying ''reasonably foreseeable,'' a longstanding touchstone of proximate cause.[144]

GHG emissions from fossil fuel-fired power plants in the United States do not have a sufficiently close connection to the harms identified in the 2015 Findings to fit within the legal meaning of ''cause'' or ''contribute.'' This understanding is complemented by the term ''reasonably'' in the phrase ''air pollution which may reasonably be anticipated to endanger public health or welfare.'' Like the terms ''cause'' and ''contribute,'' the term ''reasonably'' places an outer legal limit on the authority to anticipate dangers to public health and welfare from air pollution. The greater the number of causal links involved in anticipating such endangerment, the more difficult it is to qualify the anticipation of the danger as ''reasonable.'' Global climate change concerns involve causal relationships that are too uncertain, conjectural, remote, and convoluted by intervening and confounding factors to fit within the terms ''cause,'' ''contribute,'' and ''reasonably be anticipated to endanger'' as used in CAA section 111(b)(1)(A).

This reading follows from the understanding discussed above that title I, including CAA section 111, was designed to address air pollution with harmful impacts from local and regional exposure and that is amenable to analysis using ordinary causation standards. In specifying that emissions may ''cause, *or* contribute to'' air pollution (emphasis added), and that air pollution need only ''be reasonably anticipated to endanger public health or welfare,'' Congress signaled in CAA section 111(b)(1)(A) that regulation may be appropriate when harm is not yet occurring or is not certain to occur. But that language bearing on the degree of certainty required does not override ordinary background principles governing the limits of an attenuated causal chain.

The 2015 Findings, in which the EPA first interpreted CAA section 111 as allowing it to regulate based on global climate change concerns, represented a departure from past Agency practice. From the enactment of CAA section 111(b)(1)(A) in 1970 until 2015, the EPA used its authority to target air pollution that adversely impacts public health or welfare through local or regional exposure. The EPA generally promulgated regulations—NSPS for new sources and emission guidelines for existing sources—in waves, starting in 1971. Once a source category was listed pursuant to CAA section 111(b)(1)(A), the EPA exercised judgment as to which air pollutant(s) emitted from each source category to regulate. The earliest NSPS promulgated under CAA sections 111(b)(1)(B) and 111(a)(1) in 1971 regulated emissions of PM (sometimes expressed and regulated as opacity), $NO_X$, $SO_2$, CO, and sulfuric acid mist.[145] Other pollutants addressed in the early regulatory push of the 1970s included total fluorides,[146] total reduced sulfur,[147] and VOCs.[148] In 1996, the EPA started regulating non-methane organic compounds emitted from landfills on the basis that they contribute to ozone formation, that some NMOC are known or suspected carcinogens or cause other non-cancer health effects, and that they can cause

[139] For example, the EPA in the 2009 Endangerment Finding understood impacts on ''well-being'' as used in the CAA section 302(h) definition of ''welfare'' to be relevant ''whether [the impacts] resul[t] directly or indirectly from the pollution in the air.'' 74 FR 66528.

[140] The Agency acknowledged that difficult questions about the distinction between health and welfare impacts was something the ''EPA has not had to resolve'' in the past, ''as it has been clear whether the effects relate to public health or relate to public welfare, with no confusion over what category was at issue.'' 74 FR 66527. Rather than take this analytical difficulty as a sign that the causal chain was different in kind from the type of ''air pollution'' addressed by CAA section 202(a)(1), however, we proceeded to finalize a novel invocation of authority to regulate in response to global climate change concerns.

[141] 91 FR 7686, 7714 (Feb. 18, 2026).

[142] *See, e.g., Bank of Am. Corp.* v. *City of Miami*, 581 U.S. 189, 201 (2017); *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U.S. 118, 132 (2014); *Univ. of Tex. Sw. Med. Ctr.* v. *Nassar*, 570 U.S. 338, 347 (2013); *City of Oakland* v. *Wells Fargo* & Co., 14 F.4th 1030 (9th Cir. 2021) (en banc).

[143] *Nassar,* 570 U.S. at 347.

[144] *Foreseeable,* 1 Webster's Third New Int'l Dictionary 890 (1966) (''being such as may reasonably be anticipated''); *see, e.g., Hicks* v. *United States*, 511 F.2d 407, 421 (D.C. Cir. 1975) (finding ''proximate cause'' satisfied because it was ''foreseeable'' that a hospital's release without warning of an alcoholic patient with a history of abusing his wife could result in harm to the patient's wife).

[145] 36 FR 24877 (Dec. 23, 1971).

[146] *See, e.g.,* 41 FR 3828 (Jan. 26, 1976) (NSPS for primary aluminum reduction plants).

[147] *See, e.g.,* 43 FR 7572 (Feb. 23, 1978) (NSPS for kraft pulp mills).

[148] *See, e.g.,* 39 FR 9317 (Mar. 8, 1974) (NSPS for storage vessels for petroleum liquids).

an odor nuisance.[149] The 1996 landfills rule also regulated methane emissions based on the EPA's finding that such emissions present a fire and explosion hazard, although we acknowledged ''ancillary'' benefits that may arise given developing concerns about global climate change.[150] Overwhelmingly, the set of air pollutants and air pollution concerns addressed in the 1970s remained the focus of regulation under CAA section 111 for both new sources (under 111(b)(1)(B)) and existing sources (under 111(d)) through the ensuing decades.[151] Emissions of each of these regulated air pollutants result in air pollution that directly affects public health or welfare through exposure to those emissions, or to air pollution created through the reaction of those emissions with other airborne chemicals or conditions, at the local or regional scale.[152] Thus, the EPA deviated from over forty years of precedent when it expanded the reach of CAA section 111 in the 2015 Findings.

The approach taken for the 2015 Findings also required the EPA to find endangerment and significant contribution when most emissions are from international sources. This was similarly a departure from past practice, and it expanded the reach of CAA section 111 by allowing the EPA to regulate GHG emissions from U.S. fossil fuel-fired power plants when the overwhelming bulk of the emissions underlying the finding of endangerment were from sources outside the United States. The EPA now proposes that interpreting ''air pollution which may reasonably be anticipated to endanger public health or welfare'' to permit regulation even when most of the endangerment stems from international sources is contrary to CAA section 111. Congress has specifically provided in the CAA when and how the EPA may consider international emissions. For example, CAA section 115 authorizes the EPA to require controls for domestic emissions that contribute to air pollution that endangers public health or welfare in another country only when, among other things, that country has adopted reciprocal protections for emissions into the United States.[153] CAA section 179B authorizes the EPA to account for the impact of international emissions on NAAQS attainment under certain conditions.[154] Most tellingly, Congress adopted a new regulatory regime in 1990—title VI—in response to global concerns about depletion of the ozone layer, which contains its own findings, policies, and regulatory authorities that required the EPA to phase out domestic use of ozone-depleting substances.[155] None of these provisions encompass GHG emissions, and all support the conclusion that Congress does not presume that general authorities in the CAA encompass international emissions. Rather, Congress knows how to provide for the consideration of and regulation in response to international emissions, and has not done so for GHG emissions, either in CAA section 111 or elsewhere.

Moreover, the EPA proposes that Congress's inclusion of the qualifier ''significantly'' in CAA section 111(b)(1)(A) is evidence of its intent for the EPA to regulate only when a source category has a meaningfully large contribution to air pollution that may reasonably be anticipated to endanger public health or welfare. Congress used the phrase ''cause(s) or contribute(s) to air pollution which may reasonably be anticipated to endanger public health or welfare'' seven times in the CAA.[156] Notably, Congress used the phrase ''cause(s) or contribute(s) *significantly* to air pollution which may reasonably be anticipated to endanger public health or welfare'' four times in the Act.[157] Congress's intentional addition of ''significantly'' in CAA section 111 is evidence of an intentional design, under this section in particular, for the EPA to regulate only when a source category is responsible for a meaningfully large portion of the anticipated adverse public health or welfare impacts caused by the air pollution. This interpretation is corroborated by the legislative history of CAA section 111, which speaks to Agency regulation of source categories under CAA section 111 that have a ''substantial'' impact on ''endangerment.'' [158]

However, as discussed above, climate change concerns are global in nature—in the 2009 Endangerment Finding, the EPA determined that it was the elevated concentrations of globally well-mixed GHGs in the atmosphere that led to climate change and adverse impacts on public health and welfare. 74 FR 66516.[159] These elevated GHG concentrations are the result of emissions from myriad sources all over the world. It is thus challenging for a single source category's contribution to the global total to demonstrate significant adverse impacts; in 2022, fossil fuel-fired power plants in the United States contributed 3.0 percent of global GHG emissions.[160] Additionally, the EPA is proposing to interpret CAA section 111(b)(1)(A) as requiring the Agency to consider a source category's contribution to the *endangerment* caused by air pollution, rather than to just the air pollution itself. Due to the inherent nature of global climate change, GHG emissions from an individual U.S. source category are necessarily only one small component of a much larger and complex global emissions picture. For global climate change concerns, the threshold for a quantity of GHGs to comprise a ''significant'' contribution to either elevated atmospheric GHG concentrations (the purported ''air pollution'') or the adverse impacts thereof, is well above the likely contributions of a single source category. Our proposed futility analysis below further supports this conclusion. Thus, the EPA is proposing to find that it could not have been Congress's intent for the Agency to use CAA section 111 to regulate GHG emissions from fossil fuel-fired power plants based on global climate change concerns.

Moreover, CAA section 111 is distinguishable from statutory provisions or proposed legislation focused on global pollution or climate change concerns. For instance, to address the dangers posed by ozone depleting chemicals, title VI of the CAA, enacted in the CAA Amendments of 1990, specifically references ''global warming potential,'' the ''Montreal Protocol'' as governing international treaty, and ''international cooperation.'' [161] In contrast, CAA section 111 includes no references to global impacts or concerns. The CAA Amendments of 1990 were motivated in

[149] 61 FR 9905, 9906 (Mar. 12, 1996).

[150] *Id.*

[151] The 1979 ''Priority List an Additions to the List of Categories of Stationary Sources,'' in which the EPA promulgate a list of major source categories for which standards of performance were to be promulgated by 1982, considered emissions of nine pollutants: VOC, $NO_X$, PM, $SO_2$, carbon monoxide, lead, fluorides, acide mist, and hydrogen sulfide. 44 FR 49222 (Aug. 21, 1979).

[152] The EPA addresses landfill methane emissions in section VI of this preamble.

[153] 42 U.S.C. 7415.

[154] 42 U.S.C. 7509a.

[155] 42 U.S.C. 7671 *et seq.*

[156] 42 U.S.C. 7408(a)(1)(A), 7415(a), 7422(a), 7521(a)(1), 7521(a)(3)(D), 7521(e), 7571(a)(2)(A).

[157] 42 U.S.C. 7411(b)(1)(A), 7411(g)(2), 7547(a)(1), 7547(a)(4) (emphasis added). Note that 42 U.S.C. 7411(g)(2) and 7547(a)(4) do not include ''cause(s).''

[158] *See, e.g.,* H.R. Rep. No. 91–1146, at 9–10 (explaining that the draft legislation would authorize the EPA to ''establish emission standards with respect to any class of new stationary source which because of the nature of or amount of emissions may contribute substantially to endangerment of the public health or welfare'').

[159] The 2015 Findings adopted the same approach to characterizing the relevant air pollution. *See* 80 FR 64517.

[160] 90 FR 25768 & n.120.

[161] *See* CAA sections 601, 602(e), 614, 617 *et seq.,* 42 U.S.C. 7671 *et seq.*

part by the international negotiations leading up to the Montreal Protocol and the need for global action on the far-reaching effects of ozone depletion. Title VI evinces a congressional intent to address an international problem of global concern through express language, whereas CAA section 111 includes no such language describing global implications or specificity on reductions.

CAA section 111 may also be contrasted with attempts to amend the CAA to add authority to address global climate change. The American Clean Energy and Security Act of 2009 would have instituted a cap-and-trade system featuring renewable energy credits to reduce GHG emissions, including from fossil fuel-fired power plants, and would have directly spoken to the global concerns surrounding climate change.[162] Congress understood that addressing global climate change concerns would have required a novel legislative approach, and this legislative proposal would have added express provisions to the CAA addressing these concerns, including through promoting CCS.[163] Unlike this legislative proposal, CAA section 111 includes no such reference to global climate change or international concerns. As such, this contrast confirms our proposed conclusion that Congress did not intend CAA section 111 to apply to GHG emissions from fossil fuel-fired EGUs based on global climate change concerns.

The EPA requests comment on its proposed interpretations of the terms ''pollutant,'' ''pollution,'' and ''air pollution'' as focusing on the concepts of dangerousness and contamination, consistent with their use at the time of enactment of the 1970 CAA. The Agency is similarly requesting comment on its proposed interpretation of ''climate'' in the definition of ''welfare'' in CAA section 302(h) as referring to local or regional weather phenomena. We further solicit comment on the understanding that the 2015 Findings represented an expansion of the Agency's authority under CAA section 111 that departed from past practice under that section. We also request comment on the proposed interpretation that regulating GHG emissions based on global climate change concerns would require reading an additional instance of ''cause or contribute'' into CAA section 111(b)(1)(A), which would be inconsistent with the background legal principles of causation and proximate cause that inform the provision. Relatedly, we request comment on the proposed position that finding endangerment when the overwhelming bulk of emissions are from sources outside the United States is impermissible under CAA section 111, which does not speak to international emissions. And finally, we request comment on the proposed interpretation of ''significantly'' in CAA section 111(b)(1)(A) as indicating Congress's intent for the Agency to regulate only when a source category is responsible for a meaningful portion of the identified harm.

[162] H.R. 2454, 111th Cong. (2009).

[163] *Id.* at section 112 *et seq.* (proposing authorities for CCS within the context of the CAA).

b. The History of CAA Section 111 Supports an Interpretation of ''Air Pollution'' Based on Local or Regional Exposure

The statutory history of CAA section 111 and the structural relationship between CAA sections 107–110, section 111, and section 112 provide context for interpreting the ''air pollution which may reasonably be anticipated to endanger public health or welfare'' addressed by section 111(b)(1)(A) as being that which causes adverse impacts through local or regional exposure. Congress enacted CAA section 111 in the 1970 CAA to address the impacts of criteria pollutants and similar air pollutants on public health and the environment.[164] The newly introduced CAA section 111, which called for performance standards for new (and to a certain extent existing) sources, was part of a three-pronged regime to address air pollution from stationary sources.

CAA section 111 applies to stationary sources across the country to eliminate pollution problems at the time new sources were built, when it would be more cost effective to install air pollution controls (as opposed to retrofitting at a later date, apart from the section's existing-source authority which, as the Supreme Court recognized in *West Virginia,* was originally and for much of the statute's existence a ''little-used backwater''). Congress designed CAA section 111 to level the playing field among States by preventing sources from avoiding restrictions that applied in nonattainment areas under the NAAQS program by preferentially locating in attainment areas, which would result in a geographic ''race to the bottom.'' That is, Congress designed CAA section 111 to work in concert with sections 107–110 (establishing the NAAQS program) and section 112 (establishing the HAP program) to buttress those programs and address the same types of air pollution regulated under those provisions. To this end, Senator Muskie, the Senate sponsor of the 1970 CAA Amendments, stated:

[164] S. Rep. No. 91–1196, at 18 (Sept. 17, 1970).

[T]he bill provides that newly constructed sources of pollution must meet rigorous national standards of performance. While we clean up existing pollution, we must also guard against new problems. Those areas which have levels of air quality which are better than the national standards should not find their air quality degraded by the construction of new sources. There should be no ''shopping around'' for open sites.[165]

Critically, sections 107–110 and section 112 regulate criteria air pollutants and HAPs, respectively—all of which are pollutants that adversely impact human health or welfare through local or regional exposure. For purposes of this proposed rule, we use the phrase ''local or regional exposure'' to distinguish air pollution that impacts public health or welfare by its presence in the ambient air from ''air pollution'' consisting of six well-mixed GHGs that, as reflected in the 2015 Findings, impacts public health and welfare only indirectly and not by exposure to its presence in the ambient air.[166]

For certain regulated air pollutants that impact health or welfare through local or regional exposure, the emissions themselves are the air pollution that endangers public health or welfare, *i.e.,* the emissions are the air pollution with adverse health and welfare impacts. An example is CO, which can be harmful, and even fatal, to humans at sufficient localized concentrations.[167] Similarly, emissions of lead have deleterious effects on children's health that result from exposure to emissions.[168] For other regulated air pollutants, emissions contribute to air pollution that endangers public health or welfare by interacting with other airborne chemicals or environmental factors such as sunlight to create the air pollution that endangers, *i.e.,* the emitted air pollutants are ingredients that create the air pollution that endangers public

[165] Senate Debate on S. 4358 at 227 (Sept. 21, 1970).

[166] *See* 80 FR 64510, 64517–22 (discussing global climate change), 64531 n.110 (the air pollution defined in the 2009 Endangerment Finding is the atmospheric mix of six long-lived and directly emitted GHGs).

[167] U.S. Environmental Protection Agency. (Last updated Oct. 7, 2025). Carbon Monoxide's Impact on Indoor Air Quality: *https://www.epa.gov/indoor-air-quality-iaq/carbon-monoxides-impact-indoor-air-quality.*

[168] U.S. Environmental Protection Agency. Integrated Science Assessment for Lead. January 2024. EPA/600/R–23/375.

health or welfare in combination through local or regional exposure. An example is acid rain, in which air pollutants such as $SO_2$ interact locally and regionally with additional airborne chemicals to form acidic precipitation.[169] In either case, the scale at which emissions of, and exposure to, each of these air pollutants adversely impacts health or welfare is local or regional. That is, the pollutants are emitted from sources into the air and may travel a certain distance from the originating source, but they need not become globally well-mixed in the atmosphere to adversely impact human health or welfare through a further chain of subsequent effects.

In amending the CAA, Congress continued to focus on air pollutants that impact health or welfare through local or regional exposure. For example, in 1977, Congress added to the CAA visibility protections, which primarily concern particulates (including $SO_2$ and NOx, which form particulates in the atmosphere),[170] as well as requirements for nonattainment areas, which concern the NAAQS. For CAA section 111, Congress amended the methodology for determining standards of performance and emission guidelines; these revisions were based on the oil shortage and the consequent need to rely more heavily on combustion of coal to generate energy. The legislative history indicates that Congress was primarily concerned about $SO_2$ emissions, which confirms that Congress viewed CAA section 111 as focused on air pollutants that impact health or welfare through local or regional exposure.[171]

In the 1990 CAA Amendments, Congress continued to focus on those air pollutants, as evident by its strengthening of the NAAQS and SIP program (criteria pollutants), significant revisions to CAA section 112 (HAPs), and addition of an acid rain program ($SO_2$ and $NO_X$). With respect to CAA section 111, Congress again amended the methodology for determining standards of performance and emission guidelines to largely return to the provisions as they read after the 1970 CAA Amendments because the concerns over regulation of $SO_2$ emissions had dissipated. Congress also expressly linked CAA section 111 regulations to the national consistency and mobility concerns animating earlier legislation by amending CAA section 111(f) to specify that the EPA must consider the mobility and competitive nature of the relevant industries when prioritizing listed source categories for regulation. And when Congress sought to address global problems—for example, stratospheric ozone depletion—it did so explicitly by enacting a new title of the CAA with a distinct set of provisions addressing the unique problem. As noted above, the criteria pollutants—CO, lead, ground-level ozone, $NO_X$, PM, and $SO_2$—adversely impact public health or welfare through exposure to emissions of the pollutant itself, through interaction with other chemical constituents or environmental factors to create air pollution that then threatens harm on a local or regional scale, or both. Similarly, HAPs endanger health and welfare by virtue of their emission into and existence in the air. For example, exposure to benzene in emissions from burning coal and oil motor vehicle exhaust, and evaporation from gasoline service stations and industrial solvents, can lead to a variety of adverse impacts on human health.[172] Thus, Congress designed sections 107–110 and section 112 to address air pollutants and air pollution that adversely impact health or welfare through direct exposure at the local or regional levels.[173]

In title II of the CAA, Congress included references to the types of air pollutants it intended the EPA to regulate in CAA section 202 itself. For example, CAA section 202(3)(A)(i) references regulation of hydrocarbons, CO, $NO_X$, and PM. Similarly, CAA section 202(b)(1)(A) addresses emissions of CO, hydrocarbons, and $NO_X$, and section 202(l) directs the EPA to consider promulgating regulations addressing air toxics including benzene and formaldehyde. For stationary sources addressed in title I, Congress similarly specified air pollutants of concern in a manner that reflected the title's tripartite structure. Just as the scope of the air pollutants that Congress expressly addressed in CAA section 202 informs the breadth of the EPA's regulatory authority under that provision, the scope of the air pollutants addressed under CAA sections 107–110 and section 112 informs the EPA's authority to regulate under title I, including under CAA section 111. And because CAA section 111 was designed to work in concert with these provisions by ensuring that new sources did not exacerbate existing air pollution problems and by preventing new sources from geographic forum shopping, it follows that Congress intended it to address the same types of air pollutants and air pollution.

GHG emissions may impact health or welfare only indirectly through on the various causal steps involved in global climate change. In other words, it is the basket of various causes and affects attributed to global climate change, rather than exposure to GHGs themselves, that may adversely impact health or welfare. This is in marked contrast to the types of air pollution that Congress designed CAA sections 107–110 and section 112 to address. We propose to find it significant that neither GHGs nor $CO_2$ specifically (nor any of the other individual ''six well-mixed'' GHGs) appear in CAA sections 107–110 or 112. Nor are GHGs, collectively or individually, addressed in any of the regulatory provisions of title I.[174] Congress also did not include in Title I any *other* substances that harm public health or welfare based only on indirect effects, *e.g.,* on elevated global concentrations in the upper atmosphere that contribute to changes to the global climate system that, in turn, contribute to impacts on health or welfare. These conspicuous omissions support the EPA's proposed conclusion that the emissions subject to regulation under CAA section 111, like those under CAA sections 107–110 and section 112, are those that cause or contribute significantly to air pollution that endangers public health or welfare

[169] U.S. Environmental Protection Agency. (Last updated Mar. 4, 2025). What is Acid Rain?, *https://www.epa.gov/acidrain/what-acid-rain.*

[170] *https://www.epa.gov/visibility/basic-information-about-visibility.*

[171] H.R. Rep. No. 95–294 at 185–86, 188–89, 190–93.

[172] U.S. Environmental Protection Agency. (Last updated Jan. 2012). Benzene Hazard Summary. *https://www.epa.gov/sites/default/files/2016-09/documents/benzene.pdf.* Benzene is listed as a hazardous air pollutant under CAA section 112(b)(1).

[173] Rep. Dingell, who is considered one of the co-authors of the 1990 CAA Amendments and who also served in Congress during the 1970 and 1977 CAA Amendments, stated that treating GHGs as air pollutants under the CAA ''is not what was intended by the Congress.'' He added that:

> [A]s a matter of national policy, it seems to me to be insane that we would be talking about leaving this kind of judgment [*i.e.,* the regulation of greenhouse gases], which everybody tells us has to be addressed with great immediacy, to a long and complex process of regulatory action, litigation upon litigation, and a lack of any kind of speedy resolution to the concerns we have about the issue of global warming. Structuring a comprehensive climate change program is a responsibility for the Congress.

Hr'g before the Subcomm. on Energy & Air Quality, House Comm. on Energy & Commerce (110th Cong. Apr. 10, 2008), available at *https://www.congress.gov/110/chrg/CHRG-110hhrg51574/CHRG-110hhrg51574.pdf.*

[174] Congress has provided for other, non-regulatory (*i.e.,* not emissions standards) mechanisms under title I of the CAA to address GHG emissions, such as grant and fee programs designed to reduce emissions. *See, e.g.,* CAA section 135 (low emissions electricity program provides funding for efforts related to GHG reductions), CAA section 132 (establishing grant and rebate program for heavy duty, zero-emission vehicles).

through local or regional exposure. Thus, the EPA proposes to interpret ''air pollution'' in CAA section 111 as that which itself adversely impacts health or welfare through local or regional exposure.

This proposed interpretation is buttressed by the Supreme Court's understanding of the role of CAA section 111, and in particular section 111(d), in the overarching air pollution control strategy of title I of the CAA. In *West Virginia,* the Court explained that CAA section 111 is one of the ''three main regulatory programs to control air pollution from stationary sources such as power plants,'' 597 U.S. at 707, the other two being the NAAQS program and the NESHAP program. The Court went on to contextualize section 111 by providing background on the two other programs, *id.,* thus reinforcing the EPA's understanding that Congress intended these three programs to work together to effectuate a common statutory scheme—one that addresses air pollutants and air pollution that adverse impacts health or welfare through direct exposure at the local or regional level.

The *West Virginia* Court also discussed CAA section 111(d), which authorizes regulation of certain emissions from existing sources. Regulation of new sources to address emissions of a particular pollutant under CAA section 111(b)(1)(B) triggers the EPA's authority to regulate emissions of that same pollutant from existing sources, but only if the pollutant is not already regulated under the NAAQS or NESHAP programs. 597 U.S. at 710. The Supreme Court described CAA section 111(d) as a ''gap-filler''—a rarely-invoked ancillary provision of limited scope that cannot be used to expand the EPA's authority. *Id.* at 748–49.

The EPA requests comment on its proposed interpretation that CAA section 111(b)(1)(A) is best read as authorizing the Agency to regulate source category emissions that cause or contribute significantly to air pollution that may reasonably be anticipated to endanger public health or welfare through local or regional exposure. We also request comment on our proposed use of the statutory and legislative history of CAA section 111 and its relationship to CAA sections 107–110 and 112. Finally, we request comment on whether the Supreme Court's characterization of CAA section 111(d) in *West Virginia* supports the proposed interpretation that particular provisions of CAA section 111 cannot be used to expand the EPA's authority under title I generally.

c. A Limiting Construction of CAA Section 111(b)(1)(A) Is Necessary To Avoid Impermissible Results

The EPA proposes that interpreting CAA section 111(b)(1)(A) as not permitting regulation of fossil fuel-fired power plants based on global climate change concerns is necessary to avoid acting outside the scope of the Agency's authority. This consideration stems from the structure of CAA section 111, which bifurcates source category listing (the trigger for regulation) and standard setting (the regulation). Without a limiting interpretation of the air pollution addressed by CAA section 111, the EPA could decide to regulate a source category based on a global concern when there is little or no connection between a source category's emissions and the identified harm. The Agency could then promulgate standards of performance under CAA section 111(a)(1) for any reason so long as the standards also reduce emissions, even if those standards would do nothing to meaningfully address the harm.

The scope of permissible regulation under CAA section 111 is bounded by the source-category listing inquiry governed by CAA section 111(b)(1)(A). To avoid the EPA promulgating standards of performance for reasons divorced from the purpose or goal of regulation under CAA section 111, and also to avoid the potential for conflict with the nondelegation doctrine, the Agency proposes that the ''air pollution'' addressed in CAA section 111(b)(1)(A) must be limited to that which endangers public health or welfare through local or regional exposure. Because Congress cannot delegate legislative powers to the Executive Branch, statutes granting an agency regulatory authority must provide an intelligible principle to guide its exercise.[175] Under an interpretation that does not require a sufficiently close connection between emissions and dangerous air pollution, the EPA's authority to regulate would have no readily discernible limiting principle. The EPA would be permitted to promulgate standards of performance under CAA section 111 for any purpose and to meet any policy objective, so long as those standards also have the effect of reducing emissions. Such an exercise of authority would allow the EPA to redefine the objectives of the regulatory scheme and would be inconsistent with Congress's legislative prerogatives. Instead, under the EPA's proposed interpretation, the scope of ''air pollution'' sets the outer bounds for permissible regulation of a source category. That is, because the EPA can only regulate a source category with respect to air pollution that endangers through local or regional exposure, the emission reductions obtained through standards of performance will rightly be directed towards achieving the purpose of mitigating the harm that results or may result from that local or regional exposure.

The Supreme Court's decision in *West Virginia* provides an example of the potential result of an unbounded construction of CAA section 111(b)(1)(A), *i.e.,* of an interpretation that does not limit the EPA to regulating to address air pollution which may reasonably be anticipated to endanger public health or welfare through local or regional exposure. In *West Virginia,* the Court stated that the EPA cannot regulate fossil fuel-fired power plants for the impermissible purpose of shifting generation to cleaner sources of electricity.[176] The EPA assumed, in the 2015 CPP, that generation shifting was within its section 111 authority because it would reduce emissions of GHGs from fossil fuel-fired power plants. Had the EPA limited its approach to regulating fossil fuel-fired power plants to circumstances in which there is a closer connection between the emissions and the identified harm, it would have been clear that generation shifting did not achieve a purpose within the scope of CAA section 111 and was thus an impermissible use of its authority.

The EPA is further proposing that a limitless construction of CAA section 111(b)(1)(A) cannot be reconciled with the Supreme Court's instructions regarding the scope of agency authority in *Loper Bright.* Statutes have a single, best meaning, fixed at the time of enactment, that may include ''a degree of discretion.'' 603 U.S. at 369. Such discretion does not extend to redefining statutory terms in a manner inconsistent with ordinary meaning. Although ''Congress has often enacted'' statutes that '''expressly delegate[ ]' to an agency the authority to give meaning to a particular statutory term,'' *id.* at 394–95 (quoting *Batterton* v. *Francis,* 432 U.S. 416, 425 (1977)), there is no such express delegation in CAA section 111(b)(1)(A).[177] Nor can extending CAA

[175] *See, e.g., FCC* v. *Consumers' Rsch.*, 606 U.S. 656, 672–73 (2025).

[176] *See, e.g.,* 597 U.S. at 732 (finding no clear congressional authorization under CAA section 111 empowering the EPA to regulate by ''devis[ing] carbon caps based on a generation shifting approach'').

[177] *See, e.g., Batterton,* 432 U.S. at 417 n.2 (interpreting statutory phrase ''by reason of the

Continued

section 111(b)(1)(A) to the regulation of GHGs in response to global climate change concerns plausibly be understood as "'fill[ing] up the details' of a statutory scheme." *Id.* (quoting *Wayman* v. *Southard,* 23 U.S. (10 Wheat.) 1, 43 (1825)). And "air pollution" is not a discretion-conferring "term or phrase that 'leaves agencies with flexibility, such as 'appropriate' or 'reasonable.''" *Id.* (quoting *Michigan,* 576 U.S. at 752). Under these circumstances, the ordinary meaning of "air pollution" controls. The EPA has a degree of discretion in identifying and regulating emissions that cause or contribute significantly to air pollution which may reasonably be anticipated to endanger public health or welfare. But that discretion does not extend to redefining "air pollution" from the local and regional exposure problems understood at the time of enactment and addressed throughout the statute to global climate change concerns.[178]

The EPA's approach to construing CAA section 111(b)(1)(A), as well as our proposed interpretation of that provision, are supported by the Supreme Court's recent decision in *Louisiana* v. *Callais,* 146 S. Ct. 1131, 1153–54 (2026). The EPA has proposed to determine the best reading of the statute based on an analysis of the relevant statutory terms, both in isolation and within the broader statutory and legislative context. The EPA is further proposing that its interpretation is necessary to avoid an unconstitutional delegation of legislative power, which would otherwise result by allowing the Agency to regulate source categories divorced from the achievement of a legitimate statutory goal.

Recent decisions by the D.C. Circuit also confirm this approach. In *IGas Holdings, Inc.* v. *EPA,* the D.C. Circuit analyzed a statutory provision to determine whether Congress had provided an intelligible principle to guide the EPA's exercise of discretion.[179] Just as with our current inquiry into the scope of authority afforded by CAA section 111(b)(1)(A), the court in *IGas Holdings* was concerned with the boundaries of the EPA's discretion, in that case under the American Innovation and Manufacturing (AIM) Act. There, the Court looked to "[t]he Act's text, structure, and history" [180] to inform its assessment of the scope of the delegation to the EPA, explaining that "we do not confine ourselves to the isolated phrase in question, but utilize all the tools of statutory construction, including the statutory context and, when appropriate, the factual background of the statute . . . ." [181] Likewise, the EPA here looks to the structure and history of CAA section 111, the context provided by title I of the CAA, and the text of the statute in proposing to delineate the scope of the EPA's authority under CAA section 111(b)(1)(A). In *IGas Holdings,* the Court noted that, "to the extent the AIM Act is susceptible to more than one plausible construction, the EPA should read the statute to avoid granting discretion that is so broad that it could create a nondelegation problem." [182] As discussed in this section of the preamble, the interpretation of CAA section 111(b)(1)(A) that the EPA is proposing is necessary to avoid a nondelegation problem that could otherwise arise by giving the Agency authority to regulate stationary sources without an intelligible principle.

The EPA requests comment on its proposal that a limiting construction of CAA section 111(b)(1)(A) with respect to the "air pollution" addressed is necessary to avoid the Agency acting outside its scope of authority. In particular, the Agency requests input on its proposal that the cognizable "air pollution" must be that which itself endangers through local or regional exposure to avoid potential conflict with the nondelegation doctrine. The EPA also requests comment on its proposal that a limitless construction of CAA section 111(b)(1)(A) cannot be reconciled with *Loper Bright* because that statutory provision does not confer discretion to redefine "air pollution" from the local and regional exposure problems understood at the time of its enactment.

d. The Futility of Regulating GHG Emissions From Fossil Fuel-Fired Power Plants Supports Interpreting CAA Section 111(b)(1)(A) As Not Encompassing Global Climate Change Concerns

The EPA proposes that our separate futility analysis in section V.C further supports the conclusion that "air pollution" within CAA section 111(b)(1)(A) does not include global climate change concerns. Under section 111(b)(1)(A), a source category must contribute "significantly" to adverse public health and welfare impacts to be listed. Correspondingly, the effect of regulation of that source category on the adverse impacts resulting from the air pollution of interest must be something appreciably more than *de minimis.* That is, the effect of regulating the source category must exhibit a degree of significance. Instead, the climate modeling described in section V.C demonstrates that removing *all* GHG emissions from fossil fuel-fired power plants (which is much more than the regulations we propose to repeal would do if fully implemented) would not materially address (*i.e.,* beyond a *de minimis* level) the health and welfare dangers attributed to global climate change concerns. Congress's use of "significantly" in CAA section 111(b)(1)(A) indicates that it intended the Agency to regulate under that section when doing so would have a relatively large impact on the danger; the scale of the potential harm reduction revealed in the proposed modeling analysis, however, does not meet that threshold level of significance. Thus, we propose that this analysis further supports our proposed conclusion that Congress did not intend for CAA section 111(b)(1)(A) to reach global climate change concerns.

The EPA requests comment on its proposal that the futility of regulating GHG emissions from fossil fuel-fired power plants supports its interpretation that CAA section 111(b)(1)(A) does not authorize such regulation based on global climate change concerns.

unemployment (as determined in accordance with standards prescribed by the Secretary)"); 42 U.S.C. 7410(m) (authorizing the application of sanctions under certain conditions "in relation to any plan or plan item (*as that term is defined by the Administrator*)") (emphasis added), 7411(i) (excluding from certain stationary source regulations "country elevators (*as defined by the Administrator*)") (emphasis added); 33 U.S.C. 1311(b)(1)(A) (requiring application of "the best practicable control technology currently available *as defined by the Administrator*") (emphasis added).

[178] In reaching this conclusion, we are mindful that the Sixth Circuit applied *Loper Bright* to hold that the FCC exceeded its statutory authority in a 2024 order that subjected broadband internet service providers to "net-neutrality principles." *Ohio Telecom Ass'n* v. *FCC,* 124 F.4th 993, 997 (6th Cir. 2025). With respect to mobile broadband, the FCC had interpreted "the public switched network" to include not only the traditional telephone numbers comprising the network at the time the statute was enacted, but also public internet protocol ("IP") addresses. *Id.* at 1011. The court rejected this approach, holding as a matter of statutory interpretation that "delegation is not unfettered" and that "nothing in the statute . . . permits the FCC to effectively change the statute's original meaning of 'the public switched network' . . . by adding 'public IP addresses' to adapt to new technology." *Id.* at 1012 (citing *Loper Bright,* 603 U.S. at 395).

[179] 146 F.4th 1126 (D.C. Cir. 2025), *cert. denied,* 2026 U.S. LEXIS 2567 (U.S. Jun. 22, 2026) (No. 25–1079).

[180] *Id.*

[181] *Id.* at 1138 (citing *Owens* v. *Republic of Sudan,* 531 F.3d 884, 890 (D.C. Cir. 2008) (internal quotations omitted)).

[182] *Id.* at 1139 n.3.

e. The EPA's Proposed Interpretation Is Consistent With Relevant Caselaw

The EPA proposes that the interpretation of CAA section 111 set out above is, at minimum, not foreclosed by *Massachusetts, AEP, American Lung Association,* or *West Virginia.* These cases addressed distinct questions and, in important respects, support the EPA's authority and obligation to determine whether GHG emissions from power plants satisfy the statute's prerequisites for imposing regulation.

In *Massachusetts,* the Supreme Court rejected the argument that GHGs are not "air pollutants" under the Act-wide definition, reasoning that CAA section 302(g)'s use of the word "any" in connection with "air pollutant agent or combination of such agents, including any physical [or] chemical . . . substance" was sufficiently broad to encapsulate the combination of GHGs at issue. 549 U.S. at 530. On this basis, the Court stated that the EPA "has the statutory authority to regulate the emission of such gases from new motor vehicles." *Id.* at 532. However, *Massachusetts* did not address the question whether "air *pollution*" can be interpreted to include elevated concentrations of GHGs in the atmosphere. That is, the Court did not consider whether the Act-wide definition of "air pollutant" in CAA section 302(g) necessarily means that GHGs are also cognizable air pollution under any of the Act's provisions, nor did it hold that such emissions meet any of the statutory standards for regulation in the Act. And, critically, the *Massachusetts* Court was analyzing a petition for rulemaking under CAA section 202(a)(1),[183] which differs from CAA section 111(b)(1)(A) in several ways that would bear on any questions of statutory interpretation. For example, under CAA section 202(a)(1), the EPA makes endangerment and contribution findings to regulate additional air pollutants emitted from new motor vehicles or motor vehicle engines. In contrast, under CAA section 111(b)(1)(A), the findings serve the purpose of including a source category on a list that subjects sources in the category to certain regulations. Additionally, CAA section 111(b)(1)(A) requires the Administrator to find that a source category contributes *significantly* to dangerous air pollution, whereas CAA section 202(a)(1) requires only that a class of new motor vehicles or engines *contribute* to such air pollution. And finally, CAA section 202(a)(1) requires the EPA to make endangerment and contribution findings and prescribe standards applicable to the emission of the relevant air pollutants in a single step, whereas CAA section 111 bifurcates the findings under section 111(b)(1)(A) and promulgation of standards of performance under sections 111(b)(1)(B) and 111(a)(1).

Further, *Massachusetts* must be read in harmony with *UARG,* in which the Supreme Court held that the EPA exceeded its authority under the CAA in its approach to extending stationary source permitting to cover GHG emissions. In doing so, the Court held that "while *Massachusetts* rejected EPA's categorical contention that greenhouse gases *could not* be 'air pollutants' for any purposes of the Act, it did not embrace EPA's current, equally categorical position that greenhouse gases *must* be air pollutants for all purposes regardless of the statutory context," *id.* at 319 (citation omitted). Rather, "*Massachusetts* does not foreclose the Agency's use of statutory context to infer that certain of the Act's provisions use 'air pollutant' to denote not every conceivable airborne substance, but only those that may sensibly be encompassed within the particular regulatory program." *Id. UARG* thus makes clear that the EPA's authority to regulate an "air pollutant" must be evaluated in the context of the particular statutory provision that confers authority to regulate, and, notably, the Court has not yet had cause to analyze the term "air pollution" in the context of CAA section 111(b)(1)(A).

The EPA believes its approach to evaluating key terms in context is supported by the Supreme Court's recent decision in *Sackett* v. *EPA,* 598 U.S. 651 (2023). There, the Court analyzed the term "adjacent" in Clean Water Act section 404(g)(1),[184] which provides that wetlands "adjacent" to traditional "navigable waters" can be part of certain permitting programs. Although the term "adjacent" could be interpreted narrowly or broadly, the Court emphasized that sound statutory interpretation required more than relying on "the outer limits of [that] word's definitional possibilities," *id.* at 676 (quoting *FCC* v. *AT&T Inc.,* 562 U.S. 397, 407 (2011)), and construed "adjacent" in the context of "the rest of the law," *id.* (quoting *United Dav. Assn of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 371 (1988)). Similarly here, and consistent with *UARG,* the EPA proposes that the term "air pollution" in CAA section 111(b)(1)(A) cannot be interpreted broadly in isolation and does not confer unfettered discretion. Rather, the term must be read in the statutory context in which it appears.

In *AEP,* the Supreme Court addressed whether litigants could use Federal common law to secure judicial regulation of GHG emissions from power plants. The Court held that they could not, explaining that CAA section 111 displaces the Federal common law by vesting the decision "whether and how" to regulate such emissions in the EPA. 564 U.S. at 429. In reaching this conclusion, the Court emphasized that EPA, as the expert agency, had the necessary expertise and resources to make the necessary determinations in the first instance. *Id.* at 412.

In *American Lung Association,* the D.C. Circuit read this holding broadly, stating that the *AEP* Court spoke definitively to the question whether the EPA may or must regulate GHG emissions from existing fossil fuel-fired power plants under CAA section 111(d). 985 F.3d at 988 (quoting *AEP,* 564 U.S. at 424). However, the Supreme Court disagreed with this reasoning in *West Virginia,* clarifying that *AEP* addressed "whether Congress wanted district court judges to decide, under unwritten federal nuisance law, 'whether and how to regulate carbon dioxide emissions from power plants.' " 597 U.S. at 712 (quoting *AEP,* 564 U.S. at 410). The EPA proposes that these cases provide that the CAA speaks directly to emissions from power plants for the purpose of analyzing whether the Act displaces Federal common-law claims, and that CAA section 111 delegates to the Agency the decision "whether and how" to regulate GHG emissions from power plants. None of these cases addresses the EPA's determination in the 2015 Findings, issued several years after *AEP* and not presented for decision in *West Virginia,* that GHG emissions from power plants satisfy the statutory standard for regulation in CAA section 111(b)(1)(A).

The EPA requests comment on its proposed interpretations and applications of *Massachusetts, AEP, American Lung Association,* and *West Virginia* to the question whether CAA section 111(b)(1)(A) authorizes the EPA to regulate GHG emissions from fossil fuel-fired power plants based on global climate change concerns.

[183] The Court emphasized that its review of the denial of the rulemaking petition was "extremely limited" and concluded its opinion by clarifying that it "need not and do[es] not reach the question whether on remand EPA must make an endangerment finding." 549 U.S. at 527, 534.

[184] 33 U.S.C. 1344(g)(1). The term "navigable waters" is generally defined throughout the Clean Water Act as "waters of the United States, including the territorial seas." *Id.* 1362(7).

2. Flaws in the 2015 Findings Render Them Unlawful

The EPA further proposes that regardless whether CAA section 111 authorizes the regulation of GHG emissions from power plants in response to global climate change concerns, the Agency did not properly exercise that authority in the 2015 Findings. We propose that two flaws, both independently and collectively, render the 2015 Findings ineffective and the GHG regulations in 40 CFR part 60, subparts TTTT and TTTTa unlawful.

a. The EPA Erred in Combining Two Source Categories Without Undertaking a New Listing Under CAA section 111(b)(1)(A)

Prior to the 2015 NSPS, the EPA had, under CAA section 111(b)(1)(A), listed two separate source categories that included fossil fuel-fired electricity generating sources—steam generators and combustion turbines—and promulgated separate NSPS for non-GHG emissions from those source categories.[185] In the 2015 NSPS, the EPA combined parts of the two source categories into a single source category, which it termed ''fossil fuel-fired electricity generating units,'' solely for the purpose of regulating GHG emissions. We did not otherwise revise the prior source category listings or the promulgated NSPS and stated that combining the source categories in this fashion did not constitute a listing of a new source category under CAA section 111(b)(1)(A). We then proceeded to promulgate standards for GHG emissions from fossil fuel-fired power plants in the newly created source category under CAA section 111(b)(1)(B).

The EPA is now proposing to determine that combining parts of the two source categories for the purpose of regulating GHG emissions constituted the creation of a new source category for purposes of regulation under CAA section 111. In the 2015 NSPS, the EPA identified electricity generating fossil fuel-fired steam generating units and electricity generating fossil fuel-fired stationary combustion turbines as a single source category for the purpose of regulating GHG emissions from that universe of sources. In doing so, the EPA created a new source category that should have been listed pursuant to CAA section 111(b)(1)(A), which would have required the Agency to determine that GHGs emitted from the source category cause, or contribute significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare. The EPA purported to make such a determination in the alternative. 80 FR 64530–31. However, the EPA is now proposing that the determination in the alternative was flawed because it attempted to demonstrate endangerment based on global climate change concerns as analyzed for CAA section 202(a)(1) purposes in the 2009 Endangerment Finding and subsequent reconsideration denials. The end result is that the Agency failed to properly list the newly created source category and also failed to make a sufficient finding that GHG emissions from fossil fuel-fired power plants cause or contribute significantly to dangerous air pollution—*i.e.,* air pollution that endangers through local or regional exposure.

Thus, the EPA is proposing to conclude that it erred in the 2015 NSPS when it took the position that it had not created a new source category, and that this error renders the regulations promulgated pursuant to CAA section 111(b)(1)(B) without an adequate legal basis.

b. Rescission of the 2009 Endangerment Finding Abrogates the Basis and Interpretations Underlying the 2015 Findings

Both the EPA's purported ''rational basis'' for regulating GHG emissions from fossil fuel-fired power plants and the findings in the alternative in the 2015 NSPS relied on the legal interpretations and approach embedded in the 2009 Endangerment Finding with respect to CAA section 202(a)(1). In the 2015 Findings, the EPA explained that ''our approach here—reflected in the information and conclusions [regarding the EPA's bases for regulating GHG emissions] described above—is substantially similar to that reflected in the 2009 Endangerment Finding and the 2010 denial of petitions to reconsider.'' 80 FR 64531. We believed at the time that this reliance made sense given what we assumed to be similarities between CAA section 202(a)(1) and CAA section 111(b)(1)(A). Both provisions require the EPA to undertake certain actions—under section 202(a)(1), prescribing emission standards, and under section 111(b)(1)(A), listing a source category—if the Administrator determines the sources at issue cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare.[186]

More specifically, the 2015 Findings relied on the EPA's interpretation of this phrase in the 2009 Endangerment Finding, including that the scope of the term ''air pollutant'' as determined by the Supreme Court in *Massachusetts* necessarily defines the scope of ''air pollution'' as used in CAA sections 202(a)(1) and 111(b)(1)(A); that the contribution to air pollution and the endangerment resulting from the air pollution are evaluated in two separate steps; and that the adverse impacts of global climate change are cognizable under CAA sections 202(a)(1) and 111(b)(1)(A) despite not being associated with local or regional exposure.[187] Additionally, the 2015 Findings adopted the EPA's approach in the 2009 Endangerment Finding to characterizing the six globally well-mixed components of the GHG ''air pollutant'' and ''air pollution'' and to evaluating endangerment and contribution. The EPA proposes that, because the 2015 Findings relied on the interpretations in and approach of the 2009 Endangerment Finding rather than independently interpreting and applying CAA section 111(b)(1)(A), the rescission of the 2009 Endangerment Finding in February 2026 abrogates the legal foundation of the 2015 Findings. Separately, the EPA proposes that CAA section 111(b)(1)(A) does not permit the EPA to regulate GHGs from fossil fuel-fired power plants for many of the same reasons that CAA section 202(a)(1) does not allow the Agency to regulate GHGs from new motor vehicles or new motor vehicle engines. These reasons are detailed in section V.A.1 of this preamble.

The EPA is also proposing to find that an additional error committed in the 2009 Endangerment Finding was carried over to the 2015 Findings and provides a further basis for rescission of the 2015 Findings and repeal of all associated regulations. In the 2009 Endangerment Finding, the Administrator made two distinct findings based on two distinct

[185] *See* 36 FR 5931 (Mar. 31, 1971) (listing ''fossil fuel-fired steam generators''); 42 FR 53657 (Oct. 3, 1977) (listing ''stationary gas turbines,'' *i.e.,* stationary combustion turbines, based on NOX and $SO_2$ emissions); *see also* 36 FR 24876 (Dec. 23, 1971) (promulgating standards for emissions of PM, $SO_2$ and NOX from fossil fuel-fired steam generators under 40 CFR 60 subpart D); 44 FR 52792 (Sept. 10, 1979) (promulgating standards for emissions of $SO_2$ and NOX from combustion turbines under 40 CFR 60 subpart GG).

[186] Notably, as discussed above, CAA section 111(b)(1)(A) provides that a source category must contribute *significantly* to air pollution which may reasonably be anticipated to endanger public health or welfare.

[187] *See, e.g.,* Response to Comments for New EGUs—Chapter 4—Endangerment and Climate Science, 2015 NSPS, Document EPA–HQ–OAR–2013–0495 at 4–30 (explaining that the EPA based the 2015 Findings on information and analysis in the 2009 Endangerment Finding, coupled with more recent information included in the 2015 NSPS) and 4–31 (asserting that judicial decisions bearing on the 2009 Endangerment Finding also apply to the 2015 Findings); *see also* 80 FR 64510, 64530–31.

sets of assumptions. The Administrator first found that the ''air pollution,'' defined as the combined global concentrations in the upper atmosphere of six ''well-mixed GHGs,'' endangered public health or welfare by playing a causal role in global temperature increases, sea level rise, and other phenomena (including ocean pH changes), which, in turn, were then asserted to play a causal role in environmental phenomena with adverse impacts on public health and welfare. 74 FR 66516. In the second finding, the Administrator found that the quantity of the ''air pollutant'' (defined as the combination of same six ''well-mixed GHGs'') emitted by new motor vehicles and engines annually contributed to the ''air pollution.'' 74 FR 66536. The Administrator did not consider the extent to which emissions from CAA section 202(a)(1) sources have a more than *de minimis* effect on the *danger* identified with respect to elevated concentrations of GHGs in the upper atmosphere—let alone whether emissions from any particular class or classes of sources that the EPA intended to regulate had such an effect. Nor did the Administrator recognize the mismatch between ''air pollution'' consisting of global concentrations formed by GHG emissions past, present, and future and ''air pollutant'' emissions from new motor vehicles and engines on an annual basis, or the problems associated with measuring domestic contribution against an air pollution problem that necessarily requires global emissions to result in the identified danger. In the Endangerment Finding Rescission, the EPA interpreted CAA section 202(a)(1) as requiring the Agency to consider whether source emissions cause or contribute to air pollution and whether that air pollution poses endangerment in a single causal chain.[188]

The 2015 Findings took the same approach as the 2009 Endangerment Finding. In 2015, the EPA severed the endangerment and significant contribution inquiries, first adopting prior findings that GHGs endanger public health or welfare, and then considering in the alternative whether $CO_2$ emissions from fossil fuel-fired power plants contribute significantly to GHG air pollution. 80 FR 64530.[189] Notably, in assessing contribution, we focused on the amount of GHG emissions from the source category, stating that ''fossil fuel-fired EGUs emit almost one-third of all U.S. GHG emissions, and are responsible for almost three times as much as the emissions from the next ten stationary source categories combined.'' 80 FR 64531. The EPA is now proposing that this approach was inconsistent with the language of CAA section 111(b)(1)(A) and the structure of the CAA, which requires making distinct findings for regulating distinct types of emission sources and authorizes different regulatory tools when such thresholds are met. The CAA sets out distinct thresholds for regulating and distinct modes of regulation for various types of sources, including new motor vehicles and engines, vehicles in use, and aircraft engines, and separately addresses when and how to respond to international emissions that impact the United States. However, the EPA's approach to endangerment effectively attributed all GHG emissions coming from all of these various distinct sources within the United States, as well as from all international sources, to fossil fuel-fired power plants. Although the statute anticipates that ''air pollution'' may reflect contributions from multiple source categories, interpreting CAA section 111(b)(1)(A) as extending to global climate change concerns results in an approach to endangerment that impermissibly sweeps in emissions from source categories far beyond the reach of CAA section 111.

Whereas the ''air pollution'' identified in the 2015 Findings led to endangerment because of the sum total of all emissions, past, current, and projected, from all source categories foreign and domestic, the identified contribution from fossil fuel-fired power plants was measured in annual terms. That is, the 2015 Findings compared the wrong figures in tying significant contribution to endangerment. The EPA found that fossil fuel-fired power plants contribute significantly because they emitted almost one-third of all U.S. GHG emissions in 2013. But the EPA characterized the ''air pollution'' that endangers in different terms—total global concentrations of the six well-mixed GHGs in the atmosphere. Thus, there was a conceptual mismatch—a fundamental disconnect—between the ''air pollution'' that the EPA found to endanger and the annual streams of emissions that were said to contribute to that air pollution. This mismatch is not presented when analyzing the air pollution that the EPA proposes to interpret CAA section 111 as authorizing the Agency to regulate because the mechanism of harm from that type of air pollution does not depend on global concentrations or centuries-long time horizons. Annual emissions of airborne lead, for example, are readily measurable against the total annual concentrations of airborne lead in areas of concern, and the health and welfare impacts of air pollution in the form of airborne lead can be analyzed on the same scale. By completely severing the contribution and endangerment analyses for the six ''well-mixed'' GHGs, the 2015 Findings avoided grappling with this disconnect. The difficulties in analyzing the nexus between contribution and endangerment is not a problem to be avoided, but a further reason to propose that CAA section 111(b)(1)(A) was not designed to address global climate change concerns.

Similarly, the 2015 Findings also defined the relevant ''air pollution'' as the combined global concentration of six well-mixed GHGs, but found that fossil fuel-fired power plants only emitted, for all intents and purposes, one of them: $CO_2$. 80 FR 64531 n.110. As a result, the ''air pollution'' defined as endangering public health or welfare included at least five additional gases that were not relevant to and not included in the EPA's significant contribution evaluation in the alternative. This difference is material, given that each of the five GHGs *not* emitted in material quantities by fossil fuel-fired power plants has a higher global warming potential—in some cases much higher—than $CO_2$.[190] This additional mismatch is further evidence that the 2015 Findings misapplied the statute and cannot stand.

The EPA further proposes that severing the endangerment and cause or contribution analyses leads to untenable results and lacks any limiting principle. To illustrate the problem, severing these inquiries would allow the EPA to issue standards of performance for water vapor ($H_2O$), another substance emitted by fossil fuel-fired power plants that is also considered a GHG. Considered in isolation, increased $H_2O$ concentrations in the atmosphere from all human activities could be said to endanger public health or welfare by resulting in rain that leads to slip-and-fall injuries, drownings, and damage to crops, livestock, and property, including through pools, rivers, and floodwater, although water vapor is not itself harmful and is necessary to sustain life. Also considered in isolation, and using the approach taken in the 2015

[188] 91 FR 7719–20.

[189] *See also* 80 FR 64517–22 (discussing climate change impacts from GHG emissions), 64522–24 (discussing GHG emissions from fossil fuel-fired power plants).

[190] U.S Environmental Protection Agency. Understanding Global Warming Potentials (last updated Dec. 29, 2025). *https://www.epa.gov/ghgemissions/understanding-global-warming-potentials.*

Findings, fossil fuel-fired power plants could be said to ''contribute significantly'' to elevated $H_2O$ concentrations in the atmosphere from all anthropogenic sources, and these emissions of water vapor would thereby assertedly ''contribute significantly'' to global climate effects similar to those attributed to other GHGs. CAA section 111(b)(1)(A) does not contemplate prescribing emission standards for such an omnipresent, naturally occurring, and essential component of the ambient air because the text requires a unified analysis that ensures a nexus between the extent of contribution and the resulting danger. The logic of regulating water vapor appears absurd at first glance, but it is the same logic required to regulate GHGs under CAA section 111(b)(1)(A).

Severing the analysis of endangerment from the analysis of significant contribution produced a result that is incompatible with the statute. The practical effect of severance is that even a trivial or *de minimis* contribution to elevated GHG concentrations by CAA section 111 sources would be sufficient to trigger regulation. The language of CAA section 111(b)(1)(A) provides that a source category must ''cause[ ] or contribute[ ] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.'' The EPA proposes that the phrase ''air pollution which may reasonably be anticipated to endanger public health or welfare'' must be read as a whole, such that the relevant consideration is a source category's contribution to *endangerment,* rather than only *to air pollution.* This proposed interpretation is supported by the legislative history of CAA section 111, in which Congress described this section as addressing source categories the emissions from which ''may contribute substantially to endangerment of the public health or welfare.'' [191]

Moreover, CAA section 111(b)(1)(A) requires that a source category contribute *significantly* to air pollution which may reasonably be anticipated to endanger public health or welfare. The EPA proposes that the deliberate inclusion of this qualifier reinforces that Congress expected there to be a strong connection between a source category's contribution to an air pollution problem and the danger posed by that air pollution. That is, the EPA believes ''significantly'' strengthens the through-line between contribution and endangerment such that a source category must have a relatively large contribution to the danger. As discussed in section V.C.3. of this preamble, due to the relationship between GHG emissions from any particular source category and global climate change, even the complete elimination of GHG emissions from a source category would not materially address (*i.e.,* beyond a *de minimis* level) the public health and welfare dangers attributed to global climate change. Such an impact falls well short of CAA section 111(b)(1)(A)'s ''contributes *significantly*'' threshold. The EPA proposes that this result is further evidence that severing the contributes significantly and endangerment inquiries is inconsistent with the statutory scheme.

The EPA requests comment on its proposal that rescission of the 2009 Endangerment Finding under CAA section 202(a)(1) nullifies the 2015 Findings by removing their legal and analytical foundation. The EPA also seeks comment on the proposal that the Agency erred in the 2015 Findings by severing the endangerment and significant contribution findings, and that CAA section 111(b)(1)(A) requires us to consider endangerment and significant contribution in a single causal chain. More specifically, the EPA is requesting comment on its proposed interpretation that the mismatch in the geographic and temporal scales and the units used to evaluate endangerment and significant contribution render the 2015 Findings flawed and insupportable. The EPA additionally seeks comment on our proposals that severing endangerment and significant contribute leads to untenable results and lacks a limiting principle and that CAA section 111(b)(1)(A)'s requirement that a source category contribute ''significantly'' to endangerment is additional evidence that Congress intended there to be a strong connection between a source category's contribution to air pollution and the danger posed by that air pollution.

### *B. Lack of Clear Congressional Authorization*

The EPA is further proposing that the Agency lacks the ''clear congressional authorization'' required under the major questions doctrine to decide the Nation's response to global climate change concerns through application of CAA section 111. *West Virginia,* 597 U.S. at 723 (quoting *UARG,* 573 U.S. at 324). In this subsection, the EPA proposes that even if CAA section 111(b)(1)(A) could plausibly be read as authorizing the Agency to subject power plant emissions to regulatory controls based on global climate change concerns, the major questions doctrine requires more than a plausible textual basis for asserting such authority. First, the EPA proposes that the major questions doctrine applies to the 2015 Findings and associated regulations because the scope of authority the Agency asserted in 2015 to respond to global climate change concerns presents a major question of political and economic significance. Next, the EPA proposes that Congress did not clearly authorize the Agency to assert such authority in applying the standard for regulation in CAA section 111(b)(1)(A), or in any other provision of the Act. The general nature of the statutory text and the more specific authorities provided to address global concerns elsewhere in the CAA indicate that Congress knew how to expressly authorize the regulation of emissions to address unique and global problems and did not do so with respect to GHG emissions from power plants and global climate change. As a result, the EPA proposes that the 2015 Findings exceeded our statutory authority and should be rescinded and that associated regulatory requirements in the 2015 NSPS and 2024 CPS must be repealed.

This proposal follows from the Supreme Court's decisions in *UARG* and *West Virginia* and is consistent with *Massachusetts.* Additionally, this proposal is not precluded by *AEP,* which held that the CAA displaces any Federal common-law claims that may otherwise have existed against power plant companies for their $CO_2$ emissions.

#### 1. Applicability of the Major Questions Doctrine

In recent decisions construing the scope of the EPA's statutory authority to regulate GHGs, the Supreme Court has emphasized that the '' 'history and breadth of the authority' '' asserted by the Agency and ''the 'economic and political significance' of that assertion'' provide '' 'a reason to hesitate before concluding that Congress' meant to confer such authority.'' *West Virginia,* 597 U.S. at 721 (quoting *Brown & Williamson,* 529 U.S. at 159–60); *accord UARG,* 573 U.S. at 324. The major questions doctrine requires ''more than a merely plausible textual basis'' when asserting authority to decide a significant policy issue on Congress' behalf, *id.* at 723, regardless whether the doctrine is understood as an ordinary application of textualism that ''situates text in context'' [192] or a clear statement

[191] H.R. Rep. No. 91–1146, at 10 (1970) (reporting H.R. 17255).

[192] *Learning Res. Inc.* v. *Trump,* 607 U.S. 229, 300 (2026) (Barrett, J., concurring) (quoting *Biden* v.

rule that implements nondelegation and separation of power principles.[193]

In *UARG,* the Supreme Court applied the major questions doctrine to reject the EPA's attempt to expand the number of stationary sources subject to PSD and title V permitting requirements based on their GHG emissions. 573 U.S. at 310–13. The Court held that the EPA had ''exceeded its statutory authority when it interpreted the Clean Air Act to require PSD and Title V permitting for stationary sources based on their greenhouse gas emissions'' and ''may not treat greenhouse gases as a pollutant'' in this PSD and Title V contexts. *Id.* at 333. The Court found that the Agency's statutory interpretation and related ''tailoring rule'' that exempted many sources to address workability concerns was ''unreasonable because it would bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization.'' *Id.* at 324. The Court noted that ''a measure of skepticism'' is required when ''an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' '' *id.* (quoting *Brown & Williamson,* 529 U.S. at 159), and that ''[w]e expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance,' '' *id.* (quoting *Brown & Williamson,* 529 U.S. at 160). In sum, the Court ''ruled that the term 'air pollutant' does not include greenhouse gases, even though greenhouse gases pollute the air.'' *Learning Res. Inc.,* v. *Trump,* 607 U.S. 229, 255 (2026) (Gorsuch, J. concurring) (citing *UARG,* 573 U.S. at 316, 323–24 (2014)).

In *West Virginia,* the Supreme Court again applied the major questions doctrine to reject the EPA's attempt to shift the power grid away from using fossil fuels through GHG emission guidelines for existing power plants under CAA section 111(d). 597 U.S. at 711–15. The Court noted that when interpreting an assertion of regulatory authority, the inquiry includes the question ''whether Congress in fact meant to confer the power the agency has asserted.'' *Id.* at 721. The Court explained that the major questions doctrine applies to extraordinary cases in which ''the 'history and breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide 'a reason to hesitate before concluding that Congress' meant to confer such authority.'' *Id.* (quoting *Brown & Williamson,* 529 U.S. at 159–60). In such cases, ''both separation of powers principles and a practical understanding of legislative intent make us 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there,'' and ''[t]he agency instead must point to 'clear congressional authorization' for the power it claims.'' *Id.* at 723 (quoting *UARG,* 573 U.S. at 324). Applying that standard, the Court held that the EPA's statutory authority to establish emission limits under CAA section 111(a)(1) and (d) ''is not close to the sort of clear authorization required by our precedents.'' *Id.* at 732.

The EPA proposes that the 2015 Findings implicate the major questions doctrine for many of the same reasons the Supreme Court applied it in *UARG* and *West Virginia.* By asserting authority to regulate GHG emissions from fossil fuel-fired power plants in response to global climate change concerns, the EPA '' 'claim[ed] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority.' '' *West Virginia,* 597 U.S. at 724 (quoting *UARG,* 573 U.S. at 324). As discussed in section III of this preamble, the EPA departed from decades of established practice in 2015 when it asserted authority over GHG emissions from power plants driven by global climate change concerns, rather than the ''air pollution'' that the CAA instructs the Agency to address within the overall structure of title I. In doing so, the EPA expanded its authority in a novel and transformative way that resulted in over a decade of high-stakes litigation and tremendous regulatory uncertainty for the power sector and beyond. This proposal is reinforced by the types of controls that the EPA has historically required regulated entities to implement. The Agency's past statements and regulatory efforts demonstrate that the only way to meaningfully address GHG emissions from fossil fuel-fired power plants is by shifting the power sector away from fossil fuels. Thus, the 2015 CPP was expressly predicated on generation shifting, and the 2024 CPS included a retirement subcategory that incentivized voluntary retirement of fossil fuel-fired plants in favor of different forms of generation.

The EPA further proposes that it is '' 'highly unlikely that Congress would leave' to 'agency discretion' the decision'' of how power plants generate electricity. *West Virginia,* 597 U.S. at 729 (quoting *MCI Telecomms. Corp.* v. *AT&T Co.,* 512 U.S. 218, 231 (1994)). As the Supreme Court noted with respect to coal-based electricity generation under section 111(d), such a policy decision involves ''basic and consequential tradeoffs,'' and ''Congress certainly has not conferred a like authority upon EPA anywhere else in the Clean Air Act.'' *Id.* The EPA proposes that the Court's conclusion under section 111(d) applies equally to our assertion of authority under section 111(b)(1)(A) in the 2015 Findings.

Before the 2015 Findings, '' 'Congress considered and rejected' multiple times'' legislation that would have authorized or required the EPA to regulate GHG emissions. *West Virginia,* 597 U.S. at 731 (quoting *Brown & Williamson,* 529 U.S. at 144). As discussed above, Congress previously considered legislation that would have authorized or required the EPA to prescribe standards for GHG emissions. For example, the Safe Climate Act of 2007 would have adopted findings and policies with respect to limiting global temperature increase, required various forms of international cooperation, and added a new title VII to the CAA instructing the EPA to achieve phased GHG emission reduction targets and regulate GHG emissions of appropriate sectors or sources.[194] And, as the Court in *West Virginia* noted, the American Clean Energy and Security Act of 2009 would have required international cooperation and added new titles to the CAA requiring the EPA to, among other things, regulate GHG emissions from certain stationary sources under CAA section 111.[195] Neither bill was enacted through the legislative process, and Congress has since declined to adopt similar legislation.[196]

When Congress has addressed GHGs individually or collectively, it has not done so through general grants of

*Nebraska,* 600 U.S. 477, 507 (2023) (Barrett, J., concurring)).

[193] *Learning Res. Inc.,* 607 U.S. at 279–80 (Gorsuch, J., concurring); *West Virginia,* 597 U.S. at 735–51 (Gorsuch, J., concurring).

[194] H.R. 1590, 110th Cong. (2007). This bill was presented in the House of Representatives and never received a vote.

[195] H.R. 2454, 111th Cong. (2009). This bill, introduced on May 15, 2009—a month after the EPA proposed the 2009 Endangerment Finding—passed the House of Representatives by a 219–212 margin on June 26, 2009, but never received a vote in the Senate. As noted previously, the President and Administrator at the time expressed a strong preference for legislation but also a willingness to resolve legislative inaction by administrative means, and the Agency ultimately finalized the Endangerment Finding on December 7, 2009.

[196] Congress's pattern of not providing the EPA such authority extends long before the 2009 Endangerment Finding and 2015 Findings, as noted previously. *See Coal. for Responsible Regulation,* 2012 U.S. App. LEXIS 25997, at *36–37 (Brown, J., dissenting from denial of rh'g en banc) (summarizing earlier legislative proposals).

authority, including the new titles enacted as part of the 1990 CAA Amendments and discussed above. As an additional example, Congress enacted a comprehensive phaseout scheme for HFCs in the 2020 AIM Act, which includes detailed instructions, timelines, and requirements for implementation and allows some uses to continue under certain conditions.[197] Congress also authorized a tax credit to incentivize underground sequestration that mitigates $CO_2$ emissions.[198] And Congress amended the CAA in 2021 through the 2022 IRA to require the Agency to establish a waste emissions charge for certain sources structured to incentivize methane emissions reductions over time.[199] When addressing GHGs and global climate change concerns more generally, Congress has used non-regulatory tools that incentivize changes in manufacturing and consumer choice, including through additional funding provisions in the IRA. Multiple instances of recent legislation addressing GHGs individually and through distinct regulatory approaches suggests that Congress views such policy decisions as economically and politically significant and not adequately addressed by general statutory authorities enacted in response to different problems.

As evidenced by Congress continuing to revise these air pollutant-specific measures and nonregulatory tools, there is an ongoing national debate over the appropriate response to global climate change concerns. The OBBBA repealed several relevant measures adopted in the IRA and rescinded the EPA's appropriations to carry out several funding programs related to GHG emissions.[200] Among other things, Congress prohibited the Agency from collecting the waste emission charge for methane for ten years beyond the original statutory collection date, rescinded funding to administer grant programs in CAA sections 132 and 135–38, and repealed CAA section 134, which had included a section-specific definition of ''greenhouse gas'' applicable to the grant program set out in that section. This legislation, which was the product of substantial national debate and revised and rescinding funding for provisions of the IRA that were themselves the product of substantial national debate, indicates that the EPA erred in attempting to resolve significant policy issues on its own accord in the 2015 Findings.

Congress has also recently disapproved several actions taken by the EPA with respect to GHG emissions. On May 19, 2025, President Trump signed into law a resolution adopted by Congress under the Congressional Review Act (CRA) to void our final rule implementing the waste emission charge added to the CAA in 2021.[201] And on June 12, 2025, President Trump signed into law three resolutions adopted by Congress under the CRA[202] to void waivers we granted under CAA section 209 that allowed California and participating States to enforce GHG emission regulations for motor vehicles and engines, up to and including zero-emission standards that mandated a shift to electric vehicles.[203] These disapproval resolutions further demonstrate the economic and political significance of the EPA's GHG emission regulations and reinforce the understanding that Congress intends to reserve such major questions of policy for itself. *See West Virginia,* 597 U.S. at 731–32.

2. Lack of Clear Congressional Authorization

Under the major questions doctrine, the EPA proposes that the Agency lacks the ''clear congressional authorization'' required for the novel approach taken in the 2015 Findings and must rescind the 2015 Findings and remaining GHG emission regulations. *West Virginia,* 597 U.S. at 723 (quoting *UARG,* 573 U.S. at 324). The EPA proposes that CAA section 111(b)(1)(A) does not clearly authorize the regulation of GHG emissions from fossil fuel-fired power plants in response to global climate change concerns.

In *West Virginia,* the Supreme Court held that our authority under CAA section 111 ''to establish emission caps at a level reflecting 'the application of the best system of emission reduction . . . adequately demonstrated' '' did not clearly authorize the EPA to issue emission guidelines that addressed global climate change concerns by mandating a shift away from coal-generated electricity. 597 U.S. at 732. Similarly, in *UARG,* the Court held that our PSD and Title V authorities could not fully be extended to GHG emissions because those provisions ''are designed to apply to, and cannot rationally be extended beyond, a relative handful of large sources capable of shouldering heavy substantive and procedural burdens.'' 573 U.S. at 303. In these and other recent precedents, the Court has made clear that the express statutory authority required by major questions doctrine requires more than general language conferring ''a merely plausible textual basis for the agency action.'' *West Virginia,* 597 U.S. at 723.[204]

The EPA proposes that *West Virginia, UARG,* and other relevant major questions doctrine cases control the analysis of our authority under CAA section 111(b)(1)(A). As in *West Virginia,* our statutory authority does not clearly authorize the assertion of regulatory power announced in the 2015 Findings. And as in *UARG,* our statutory authority to ''include a category of sources in such list if in [the Administrator's] judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare'' does not clearly authorize using the CAA's stationary source listing to address GHG emissions based on global climate change concerns. The 2015 Findings concluded that the EPA had a ''rational basis'' for regulating $CO_2$ emissions from fossil fuel-fired power plants under CAA section 111, supported by the now-rescinded 2009 Endangerment Finding and certain other information. That the EPA asserted such authority based on

[197] Public Law 116–260, Div. S, 134 Stat. 1182, 2255–71 (codified at 42 U.S.C. 7675 *et seq.*).

[198] 26 U.S.C. 45Q.

[199] Public Law 117–169, section 60113, 136 Stat. 1818, 2074 (codified at 42 U.S.C. 7436).

[200] Public Law 119–21.

[201] Public Law 119–2; *see* 90 FR 21225 (May 19, 2025).

[202] H.J. Res. 87; H.J. Res. 88; H.J. Res. 89; *see also Diamond Alt. Energy,* 606 U.S. at 107 n.1; Statement by the President (June 12, 2025): *https://www.whitehouse.gov/briefings-statements/2025/06/statement-by-the-president/.*

[203] For example, California's Advanced Clean Cars II required an increasing amount of EVs to be sold so that by 2035 100 percent of new cars and light trucks sold in California would be zero-emission vehicles, including PHEV. *See* California Air Resources Board, California moves to accelerate to 100% new zero-emission vehicle sales by 2035, available at *https://ww2.arb.ca.gov/news/california-moves-accelerate-100-new-zero-emission-vehicle-sales-2035.*

[204] *See, e.g., Learning Resources, Inc.,* 607 U.S. at 242 (holding that the President lacked clear authority to implement tariffs under statutory provision authorizing him to ''regulate . . . importation'' in response to certain emergency situations); *Nebraska,* 600 U.S. at 506–07 (holding that the Department of Education lacked clear authority to forgive student loans under statutory language authorizing the Secretary to ''waive or modify any statutory or regulatory provision applicable to the student financial assistance programs . . . deem[ed] necessary in connection with a war or other military operation or national emergency''); *NFIB* v. *OSHA,* 595 U.S. 109 (2022) (per curiam) (holding that the Occupational Safety and Health Administration lacked clear authority to impose a COVID–19 vaccine mandate or weekly testing for 84 million Americans through its authority to ensure ''safe and healthful working conditions''); *Ala. Ass'n of Realtors* v. *HHS,* 594 U.S. 758 (2021) (per curiam) (holding that the CDC lacked clear authority to impose eviction moratorium during the COVID–19 pandemic under language permitting ''such regulations as in [the Surgeon General's] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases'').

only a ''rational basis'' is itself a strong indicator that the Agency was not relying on statutory language conferring clear congressional authorization. Moreover, the ''substantially similar'' approach taken in the 2015 Findings has similar legal flaws as the 2009 Endangerment Finding. The EPA proposes that in relying on the 2009 Endangerment Finding's analysis and conclusions as the primary basis for regulating $CO_2$ under CAA section 111, the 2015 Findings erred by asserting authority to regulate GHG emissions from power plants in an attempt to resolve a global problem without clear congressional authorization.

The EPA further proposes that *Massachusetts* does not preclude the application of the major questions doctrine to our authority to regulate GHG emissions from fossil fuel-fired power plants under CAA section 111(b)(1)(A), and that it does not provide a basis for concluding that Congress clearly authorized the Agency to assert such authority. The *Massachusetts* Court did not consider or have reason to interpret the scope of our authority under CAA section 202(a)(1) given our position in the 2003 Denial that GHGs are not ''air pollutant[s]'' under any provision of the statute, and it had no reason to examine the scope of our authority under CAA section 111(b). Rather, *Massachusetts* rejected our position at the time that GHGs are ''categorically'' excluded from the CAA and remanded for the Administrator to determine whether four GHGs met the standard in CAA section 202(a)(1). *UARG,* 573 U.S. at 320. Further, *Massachusetts* must be read together with the Supreme Court's decisions in *West Virginia* and *UARG* as well as other relevant precedents decided since 2007.[205] The decision in *Massachusetts* necessarily does not reflect consideration of these precedents or additional legislative and regulatory developments since that time.

The EPA further proposes that *AEP* does not limit our proposed application of the major questions doctrine to the 2015 Findings. The *AEP* Court held that, with respect to the displacement of Federal common law, CAA section 111 ''speaks directly'' to $CO_2$ emissions from power plants. 564 U.S. at 424. The Court concluded that Congress set out the standard for triggering regulation (*e.g.,* to list categories of stationary sources that in the Administrator's judgment cause, or contribute significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare) and empowered the EPA alone to determine whether the standard is met. The Court was not presented with the question whether GHG emissions from fossil fuel-fired power plants meet the standard. *Id.* at 426 (''The critical point is that Congress delegated to EPA the decision *whether and how* to regulate carbon-dioxide emissions from power plants; the delegation is what displaces federal common law. Indeed, were EPA to decline to regulate carbon-dioxide emissions altogether . . . federal courts would have no warrant to employ the federal common law of nuisance to upset the Agency's expert determination.'') (emphasis added). The EPA did not decide ''whether'' such emissions could be regulated until the 2015 NSPS and 2015 CPP, which issued several years after *AEP.* Instead, the Court in *AEP* decided whether Federal district courts can determine, through unwritten Federal nuisance law, whether and how to regulate $CO_2$ emissions from power plants, and answered ''no'' given the existence of CAA section 111(d). *See id.; West Virginia,* 597 U.S. at 730.

The EPA requests comment on the proposed application of the major questions doctrine to the 2015 Findings and whether Congress clearly authorized the agency to regulate GHG emissions from fossil fuel-fired power plants in CAA section 111(b)(1)(A).

*C. Eliminating GHG Emissions From Fossil Fuel-Fired Power Plants Would Be Futile*

As another independent ground for the rescissions and repeals, the EPA is proposing that the Agency cannot or should not exercise its regulatory authority under CAA section 111 when that exercise would have no meaningful impact on the identified dangers to public health and welfare. Modeling analysis performed to evaluate the potential impacts of GHG regulations issued pursuant to CAA section 111 indicates that regulating fossil fuel-fired power plant $CO_2$ emissions under this provision would have no more than a trivial effect on the key global climate change indicators that relate to adverse public health and welfare impacts. These results and analyses are discussed in section V.C.3 of this preamble. The 2015 NSPS and the EPA's subsequent attempts to establish GHG emission limitations for fossil fuel-fired EGUs avoided confronting this question by focusing on the emissions reductions potential of the regulation rather than the impacts of those emission reductions on health and welfare. Upon further review, we propose that this approach is not consistent with the best reading of the statute or the requirement that regulations be reasonable and reasonably explained. CAA section 111(b)(1)(A) instructs the EPA to regulate in furtherance of public health and welfare when a source category contributes significantly to qualifying air pollution, not to reduce emissions regardless whether such reductions have any material health and welfare impact.

Specifically, the EPA is proposing that the potential for regulations limiting GHG emission from fossil fuel-fired power plants to yield more than *de minimis* gains for public health or welfare is relevant and should be considered when applying CAA section 111(b)(1)(A). This principle applies generally and was recognized in the 2009 Endangerment Finding when the EPA noted that the relative contribution of GHG emissions from new motor vehicles and engines in the U.S. and their contribution to global concentrations must be more than *de minimis* to invoke our authority under CAA section 202(a)(1). Although the 2009 Endangerment Finding failed to account for this principle in its findings, the EPA applied this principle in the Endangerment Finding Rescission to conclude, as one of several independent bases for that final action, that CAA section 202(a)(1)'s GHG motor vehicle regulations should be rescinded based on their inability to achieve more than a *de minimis* impact on public health and welfare. We propose to apply the same background legal principles to CAA section 111(b)(1)(A): *de minimis* concerns are not encompassed within the scope of general statutory language, and the ability of regulation to address identified dangers is relevant to whether the emissions contribute significantly to air pollution that endangers public health or welfare within the meaning of the statute in the first instance. As discussed in this subsection, our proposed analysis demonstrates that any potential impact on public health or welfare of $CO_2$ regulations for fossil fuel-fired power plant emissions is at most *de minimis.* Even a complete elimination of all $CO_2$ emissions from fossil fuel-fired power plants (far more than the standards at issue in this action would do if fully implemented) would not address the risks attributed to phenomena associated with elevated global concentrations of GHGs. We are proposing that this futility demonstrates that CAA section 111(b)(1)(A) does not, as a matter of text and structure,

[205] The EPA notes that recent Supreme Court decisions have not cited *Massachusetts* as a precedent applying, or declining to apply, the major questions doctrine. *See, e.g., Learning Resources, Inc.,* 607 U.S. 229 (2026); *Nebraska,* 600 U.S. 477 (2023); *West Virginia,* 597 U.S. 697 (2022).

authorize or require the EPA to prescribe standards for GHG emissions from fossil fuel-fired power plants, and that retaining standards under the circumstances would be unreasonable.

1. Background Legal Principles

Courts have long recognized the "background" legal principle "against which all enactments are adopted" that general language does not encompass *de minimis* concerns. *Wis. Dep't of Rev.* v. *William Wrigley Jr., Co.,* 505 U.S. 214, 231 (1992). Unless the relevant statute provides otherwise, agencies have implied authority to exempt *de minimis* concerns "when the burdens of regulation yield a gain of trivial or no value." *Ala. Power Co.* v. *Costle,* 636 F.2d 323, 360–61 (D.C. Cir. 1979). This conclusion informs our interpretation of CAA section 111(b)(1)(A) by suggesting that the provision does not encompass the authority to regulate GHG emissions where regulations cannot have more than a trivial impact on the identified dangers to public health and welfare. Nothing in the statutory language of CAA section 111 suggests that Congress intended to overcome this background principle, and both the Supreme Court and the D.C. Circuit have recognized its applicability in comparable statutory contexts.[206] Put another way, we propose that the inability of GHG emission limitations for fossil fuel-fired power plant to have any material impact on the global climate change concerns relied upon in the 2015 Findings suggests that it would be unreasonable to conclude that GHG emissions from fossil fuel-fired power plants cause or contribute significantly to air pollution which may reasonably be anticipated to endanger public health or welfare or to retain associated standards.

2. Proposed Approach for Assessing the Public Health and Welfare Impacts Related to Global Climate Change Concerns

The EPA is proposing to rely on global mean surface temperature (GMST)[207] and global mean sea level rise (GSLR)[208] as metrics to assess the potential magnitude of public health and welfare impacts from the regulation of power plant GHG emissions under CAA section 111. These metrics, which are commonly derived from climate models, were the primary drivers of the EPA's causal analysis within the 2009 Endangerment Finding, which the Agency relied on to establish the predicate for power plant $CO_2$ regulations under CAA section 111.

The 2009 Endangerment Finding centrally links GMST and GSLR to the adverse public health and welfare impacts attributed to global climate change concerns. There, the Administrator relied on IPCC Assessment Report 4 (AR4) projections to find that GMST would likely increase between 1.8 to 4 °C by 2100 (compared to the average temperature around 1990), with an uncertainty range of 1.1 to 6.4 °C. 74 FR 66519. Operating within this analytical framework, the Administrator found that elevated global concentrations of GHGs from all foreign and domestic sources were responsible for increased GMST that were responsible in turn for indirect health risks driven by (1) more frequent heat waves; (2) air quality effects, including increased formation of ozone; and (3) broader societal impacts related to increased frequency and severity of certain extreme weather events. 74 FR 66525.[209] The Administrator also found that GHG emissions could lead to welfare effects related to GSLR and other downstream impacts, including (1) food production and agriculture; (2) forestry; (3) water resources; and (4) energy infrastructure and settlements, although the evidence was uncertain for several categories that may see near-term benefits. 74 FR 66531–35.[210]

The nature of these specific health risks and welfare effects is speculative, multi-faceted, and multi-causal. The preceding discussion in section V.A.1.a explains the complex causal chain between the emission of "climate pollutants," their global diffusion throughout the atmosphere, and the subsequent manifestation of related public health and welfare impacts through additional complex causal chains. There, these analytical difficulties, uncertainties, and multiple causal leaps were themselves a reason to conclude that CAA section 111(b)(1)(A) does not encompass emissions that can be said to lead to adverse health and welfare impacts only by constructing a global air pollution framework. Here, they suggest that GMST and GSLR, which are key causal indicators for many of the adverse impacts attributed to global climate change that require fewer causal steps and analytical assumptions to assess, are reasonable proxies to examine the magnitude of public health and welfare impacts of GHG emission reductions in general, and $CO_2$ emission reductions from power plants in particular. The public health and welfare impacts represented by GMST and GSLR are the same public health and welfare effects that the Agency relied on in the 2015 NSPS to regulate power plant $CO_2$ emissions under CAA section 111 for the first time.

3. Proposed Futility Analysis and Rationale

The EPA recognizes that there are significant uncertainties related to climate modeling and significant, ongoing disputes regarding climate science and modeling. However, the EPA is proposing to utilize the climate modeling provided within this section to help illustrate that, even applying the assumptions of these climate models and uncertainties contained therein and without endorsing the underlying assumptions reflected in these commonly used models, removing all $CO_2$ emissions from fossil fuel-fired power plants would not materially address the public health and welfare dangers attributed to global climate change concerns.

To assess the magnitude of public health and welfare benefits available through the regulation of power plant GHG emissions under CAA section 111, the EPA developed a composite forecast of U.S. power plant $CO_2$ emissions from 2026 through 2100 based on projections of U.S. electric power generation and $CO_2$ emissions from the 2025 U.S. Energy Information Administration Annual Energy Outlook (AEO) and electricity supply and demand from the North American Electric Reliability Corporation (NERC). The composite forecast was developed specifically for this analysis to exclude the reduction in future emissions from the IRA. Additional details about the methodology the EPA used to develop

[206] *See UARG,* 573 U.S. at 309 n.1; *Ala. Power,* 66 F.2d at 360–61; *see also EPA* v. *EME Homer City Generation, L.P.,* 572 U.S. 489 (2014) (approving of approach that did not require additional emissions reductions from States that contributed trivially to nonattainment in other States); *Ohio* v. *EPA,* 997 F.2d 1520, 1534–35 (D.C. Cir. 1993) (accepting de minimis approach to CERCLA five-year risk reviews because the statute did not clearly prohibit the approach and anything less would be contrary to legislative design).

[207] As GMST is a widely used metric for tracking temperature changes related to global climate change concerns, we use the term interchangeably with "global temperature" within this preamble and supporting documentation.

[208] As GSLR is a widely used metric for tracking sea level rise related to global climate change concerns, we use the term interchangeably with "global sea level," "sea level," and "sea level rise" within this preamble and supporting documentation.

[209] The Administrator also noted that increased GMST could lead to changes in certain food- and water-borne pathogens and allergens (including increases in pollen resulting from increased plant growth at higher concentrations of $CO_2$) but did "not plac[e] primary weight on these factors." 74 FR 66498, 66526.

[210] The Administrator relied on welfare impacts to water resources and sea level rise as providing "the clearest and strongest support for an endangerment finding." 74 FR 66534.

this dataset and the specific AEO and NERC data relied on are available in the Technical Memo, *Temperature, $CO_2$ Concentration, and Sea Level Rise Impacts of $CO_2$ Emissions from U.S. Electricity Generating Units,* available in the rulemaking docket. Table 1 lists the resulting $CO_2$ emissions from U.S. power plants from this composite forecast in a 2026 baseline year as well as for two future years: 2050 and 2100 (Table 1).

The EPA used the Finite amplitude Impulse Response (v2.2.3) climate emulator model (FaIR model) to quantify changes in global $CO_2$ concentration and GMST associated with the marginal change in emissions from each power plant scenario relative to the baseline. The FaIR model is an open-source emulator that seeks to reasonably reflect the best available information and science but does not include all possible Earth system processes. In FaIR, GHG lifetimes are based on a four-box decay model that is also a function of atmospheric and ocean temperatures and emissions of other gases. The model accounts for radiative forcing from GHGs, aerosols, albedo changes due to land use, solar cycles, and volcanic eruptions, given an externally defined time path for each. FaIR uses three layers for the ocean component, as heat uptake by the ocean controls how fast atmospheric temperature changes after a change in radiative forcing. FaIRv2 includes uncertainty estimates that are based on a calibration to global climate models, historical observations, and parameter uncertainty ranges from the IPCC Sixth Assessment Report (AR6). Uncertainties in climate model parameters considered in FaIR include the sensitivity of climate to increases in atmospheric $CO_2$ concentrations, forcing from aerosol interactions with radiation and clouds, forcing from black carbon on snow, and carbon cycle parameters. All simulations were run with historical volcanic and solar cycle forcing, with solar values held constant after 2022.

The EPA also used the Building Blocks for Relevant Ice and Climate Knowledge (BRICKv1.0.1) model to quantify changes in GSLR associated with the marginal temperature changes from each emissions scenario. BRICK is a semi-empirical, open-source model, with four sub-components that each model the physical changes in the four major contributors to GSLR—glaciers and ice caps, land water storage, ice sheets, and thermal expansion—in response to changes in temperature. Similar to FaIR, the BRICK model is also designed with uncertain parameters intended to encompass the range of possible GSLR responses to a given input of temperature and ocean heat content. Uncertainties in GSLR parameters considered in BRICK include contributions from glaciers and ice caps and the Antarctic and Greenland ice sheets, as well as ocean thermal expansion, and were calibrated through a coupled physical-statistical framework, using an adaptive Markov chain Monte Carlo approach. Reduced complexity models like BRICK and FaIR allow for the flexibility to analyze custom scenarios, quantitatively discern changes between any scenarios, and characterize uncertainties surrounding global change. The National Academies of Sciences, Engineering and Medicine (NASEM) in a 2017 report endorsed the use of the FaIR model, and the BRICK model was developed in response to recommendation 4–3 from the same 2017 NASEM report.[211]

All modeled outputs—absolute global $CO_2$ concentrations, GMST, and GSLR—were evaluated across three different future scenarios projected from 2026 to 2100. The first scenario is a baseline global emission scenario: the Shared Socioeconomic Pathway 2 scenario with a radiative forcing of 4.5 watts per square meter by 2100 (SSP2–4.5). The second two scenarios represent these same global emission projections, but with some amount of $CO_2$ emissions removed from U.S. power plants. The first eliminates all $CO_2$ emissions from U.S. power plants while the second eliminates 50 percent of U.S. power plant $CO_2$ emissions. The scenario that eliminates all $CO_2$ emissions from U.S. power plants is presented here for analytical completeness only. This scenario does not represent a realistic approximation of the impacts of any potential regulation addressing GHG emissions from fossil fuel-fired power plants under CAA section 111.

The EPA modeling described above estimates that global atmospheric concentrations of $CO_2$ will be 418.1 parts per million by volume (ppmv) (with an associated 95 percent confidence interval (95 percent CI) of 416.7–419.7 ppmv) in the 2026 baseline year and projects that these concentrations will increase in the baseline scenario to a median of 475.4 ppmv by 2050 and 533.6 ppmv by 2100 (Table 2). The 95 percent CI reflects the uncertainty in the FaIR model input parameters and ranges from 461.8–484.3 ppmv in 2050 to 482.5–565.4 ppmv in the year 2100 (Table 2). When comparing to the year 2026, concentrations of $CO_2$ in this baseline scenario are projected to increase in 2050 and 2100 by 57.3 ppmv and 115.6 ppmv, respectively (Table 3). Emissions of $CO_2$ from power plants in the United States are projected to contribute 2.9 ppmv (or 5 percent) and 7.2 ppmv (or 6 percent) to this global increase by 2050 and 2100, respectively (Table 3).

The modeled GMST in the 2026 baseline year is estimated to be 1.33 °C above pre-industrial temperatures, defined as the average between 1850 and 1900 (Table 4). GMST in the baseline scenario is estimated to increase to 1.89 °C (95 percent CI: 1.44–2.37 °C) and 2.66 °C (95 percent CI: 1.86–3.87 °C) above pre-industrial temperatures by the years 2050 and 2100, respectively (Table 4). These changes are +0.55 °C (95 percent CI: 0.33–0.87 °C) and +1.30 °C (95 percent CI: 0.68–2.45 °C) above 2026 baseline temperatures (Table 5). Emissions of $CO_2$ from power plants in the United States are projected to contribute to 0.014 °C (95 percent CI: 0.010–0.018 °C) (or 2 percent) of this increase in GMST by 2050 and 0.035 °C (95 percent CI: 0.023–0.053 °C) (or 3 percent) of this increase by 2100 (Table 5).

The modeled GSLR in the 2026 baseline year is estimated to be 25.3 cm higher than during the pre-industrial era (1850–1900) (Table 6). GSLR in the baseline scenario is projected to be 38.9 cm (95 percent CI: 26.5–50.1 cm) by 2050 and 97.1 cm (95 percent CI: 59.6–166.3 cm) by 2100 relative to pre-industrial (Table 6). These increases in the baseline scenario are roughly 12.9 cm (95 percent CI: 9.8–23.2 cm) and 73.3 cm (95 percent CI: 36.0–141.7 cm) higher than 2026 levels (Table 7). Emissions of $CO_2$ from power plants in the United States contribute to roughly 0.10 cm (0.06–0.98 cm) (or 1 percent) of this global increase in 2,050 and 1.37 cm (0.39–4.77 cm) (or 2 percent) of this global increase by 2100 (Table 7).

[211] National Academies of Sciences, Engineering, and Medicine. 2017. Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide. Washington, DC: The National Academies Press. A copy of this report is available in the docket for the rulemaking. Available online: *https://doi.org/10.17226/24651.*

TABLE 1—GLOBAL $CO_2$ EMISSIONS (MILLION METRIC TONS (Mt) $CO_2$/YEAR (yr)) (ABSOLUTE AND CHANGE RELATIVE TO 2026) AND CONTRIBUTION FROM U.S. POWER PLANTS

| Scenario | 2026 | 2050 | 2100 |
| --- | --- | --- | --- |
| #1 Baseline (SSP2–4.5) [a] | 39,310 | 42,960 (+3,650) | 14,480 (−24,830). |
| #2 U.S. EGU sector: | | | |
| #2a. 100% EGU Contribution | 1,540 | 1,290 | 1,290. |
| #2b. 50% EGU Contribution | 770 | 640 | 640. |

[a] Absolute emissions each year. In parenthesis, the absolute change (Mt) in global fossil $CO_2$ emissions in 2050 and 2100 relative to 2026.

TABLE 2—ABSOLUTE GLOBAL $CO_2$ CONCENTRATIONS (ppmv), BY SCENARIO *

| Scenario | Modeled median (95% confidence interval) (ppmv) | | |
| --- | --- | --- | --- |
| | 2026 | 2050 | 2100 |
| #1 Baseline (SSP2–4.5) | 418.1 (416.7–419.7) [212 213] | 475.4 (461.8–484.3) | 533.6 (482.5–565.4). |
| #2 Baseline without U.S. EGU sector: | | | |
| #2a. Baseline w/o 100% EGU Contribution | | 472.5 (459.3–481.1) | 526.3 (477.8–557.0). |
| #2b. Baseline w/o 50% EGU Contribution | | 473.9 (460.6–482.7) | 529.9 (480.2–561.2). |

* Contributions may not sum due to rounding.

TABLE 3—CHANGES IN GLOBAL $CO_2$ CONCENTRATIONS (ppmv) RELATIVE TO 2026, BY SCENARIO *

| Scenario | Median concentration change (ppmv) and contribution from U.S. EGUs [a] | |
| --- | --- | --- |
| | 2050 | 2100 |
| #1 Baseline (SSP2–4.5) | +57.3 (43.9–66.2) ppmv | +115.6 (64.3–147.4) ppmv. |
| #2 U.S. EGU sector: | | |
| #2a. 100% EGU Contribution | 2.9 (2.5–3.2) ppmv (5%) [a] | 7.2 (4.7–8.6) ppmv (6%). |
| #2b. 50% EGU Contribution | 1.5 (1.2–1.6) ppmv (3%) | 3.6 (2.3–4.3) ppmv (3%). |

[a] Percent change calculated as the absolute contribution in each year (rows 2, 3) divided by the increase in the baseline in that year (row 1).
* Contributions may not sum due to rounding.

TABLE 4—GMST RELATIVE TO PRE-INDUSTRIAL (1850–1900), BY SCENARIO *

| Scenario | Modeled median (95% confidence interval) (°C) | | |
| --- | --- | --- | --- |
| | 2026 | 2050 | 2100 |
| #1 Baseline (SSP2–4.5) | 1.33 (1.04–1.61) [214] | 1.89 (1.44–2.37) | 2.66 (1.86–3.87). |
| #2 Baseline without U.S. EGU Contribution: | | | |
| #2a. Baseline w/o 100% EGU Contribution | | 1.88 (1.43–2.36) | 2.62 (1.83–3.82). |
| #2b. Baseline w/o 50% EGU Contribution | | 1.88 (1.44–2.37) | 2.64 (1.85–3.85) |

* Contributions may not sum due to rounding.

TABLE 5—CHANGE IN GMST RELATIVE TO 2026, BY SCENARIO *

| Scenario | Median temperature change and contribution from U.S. EGUs | |
| --- | --- | --- |
| | 2050 | 2100 |
| #1 Baseline (SSP2–4.5) | +0.55 (0.33–0.87) °C | +1.30 (0.68–2.45) °C. |
| #2 U.S. EGU Sector: | | |
| #2a. 100% EGU Contribution | 0.014 (0.010–0.018) °C (2%) [a] | 0.035 (0.023–0.053) °C (3%). |
| #2b. 50% EGU Contribution | 0.007 (0.005–0.009) °C (1%) | 0.018 (0.012–0.026) °C (1%). |

[a] Percent change calculated as the absolute contribution in each year (rows 2, 3) divided by the increase in the baseline change in that year (row 1).
* Contributions may not sum due to rounding.

TABLE 6—GSLR (cm) RELATIVE TO PRE-INDUSTRIAL (1850–1900), BY SCENARIO *

| Scenario | Modeled median (95% confidence interval) (cm) | | |
| --- | --- | --- | --- |
| | 2026 | 2050 | 2100 |
| #1 Baseline (SSP2–4.5) | 25.3 (14.5–32.9) [215] | 38.9 (26.5–50.1) | 97.1 (59.6–166.3). |
| #2 Baseline without U.S. EGU Contribution: | | | |
| #2a. Baseline w/o 100% EGU Contribution | | 38.8 (26.4–49.9) | 95.5 (59.0–163.9). |

TABLE 6—GSLR (cm) RELATIVE TO PRE-INDUSTRIAL (1850–1900), BY SCENARIO *—Continued

| Scenario | Modeled median (95% confidence interval) (cm) | | |
|---|---|---|---|
| | 2026 | 2050 | 2100 |
| #2b. Baseline w/o 50% EGU Contribution | | 38.8 (26.4–50.0) | 96.1 (59.3–164.4). |

* Contributions may not sum due to rounding.

TABLE 7—CHANGE IN GSLR (cm) RELATIVE TO 2026, BY SCENARIO *

| Scenario | Median sea level change and contribution from U.S. EGUs | |
|---|---|---|
| | 2050 | 2100 |
| #1 Baseline (SSP2–4.5) | +12.9 (9.8–23.2) cm | +73.3 (36.0–141.7) cm. |
| #2 U.S. EGU Sector: | | |
| #2a. 100% EGU Contribution | 0.10 (0.06–0.98) cm (1%) [a] | 1.37 (0.39–4.77) cm (2%). |
| #2b. 50% EGU Contribution | 0.05 (0.03–0.54) cm (<1%) | 0.44 (0.20–2.53) cm (1%). |

[a] Percent change calculated as the absolute contribution in each year (rows 2, 3) divided by the increase in the baseline in that year (row 1).
* Contributions may not sum due to rounding.

As shown above, the changes in $CO_2$ emissions and global $CO_2$ concentrations by 2050 and 2100 resulting from the complete elimination of all $CO_2$ emissions from U.S. power plants would be relatively minor. And CAA section 111(b)(1)(a) instructs that the appropriate indicator of impact is not emissions or concentrations, but public health and welfare impacts.[216] Section V.C.2 describes our proposed basis for using the projected impacts of the elimination of power plant $CO_2$ emissions on trends in GMST and GSLR as a proxy for public health and welfare impacts.

While the EPA presents the results of a scenario eliminating all $CO_2$ emissions from U.S. power plants, this substantially overestimates the impacts of the EPA's GHG regulations and is not intended to be a realistic approximation of those impacts. As noted above, the 100 percent elimination scenario is presented here for analytical completeness. The 2015 NSPS was projected to result in only ''negligible $CO_2$ emission changes.'' 80 FR 64640. While the EPA estimated non-zero impacts for subsequent power plant regulations under CAA section 111, all fell well below a 100 percent reduction in emissions from U.S. power plants. The 2015 CPP, which assessed its emission impacts under two different implementation scenarios, projected an average reduction of 414 million short tons of $CO_2$ in 2030. 80 FR 64924. The 2019 ACE Rule estimated a smaller 11 million short ton decline in power plant $CO_2$ emissions in 2030. For 2035, the 2019 ACE Rule's estimated emissions reduction shrank to 9.3 million short tons. 84 FR 32561. The 2024 CPS projected annual reductions in power plant $CO_2$ emissions of 50, 123, 54, and 42 million metric tons in 2030, 2035, 2040, and 2045, respectively. 91 FR 40005. By comparison, the composite emissions forecast in this proposed futility analysis estimated total annual $CO_2$ emissions from U.S. power plants of 1,540 million metric tons (Mt) in 2026 and 1,290 Mt in all years after 2050 (Table 1). Converting units for a direct comparison to the EPA's 2019 ACE and 2015 CPP rules, these values represent 1,698 and 1,422 million short tons, respectively, in 2026 and after 2050. None of the annual estimated $CO_2$ emission impacts for the 2015 NSPS, 2015 CPP, 2019 ACE, or 2024 CPS approaches these totals. Estimating the percentage reduction in $CO_2$ emissions from U.S. power plants that would or could result from regulation of these sources under any CAA section 111 is highly uncertain and turns on factors that are difficult to predict, including our regulatory decisions for the power sector, separate regulatory influences, and changes to the underlying economics and power system technologies. Regardless, the EPA believes that the complete elimination of $CO_2$ emissions from U.S. power plants is unrealistic. As a proxy for a more likely, real-world scenario, we present below a scenario in which 50 percent of $CO_2$ emissions from U.S. power plants would be eliminated.

Under the 50 percent scenario, Table 5 shows that retaining 50 percent of the $CO_2$ emissions from power plants would contribute to a smaller amount of warming than the 100 percent scenario, potentially resulting in an estimated 0.007 (0.005–0.009) °C increase in GMST by 2050 and a 0.018 (0.012–0.026) °C increase in GMST by 2100 (temperature increases are relative to the 2026 baseline). Similarly, 50 percent of power plant $CO_2$ emissions would contribute to a smaller amount of GSLR than 100 percent of the power plant $CO_2$ emissions, potentially resulting in an estimated 0.05 (0.03–0.54) cm increase (again, increases are relative to the 2026 baseline) in GSLR by 2050 and 0.44 (0.20–2.53) cm increase in GSLR by 2100 (Table 7). This is an illustrative scenario that cannot be assumed to translate with precision directly to specific adverse health or welfare impacts. But these figures are likely an overestimation of the actual predicted impact of CAA section 111 GHG standards over the relevant time horizon because the 50 percent scenario does not reflect what such standards would realistically achieve given technical and statutory constraints. The EPA's prior regulatory impact analyses for power sector regulations support this conclusion. The composite forecast estimated that 50 percent of U.S. power plant $CO_2$ emissions correspond to 770

[212] Average annual observed $CO_2$ concentrations in 2024 were 423 ppmv. Source: Trends in Atmospheric Carbon Dioxide ($CO_2$) from: *https://gml.noaa.gov/ccgg/trends/global.html.*

[213] Observed data do not exactly correspond with the modeled estimates, as the FaIR and BRICK modeling start in 1750 (or 1850) for estimation of both historical and future projected GHG concentrations, temperatures, and GSLR.

[214] GMST observations in 2024 were 1.55 (1.42–1.68) °C relative to 1850–1900 to present from *https://wmo.int/publication-series/state-of-global-climate-2024.* The uncertainty in observed temperatures is due to the uncertainty in temperature before 1900, due to the sparsity of observations during that period.

[215] Observations of GSLR in 2024 are 22.5 cm relative to pre-industrial. Source: *https://www.climate.gov/news-features/understanding-climate/climate-change-global-sea-level.*

[216] *See* section V.A.2.b of this preamble for discussion of the EPA's proposed interpretation that CAA section 111(b)(1)(A) requires the Agency to evaluate a source category's contribution to endangerment, not merely to air pollution.

Mt in 2026 and 640 Mt in each year after 2050, which are equivalent to 849 and 705 million short tons, respectively (Table 1). As with the comparison between total U.S. $CO_2$ power plant emissions and the estimated $CO_2$ emissions of prior EPA rules, none of the annual estimated $CO_2$ emission impacts for the 2015 NSPS, 2015 CPP, 2019 ACE, or 2024 CPS exceeds the composite forecast emissions of the 50 percent reduction scenario.

Whether viewed in terms of the complete elimination scenario or the 50 percent reduction scenario, these projections lead the EPA to propose that power plant GHG regulations predicated on CAA section 111(b)(1)(A) have no material impact (*i.e.,* beyond a *de minimis* level) on key indicators of public health and welfare effects stemming from global climate change concerns. This, in turn, leads us to propose that the futility of GHG emission standards under CAA section 111 further supports that global climate change concerns are not encompassed within the scope of what Congress authorized and required the EPA to address. Under any reasonable understanding, the predicted impacts of even the unrealistic scenario of eliminating all U.S. $CO_2$ emissions from power plants on GMST and GSLR are *de minimis.* The predicted impacts by 2100 (0.035 °C as shown in Table 5) are below the range of measurability for GMST.[217] Additionally, GMST variability from 2016–2025 was 0.14 °C, which is almost four times greater than the GMST change estimated in 2100 from eliminating all U.S. power plant GHG emissions.[218]

The 50 percent reduction scenario, which reflects a more reasonable approximation of the power plant GHG emission reduction potentials achievable through the application of CAA section 111, clearly demonstrates *de minimis* impacts. The impact of reducing U.S. power plant $CO_2$ emissions by 50 percent is that the sector would contribute approximately one percent of the model-projected increase in GMST between the baseline year (2026) and 2050 and 2100 (Table 5).[219] For GSLR, the impact of 50 percent of U.S. power plant $CO_2$ emissions is less than one percent of the modeled increase between 2026 and 2050 and only one percent of the change between 2026 and 2100. As discussed in section V.C.1 of this preamble, Congress does not include *de minimis* concerns in general statutory language, and agencies need not address *de minimis* concerns where doing so would not yield value under the statutory scheme.[220] The general instruction in CAA section 111(b)(1)(A) to ''list categories of stationary sources'' where each category must ''cause[ ], or contribute[ ] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare'' does not override this background principle, and regulatory agencies and courts have viewed impacts of one percent as *de minimis* and therefore not encompassed within general statutory language.[221]

*Relevance to the best reading of CAA section 111(b)(1)(A).* In proposing this futility finding, we recognize that CAA section 111(b)(1)(A) authorizes preventative regulation that need not fully ameliorate the identified harms. But in discussing the statute's preventative nature, the EPA and reviewing courts have consistently understood that regulation must be capable of having *at least a material impact* on the identified danger.[222] The background legal principles discussed at the start of this section support this reading of the statutory standard.

The proposed futility determination in this supplemental notice is different in kind from the policy arguments previously addressed in *Massachusetts* and *Coalition,* which focused on the cost-benefit balance of potential regulatory responses and general concerns about the most efficient way to regulate in response to global climate change concerns. Rather, we are proposing that CAA section 111(b)(1)(A) requires that emission standards be capable of having a material impact on the identified danger for the Administrator to conclude that regulated air pollutant from a listed source category, here, GHG emissions from fossil fuel-fired power plants, ''contributes significantly'' to air pollution that may ''reasonably be anticipated'' to endanger public health and welfare.

The proposed futility determination also differs in degree from other statutory contexts where the EPA has assessed our authority under the CAA to address global climate change concerns, namely our authority under CAA section 202(a)(1). There, the Administrator may only prescribe standards when the motor vehicle air pollutant emissions ''cause or contribute'' to air pollution that meets the statutory endangerment requirement. CAA section 111(b)(1)(A) sets a higher threshold, requiring that the regulated category of sources ''causes, or contributes significantly'' to air pollution that meets the endangerment threshold. This textual difference indicates that Congress intended an even stronger linkage between the authority to regulate stationary sources under CAA section 111 and the degree of harm reduction achievable through the exercise of that authority. If standards controlling emissions from the regulated source category would not materially impact the identified danger, it cannot be said that the emissions contribute significantly to air pollution that meets the endangerment threshold. Put another way, the inability of GHG emission standards to have any material impact demonstrates that GHG emissions from fossil fuel-fired power plants do not contribute significantly to air pollution that endangers public

[217] The EPA uses the term ''measurability'' here to refer to the uncertainty in reconstructing estimates of historical global mean surface temperature. The magnitude of the modeled change in GMST in 2100 associated with eliminating all U.S. $CO_2$ emissions from power plants (Table 5) is less than the level of uncertainty in GMST estimates for the year 2020, as calculated by several global products (*e.g.,* Figure 4 in Lenssen, N. (2024) A NASA GISTEMPv4 Observational Uncertainty Ensemble, *Journal of Geophysical Research: Atmospheres,* 129, e2023JD040179. *https://doi.org/10.1029/2023JD040179*).

[218] National Centers for Environmental Information, *Climate at a Glance.* NOAAGlobalTemp. Available at *https://ncei.noaa.gov/access/monitoring/climate-at-a-glance/global/time-series/globe/land_ocean/tavg/ytd/12/1950-2025.* The EPA assumes for the purposes of this comparison that the ''variability'' in GMST is represented by the standard deviation of the global annual land and ocean average temperature anomaly data from 2016–2025 (exclusive of 2016). The magnitude of the modeled change in GMST associated with eliminating all U.S. $CO_2$ emissions from power plants (Table 5) is less than the recent year-to-year annual variability in mean GMST.

[219] For context, the Administrator relied in the Endangerment Finding on predictions that global temperature would increase from 1990 to 2100 between 1.8 to 4.0 °C. 74 FR 66519.

[220] *See, e.g., UARG,* 573 U.S. at 333; *Ala. Power,* 636 F.2d at 360–61.

[221] *See, e.g., UARG,* 573 U.S. at 333 (suggesting that an appropriate *de minimis* level of stationary source GHG emissions could be substantial in an absolute sense); *EME Homer,* 572 U.S. 489 (approving rule that did not require additional emissions reductions from States that contributed less than one percent to nonattainment in other States); In re Rail Freight Fuel Surcharge Antitrust Litig., 934 F.3d 619, 625 (D.C. Cir. 2019) (applying benchmark of five-to-six percent for the number of uninjured class members that destroy predominance in class certification context); *CareFirst of Md., Inc.* v. *First Care, P.C.,* 434 F.3d 263, 268 (4th Cir. 2006) (survey showing two percent consumer confusion de minimis in the trademark context); *Arent* v. *Shalala,* 70 F.3d 610, 617 (D.C. Cir. 1995) (accepting 10 percent de minimis threshold in FDA compliance regulation).

[222] *See, e.g., Ethyl Corp.,* 541 F.2d at 29–32 (approving standards for lead content in gasoline supported by finding that lead emissions from gasoline were a ''significant source'' of total environmental exposure ''that was particularly suited to ready reduction'').

health or welfare. That determination is relevant to how we assess the outer bounds of CAA section 111(b)(1)(A).

The EPA has already recognized that *de minimis* principles apply when considering the agency's CAA authority to address harms attributed to global climate change concerns. The EPA acknowledged in the 2009 Endangerment Finding that CAA section 202(a) incorporates *de minimis* principles, stating that the contribution of new motor vehicle and engine GHG emissions to ''air pollution'' must be more than trivial. *See* 74 FR 66506, 66509, 66542–43. But the 2009 Endangerment Finding avoided consideration of this limitation by severing its endangerment and contribution analyses. We asserted then that requiring the Agency to show that control measures ''would prevent at least a substantial part of the danger'' would ''be an unworkable interpretation, calling for EPA to project out the result of perhaps not one, but even several, future rulemakings stretching over perhaps a decade or decades.'' 74 FR 66507–08. We further asserted that effectiveness would turn not only on CAA section 202(a)(1) regulations, but also on ''the larger context of the CAA and perhaps even the global context'' based on our belief that all sources must ''do their part'' to avoid a collective action problem. 74 FR 66508. In this way, we deferred to future agency action any consideration whether regulation would have more than a *de minimis* impact. Until recently, the EPA never meaningfully returned to this question. For example, in multiple rounds of CAA section 202(a)(1) GHG emission standard rulemakings predicated on the 2009 Endangerment Finding, we focused on estimates of GHG emission reductions and, in regulatory impact analyses not relied upon to justify the standards, attempts to monetize such reductions using social cost of carbon (SCC) methodology.[223] That was not consistent with the best reading of the statute, which provides that the proper focus is not on the emissions themselves, but on the possible dangers to public health or welfare. When the Agency returned to the futility question in the Endangerment Finding Rescission, the EPA found that even the total elimination of light-duty, medium-duty, and heavy-duty vehicle GHG emissions, and certainly any emission reductions likely to be achieved through regulation, would have a *de minimis* impact on public health and welfare harms.[224]

The EPA has similarly failed over multiple rulemakings to consider whether regulations predicated by CAA section 111(b)(1)(A) addressing GHG emissions from fossil fuel-fired power plants have more than a *de minimis* impact on the harms attributed to global climate change concerns. The 2015 NSPS, which asserted authority to regulate $CO_2$ emissions from fossil fuel-fired power plants in the first instance, projected only ''negligible $CO_2$ emission changes'' because the agency anticipated that ''newly constructed EGUs will likely choose technologies, primarily [natural gas combined cycle], which meet the standards even in the absence of this rule.'' 80 FR 64640. The 2015 CPP, which attempted to regulate $CO_2$ emissions from existing fossil fuel-fired power plants and was promulgated simultaneously with the 2015 NSPS, included an impacts analysis focused on the rule's $CO_2$ emission reduction potential and, similar to the EPA's prior approaches in the mobile source context, applied a SCC-based methodology to monetize those reductions.[225] The EPA's next attempt, the 2019 ACE rule, estimated the $CO_2$ emission changes from an illustrative rule implementation scenario,[226] while the Agency's most recent effort to apply a framework to regulate $CO_2$ emissions from fossil fuel-fired power plants, the 2024 CPS, generally followed the 2015 CPP's analytical approach with an impacts analysis centered on anticipated $CO_2$ emission changes and then monetized by applying SCC values. *See* 91 FR 40004–06. In none of these attempts did the EPA squarely consider the degree of the regulatory impacts upon the adverse public health and welfare effects attributed to global climate change concerns that served as the basis for the EPA's regulatory authority.

Emissions standards for air pollution that impacts public health and welfare through local or regional exposure, the traditional target of CAA section 111, have markedly different impacts from regulations based on global climate change concerns. Regulations targeting air pollution that adversely impacts health or welfare through local or regional exposure provide direct local and regional health benefits commensurate with the amount of pollution reduced. For global climate change, however, harm reductions do not occur directly as result of emission reductions. There, the linkage between the emission of the air pollutant and the harms to public health and welfare depends on the intermediate diffusion of GHGs into the global atmosphere and then on additional causal chains that eventually lead to the asserted impacts. Moreover, standards addressing air pollution exhibiting adverse local or regional exposure-based impacts achieve public health and welfare benefits without relying on further action by additional sources or other countries. The impacts from GHGs based on global climate change concerns, in contrast, stem from a collective mass of emissions that is both globally diffused and predominantly emitted by sources outside of the United States, in addition to the time-horizon considerations discussed earlier in this preamble. Thus, non *de minimis* harm reductions necessarily depend on coordinated action across many, many sources. But for air pollution with local or regional exposure-based health impacts, such as criteria pollutant emissions from fossil fuel-fired power plants, regulations can have a material impact on public health and welfare regardless whether the EPA regulates the same emissions from other source categories. Importantly, the risk-reduction benefits of those standards are also *material* regardless whether other countries reduce emissions of the same pollutants.[227]

## VI. Repeal of GHG Standards of Performance for Fossil Fuel-Fired EGUs Under CAA Section 111

For the reasons stated in section V of this preamble, the EPA is proposing to repeal all GHG standards for fossil fuel-fired EGUs. This section details the scope of the proposed repeals and our understanding of the impact of the repeals.

### *A. Scope of Repeal of GHG Standards of Performance*

The proposed repeal would be limited to the regulatory provisions setting out GHG standards of performance for fossil fuel-fired EGUs found in 40 CFR part 60, subparts TTTT and TTTTa, which are the GHG standards of performance in place for this source category under CAA section 111 after issuance of the concurrent final rule. If finalized as proposed, the conclusion that the EPA lacks statutory authority to regulate power plant emissions in response to

[223] *See, e.g.,* 89 FR 29440, 29675 (Apr. 22, 2024) (2024 HD GHG Emission Standards Rule); 75 FR 25324 (May 7, 2010) (Tailpipe Rule).

[224] 91 FR 7728.

[225] *See* 80 FR 64920–30.

[226] *See* 84 FR 32561.

[227] To note, the EPA acknowledges that criteria air pollution may originate, in part, from other countries and that the CAA allows for discounting those emissions when determining compliance with the NAAQS and authorizes the EPA to take certain steps under certain conditions.

global climate change concerns would also require rescinding the findings and determinations in the 2015 NSPS and 2024 CPS, along with the remaining standards in the 2024 CPS. The decision to create a source category for fossil fuel-fired EGUs for the purpose of regulating GHG emissions would no longer be operative, and any endangerment and significant contribution findings applicable to fossil fuel-fired EGUs, whether based on the 2009 Endangerment Finding or additional information, would similarly be rescinded.

The 2015 NSPS includes standards of performance for GHG emissions from steam generating units and integrated gasification combined cycle (IGCC) facilities that commence construction after January 8, 2014, commence reconstruction after June 18, 2014, or commence modification after January 8, 2014, but on or before May 23, 2023. 80 FR 64510. It also includes standards of performance for GHG emissions from stationary combustion turbines that commence construction after January 8, 2014, but on or before May 23, 2023, or commence reconstruction after June 18, 2014, but on or before May 23, 2023. These regulations are contained within 40 CFR part 60, subpart TTTT, and are currently in effect.

The 2015 CPP established emission guidelines and required the submission of State plans to implement and enforce regulatory requirements, including those based on a BSER of generation shifting. 80 FR 64662. Such plans would have established standards of performance for GHG emissions from steam generating units, IGCC units, and stationary combustion turbines that commenced construction on or before January 8, 2014 (*i.e.,* existing fossil fuel-fired power plants). The 2015 CPP was codified at 40 CFR part 60, subpart UUUU. The 2015 CPP was never implemented because the Supreme Court stayed the action in 2016. The EPA later repealed the 2015 CPP (*i.e.,* the entirety of 40 CFR part 60, subpart UUUU) in the 2019 ACE Rule, and the Supreme Court subsequently held in *West Virginia* that the 2015 CPP exceeded the Agency's authority. As a result, none of the 2015 CPP's regulatory provisions are in effect and all have been removed from the CFR.[228]

The 2019 ACE Rule, finalized in 2019, established emission guidelines and required the submission of State plans to implement and enforce regulatory requirements based on a different BSER from that in the 2015 CPP. 84 FR 32520. Under this rule, codified at 40 CFR part 60, subpart UUUUa, States were required to establish standards of performance for coal-fired steam generating units that commenced construction on or before January 8, 2014. The EPA repealed this aspect of the 2019 ACE Rule when it promulgated the 2024 CPS. 89 FR 39798.

The 2024 CPS—the EPA's most recent regulatory action in this context—revised standards of performance for new and reconstructed fossil fuel-fired stationary combustion turbines that commence construction after May 23, 2023, and also revised the standards of performance applicable to coal-fired steam generating units and IGCC facilities that commence modification after May 23, 2023. These revised standards of performance are codified at 40 CFR part 60, subpart TTTTa. The 2024 CPS also included emission guidelines and required the submission of State plans to implement and enforce regulatory requirements based on BSERs of 90 percent CCS, 40 percent natural gas co-firing, or certain practices, as applicable. The emission guidelines applied to fossil fuel-fired steam generating units that were in operation or had commenced construction on or before January 8, 2014, and coal-fired steam generating units that commenced a modification on or before May 23, 2023. The regulations addressing State plans for existing sources were codified at 40 CFR part 60, subpart UUUUb.

In the final rule issued concurrently with this proposal, the EPA is repealing certain portions of the 2024 CPS pursuant to a record-based reconsideration of its BSER determinations. Specifically, the Agency is repealing emission guidelines for existing fossil fuel-fired steam generating units (the entirety of 40 CFR part 60, subpart UUUUb), the standards of performance for coal-fired steam generating units undertaking a large modification (contained within 40 CFR part 60, subpart TTTTa), and the standards of performance for base load combustion turbines that apply beginning January 2032 (contained within 40 CFR part 60, subpart TTTTa).[229] As noted previously, the Agency is not reopening or seeking further comment on this action, which finalizes the alternative proposal in the June 2025 NPRM and includes responses to all significant comments received on the alternative proposal. Rather, we summarize the final rule here to explain the scope of the repeal that would result from finalizing the proposed approach in this supplemental proposal. We note that the scope of such repeal would be identical to that which would result from finalizing the primary proposal in the June 2025 NPRM.

In summary, the existing requirements related to GHG emissions from fossil fuel-fired power plants under CAA section 111—accounting for the final rule issued concurrently with this supplemental proposal—are: (1) standards of performance for new, reconstructed, and modified steam generating units and IGCC facilities under 40 CFR part 60, subpart TTTT; (2) standards of performance for new and reconstructed stationary combustion turbines under 40 CFR part 60, subpart TTTT; and (3) standards of performance for new and reconstructed stationary combustion turbines under 40 CFR part 60, subpart TTTTa. The EPA is proposing to repeal the remaining regulations in 40 CFR part 60 subparts TTTT and TTTTa on the basis that we lack the authority for these regulations under CAA section 111.

*B. Impacts of Repeal of GHG Standards of Performance*

The proposed repeal would increase flexibility for regulated entities currently subject to existing requirements in the 2015 NSPS and/or 2024 CPS. Sources constructed, modified, or reconstructed after May 23, 2023, would no longer be subject to the requirements of the 2024 CPS, and sources constructed, modified, or reconstructed between January 8 or June 18, 2014, as applicable, and May 23, 2023, would no longer be subject to the requirements of the 2015 NSPS.

These proposed repeals would increase flexibility for power plants constructed, modified, or reconstructed between 2014 and 2023, and for regulated parties seeking to construct, modify, or reconstruct power plants since 2023 and going forward. Regulated parties would no longer be constrained by standards of performance for GHG emissions pursuant to CAA section 111. At the same time, regulated parties would not be required, as a consequence of the proposed repeals, to alter existing plans, designs, technologies, or investments. Thus, we would not anticipate material compliance difficulties on the part of regulated parties in response to the proposed rescissions and repeals.

If finalized as proposed, the repeals would not disrupt prior NSPS or emission guidelines for the emission of

[228] As noted previously, were the 2015 CPP not already repealed, finalizing the conclusion that the EPA lacks statutory authority to regulate power plant GHG emissions in response to global climate change would require treating the 2015 CPP in the same manner as the 2015 NSPS and 2024 CPS.

[229] All other standards of performance for combustion turbines in 40 CFR part 60, subpart TTTTa remain in effect.

air pollutants by power plants. For example, standards for PM, $NO_X$, and $SO_2$ are outside the scope of this rulemaking and would not be impacted by the contemplated rescissions and repeals. As discussed in section III of this preamble, the EPA has been regulating such emissions with adverse impacts from local and regional exposure since the 1970s under several source categories encompassing power plants. Similarly, the proposed repeals and supporting rationales would not encompass federally enforceable requirements for the emission of air pollutants applicable to particular fossil fuel-fired EGUs. For example, limitations on criteria pollutant emissions arising from an EPA-approved SIP or EPA-issued FIP under the NAAQS program would not be impacted by the contemplated rescissions and repeals. The EPA has not attempted to regulate GHGs, individually or collectively, as criteria pollutants under the NAAQS program.

If finalized as proposed, the repeals would not impact existing regulations for source categories other than fossil fuel-fired EGUs under CAA section 111. That includes limited instances in which existing regulations address the emission of GHGs for reasons other than global climate change concerns. For example, the EPA has regulated certain solid waste landfills since 1996, including through limited regulatory provisions for methane that address, among other things, the risk of explosions in the landfill context. That also includes limited instances in which existing regulations address the emission of GHGs in response to global climate change concerns, but for distinct source categories. For example, the EPA has regulated the oil and gas source category since 2016 in a manner that in part addresses global climate change concerns by limiting methane emissions and in part addresses adverse impacts from local and regional exposure by limiting VOC emissions. Regulations for the oil and gas source category under CAA section 111 have their own regulatory history and relevant considerations. The EPA would address in a future rulemaking, as appropriate, the extent to which the proposed conclusions in this supplemental proposal and the June 2025 NPRM with respect to the Agency's statutory authority under CAA section 111 require revisions to the oil and gas regulations at 40 CFR part 60, subparts OOOOa, OOOOb and OOOOc.

If finalized as proposed, the proposed repeals also would not impact the CAA's preemptive effect with respect to the regulation of interstate emissions. The CAA would continue to displace any Federal common-law claims that might otherwise be available to those seeking to regulate GHG emissions from power plants. In CAA section 111, Congress adopted a standard for when such emissions rise to the level of regulatory concern and ''delegated to EPA the decision whether and how to regulate'' such emissions. *AEP,* 564 U.S. at 426. Similarly, the proposed repeals would not impact preemption under the CAA and other applicable constraints on State regulation of State common-law claims, statutes, or regulations that seek to regulate out-of-state GHG emissions. *See City of New York* v. *Chevron Corp.,* 993 F.3d 81, 98–100 (2d Cir. 2021); *cf. Int'l Paper Co.* v. *Ouellette,* 479 U.S. 481, 492 (1987).

Under the approach proposed in this rulemaking, the EPA would affirm its authority under CAA section 111 to list and regulate source categories that, in the Administrator's judgment, cause or contribute significantly to air pollution that may reasonably be anticipated to endanger public health or welfare. Adopting the approach proposed in this rulemaking would not disturb our authority to identify and regulate circumstances where emissions, including GHG emissions, satisfy the statutory threshold for listing and regulation. Although we grouped and labeled $CO_2$, methane, and additional gases as ''GHGs'' and ''climate forcers'' in the 2009 Endangerment Finding and 2015 NSPS and 2015 CPP, each is a gas emitted into the air with individual properties that may, under certain circumstances and like any other gas, endanger public health or welfare through local or regional exposure. Thus, for example, we would continue to regulate methane emissions from the municipal solid waste landfills source category in response to the risk of on- and off-site explosions in the landfill context. However, we would not list or regulate a source category based on global climate change concerns associated with its GHG emissions because such concerns would not satisfy the statutory standard for regulation.

The proposed repeals would effectively return stationary source regulation to the pre-2015 status quo the Supreme Court faced in *AEP.* The Court in *AEP* did not predicate its analysis on the EPA's exercise of regulatory authority or issuance of any findings predicate thereto with respect to particular emissions. Rather, the Court explained that CAA section 111 ''directs the EPA'' to list and establish standards of performance for source categories that meet the statutory threshold, that the Act ''provides multiple avenues for enforcement,'' and that ''[i]f EPA does not *set* emissions limits for a particular pollutant or source of pollution, States and private parties may petition for a rulemaking on the matter, and EPA's response will be reviewable in federal court.'' 564 U.S. at 425. Thus, the Act itself ''provides a means to seek limits on emissions of carbon dioxide from domestic powerplants.'' *Id.* The Court further explained that the CAA ''is no less an exercise of the Legislature's 'considered judgment' concerning the regulation of air pollution because it permits emissions *until* EPA acts . . . . The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from powerplants; the delegation is what displaces federal common law.'' *Id.* at 425 (quoting *Middlesex Cnty. Sewerage Auth.* v. *Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 22 n.32 (1981)). Preemption is no less applicable where, as contemplated here, the EPA does not regulate emissions that do not meet the statutory standard for imposing regulations. Congress exercised its '''considered judgment''' in setting out a standard that allows emissions until the Agency determines ''whether'' the standard is met and, if so, ''how'' they should be regulated.

With respect to State regulation, the CAA authorizes States to regulate emissions from sources within their borders.[230] However, the Act does not empower States to apply their own law to control out-of-state emissions by regulating sources outside their jurisdiction. The Act delegates the development of generally applicable standards to the EPA (*e.g.,* NSPS under CAA section 111(b) and NESHAPs under CAA section 112) and instructs States to develop and submit to the EPA for review plans for implementing and enforcing certain Federal requirements within their borders (*e.g.,* emission guidelines under CAA section 111(d) and NAAQS under CAA sections 107–110). And the Act provides specific authorities under which the EPA may require States to limit emissions from sources within their jurisdiction to address impacts of those emissions in other States (*e.g.,* interstate transport under CAA section 110(a)(2)(D)). In short, the Act ''permits states to create and force their own emission standards applicable to in-state polluters'' but does not authorize regulatory efforts against out-of-state sources. *City of New York,* 993 F.3d at 99–100. Because

[230] *See* 42 U.S.C. 7416 (confirming that States and local subdivisions may adopt and enforce limits on stationary sources that are not less stringent than an applicable Federal standard or limitation).

''disputes involving interstate air pollution'' implicate Federal interests ''that are incompatible with the application of state law,'' States cannot regulate, whether through legislation or common-law claims, emissions from out-of-state sources absent statutory authorization that the Act does not provide. *Id.* at 91–92 (discussing *Illinois* v. *City of Milwaukee,* 406 U.S. 91, 102–03 (1972)).

Note that the EPA is not expanding the scope of this rulemaking to include additional regulatory subjects by discussing the anticipated impacts of the proposed repeals and rationales on other CAA programs, additional source categories, and issues related to preemption. We are not proposing to repeal, revise, or prescribe regulations pertaining to these subjects and are not seeking comment on these subjects except as relevant to the proposed actions and rationales in this rulemaking. Rather, we discuss these subjects to clarify the scope of the proposed actions and rationales, inform public comments on the proposed actions and rationales, and solicit comment on the extent to which the additional rationales implicate reliance interests not already presented for public comment in the primary proposal to the June 2025 NPRM.

## VII. Requests for Comment

The EPA is specifically soliciting comment on key aspects of the proposed rule. To facilitate comment on those portions of the rule, the EPA has indexed each comment solicitation with a unique identifier below (*e.g.,* ''C–1'', ''C–2'') to provide a consistent framework for effective and efficient provision of comments. Accordingly, we ask that commenters include the corresponding identifier when providing comments relevant to that comment solicitation. We ask that commenters include the identifier either in a heading or within the text of each comment, to make clear which comment solicitation is being addressed. The EPA notes that the Agency is not limiting comment to these identified areas. Specifically, we are soliciting comment on the following:

- Any relevant arguments and information, including with respect to legitimate reliance interests on the 2015 NSPS and the 2024 CPS (C–1).
- The textual requirements of CAA section 111(b), relevant context from the remainder of CAA section 111, and relevant structural arguments regarding the CAA more generally, including statutory provisions not specifically discussed in this proposal (C–2).
- The alternative interpretation that removing GHG emissions from EGUs would be futile (C–3).
- Whether and how the Supreme Court's decision in *Loper Bright* should inform the EPA's approach to interpreting CAA section 111 and selecting which interpretation better reflects the best reading of the statute (C–4).
- Climate impact modeling with respect to the impact from GHGs from EGU, if any (C–5).
- Additional information on cost savings, benefits, and disbenefits, including those that have not been monetized, quantified, or qualitatively discussed. To the extent feasible, provide uncertainty analyses with any monetized or quantified information (C–6).
- Other electric utility modeling or information related to the impacts of this proposed regulatory action that may be more appropriate than the use of the Integrated Planning Model (IPM). Please provide justification for the use of a different model as well as whether it is open source (C–7).

## VIII. Statutory and E.O. Reviews

Additional information about these statutes and E.O.s can be found at *http://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### *A. E.O. 12866: Regulatory Planning and Review*

This action is a significant regulatory action that was submitted to the Office of Management and Budget (OMB) for review. Any changes made in the course of E.O. 12866 review have been documented in the docket. The EPA prepared an analysis of the potential costs and benefits associated with this action. This analysis, *Economic Impact Analysis for the Supplemental Proposed Rule, Rescission of the Greenhouse Gas Findings for Fossil Fuel-Fired Power Plants and Repeal of Regulations for Power Plant Greenhouse Gas Emissions Under Clean Air Act Section 111,* is available in the docket.

The EPA presents the estimated present value (PV) and equivalent annualized value (EAV) of the projected cost savings for the power sector of this proposed repeal for the years 2026 to 2047 in 2024 dollars, discounted to 2025. In addition, the EPA presents the results for specific snapshot years, consistent with historical practice. These snapshot years are 2030, 2035, 2040, and 2045. The benefit-cost analysis, which is in the economic impact analysis (EIA) for this rulemaking, is available in the docket. This information is provided for information purposes only and does not impact the justification for this action.

The analysis considers the power industry's compliance costs as the change in electric power generation costs due to this proposed repeal. Table 8 presents the estimates of compliance cost savings of this proposed rule for the power sector.

TABLE 8—PRESENT VALUE (PV) AND EQUIVALENT ANNUALIZED VALUE (EAV) OF THE COMPLIANCE COST SAVINGS

[Million 2024$, discounted to 2025]

| 3% Discount rate | | 7% Discount rate | |
|---|---|---|---|
| PV | EAV | PV | EAV |
| 370 | 23 | 230 | 21 |

The compliance cost savings in Table 8 are the estimated change in expenditures by the power sector due to this proposed repeal, which include changes in taxes paid and credits received. The analysis also considers the real resource cost savings due to this proposed repeal, which are the change in the total avoided cost of resources used by the power sector, which includes capital, labor, fuel, and material inputs, that would have been used for compliance.

In contrast to the compliance cost savings in Table 8, the real resource cost savings do not include transfers, such as taxes paid or tax credits, that shift who is paying for the inputs for compliance but do not reduce the social cost. These tax credits would have reduced costs from the perspective of the power sector but would have been a cost from a societal perspective and will now be avoided as a result of this proposed action. Over the 2026 to 2047 period, the PV of the estimated real resource cost savings is $270 million using a

three percent discount rate and $170 million using a seven percent discount rate discounted to 2025. Over this same timeframe, the EAV of the estimated real resource cost is $17 million using a three percent discount rate, and $15 million using a seven percent discount rate.

*B. E.O. 14192: Unleashing Prosperity Through Deregulation*

This action is expected to be an E.O. 14192 deregulatory action. Details on the estimated cost savings of this proposed rule can be found in the EPA's analysis of the potential costs and benefits associated with this action. This analysis, *Economic Impact Analysis for the Supplemental Proposed Rule, Rescission of the Greenhouse Gas Findings for Fossil Fuel-Fired Power Plants and Repeal of Regulations for Power Plant Greenhouse Gas Emissions Under Clean Air Act Section 111,* is available in the docket.

*C. Paperwork Reduction Act (PRA)*

The information collection activities in this proposed action have been submitted for approval to the Office of Management and Budget (OMB) under the PRA. The EPA proposes to amend the information collection requests for 40 CFR part 60, subparts TTTT and TTTTa. Details on the amendments for these subparts are described below.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations in 40 CFR are listed in 40 CFR part 9.

Submit your comments on the Agency's need for this information, the accuracy of the provided burden estimates and any suggested methods for minimizing respondent burden to the EPA using the docket identified at the beginning of this rule. The EPA will respond to any ICR-related comments in the final rule. You may also send your ICR-related comments to OMB's Office of Information and Regulatory Affairs using the interface at *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting ''Currently under Review—Open for Public Comments'' or by using the search function. OMB must receive comments no later than October 19, 2026.

1. 40 CFR part 60, subpart TTTT

The Information Collection Request (ICR) document that the EPA prepared has been assigned EPA ICR number 2465.06. You can find a copy of the ICR in the docket for this rule, and it is briefly summarized here.

*Respondents/affected entities:* Owners and operators of fossil fuel-fired EGUs.

*Respondent's obligation to respond:* No longer mandatory.

*Estimated number of respondents:* 92.

*Frequency of response:* No response required.

*Total estimated burden:* 3,130 hours (per year). Burden is defined at 5 CFR 1320.3(b).

*Total estimated cost:* $376,000 (per year), includes $0 annualized capital or operation & maintenance costs.

2. 40 CFR part 60, subpart TTTTa

The ICR document that the EPA prepared has been assigned EPA ICR number 2771.04. You can find a copy of the ICR in the docket for this rule, and it is briefly summarized here.

*Respondents/affected entities:* Owners and operators of fossil fuel-fired EGUs.

*Respondent's obligation to respond:* No longer mandatory.

*Estimated number of respondents:* 2.

*Frequency of response:* No response required.

*Total estimated burden reduction:* 110 hours (per year). Burden is defined at 5 CFR 1320.3(b).

*Total estimated cost savings:* $12,000 (per year), includes $0 annualized capital or operation & maintenance costs.

*D. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. The Agency is certifying that this proposed rule will not have a significant economic impact on a substantial number of small entities because this action relieves regulatory burden on the small entities subject to the rule. As outlined in section 2.3.4 of the EIA for this rulemaking, the EPA identified 25 potentially affected small entities that own combustion turbine units considered in the analysis. Under the repeal, the EPA projected compliance cost savings of $6.8 million for these small entities in 2035 (this is the year with the highest projected cost savings). There are no years that are estimated to have costs on small entities for this proposed action. The EPA expects that this deregulatory action will relieve the regulatory burden for facilities that, absent this repeal, would be affected by the provisions from the 2015 NSPS and the 2024 CPS. This action will not have a significant economic impact on a substantial number of small entities under the RFA. We have therefore concluded that this action will relieve regulatory burden for all directly regulated small entities.

*E. Unfunded Mandates Reform Act (UMRA)*

This action does not contain an unfunded mandate of $100 million (adjusted annually for inflation) or more (in 1995 dollars) as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any State, local, or tribal governments or the private sector.

*F. E.O. 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.

*G. E.O. 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have Tribal implications as specified in E.O. 13175. It will not have substantial direct effects on Tribal governments, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes, as specified in E.O. 13175. Thus, E.O. 13175 does not apply to this action.

*H. E.O. 13045: Protection of Children From Environmental Health Risks and Safety Risks*

E.O. 13045 directs Federal agencies to include an evaluation of the health and safety effects of the planned regulation on children in Federal health and safety standards and explain why the regulation is preferable to potentially effective and reasonably feasible alternatives. This action is not subject to E.O. 13045 because it is not a significant regulatory action under section 3(f)(1) of E.O. 12866, and because the EPA does not believe the environmental health or safety risks addressed by this action present a disproportionate risk to children. However, the EPA's Policy on Children's Health applies to this action.[231]

This proposed action does not affect the level of public health and environmental projection already being provided by existing NAAQS and other

[231] U.S. Environmental Protection Agency. (2021). 2021 Policy on Children's Health: *https://www.epa.gov/system/files/documents/2021-10/2021-policy-on-childrens-health.pdf.*

mechanisms in the CAA. This proposed action does not affect applicable local, State, or Federal permitting or air quality management programs that will continue to address areas with degraded air quality and maintain the air quality in areas meeting current standards. Areas that need to reduce criteria air pollution to meet the NAAQS will still need to rely on control strategies to reduce emissions.

*I. E.O. 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not a ''significant energy action'' because it is not likely to have a significant adverse effect on the supply, distribution or use of energy over the analysis period (2026–2047) based on the results presented in the EIA accompanying this rulemaking.

*J. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51*

This proposed rulemaking does not involve technical standards; however, the proposed removal of 40 CFR part 60, subparts TTTT and TTTTa involve removing the corresponding measurement and compliance procedures, some of which also involve removing existing references to voluntary consensus standards and other technical standards. This proposed action does not include any new requirements or new references to technical standards.

**Lee Zeldin,**

*Administrator.*

[FR Doc. 2026–19072 Filed 9–16–26; 8:45 am]

**BILLING CODE 6560–50–P**